# KRAMER LEVIN NAFTALIS & FRANKEL LLP

JEFFREY L. BRAUN
PARTNER
PHONE 212-715-7830
FAX 212-715-8285
JBRAUN@KRAMERLEVIN.COM

July 8, 2013

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: July 15, 2013

**BY E-MAIL**

The Honorable Paul A. Crotty
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

Re:  *Residents for Sane Trash Solutions v. U.S. Army Corps of Eng'rs*, 12 Civ. 8456 (PAC)
     *Kellner v. U.S. Army Corps of Eng'rs*, 12 Civ. 8458 (PAC)

Dear Judge Crotty:

        We write on behalf of the plaintiffs in both actions.  On May 29, we received from the City·a DSNY memorandum, with attachments, presenting the result of DSNY's post-Sandy review of flood risks at the proposed East 91st Street transfer station.  On June 17, we received the Army Corps' administrative record, including its acquiescence in the result of DSNY's post-Sandy review.  In anticipation of the July 10 conference with Your Honor, this letter outlines the discovery that plaintiffs ask this Court to allow.

        Although judicial review under the APA generally is limited to the agency's record, the courts allow discovery in a number of circumstances, including cases where (1) a NEPA claim requires the court to look outside the record to determine whether significant environmental effects were overlooked, (2) the agency's inadequate explanation of its actions frustrates judicial review, (3) new evidence undermines the soundness of the agency's decisions, or (4) there is evidence that the administrative record is incomplete.  *See, e.g., Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14-15 (2d Cir. 1997); *Dopico v. Goldschmidt*, 687 F.2d 644, 654 (2d Cir. 1982); *County of Suffolk v. Sec'y of the Interior*, 562 F.2d 1368, 1384 (2d Cir. 1977); *Preservation Coalition v. Federal Tr. Admin.*, 129 F.Supp.2d 538 (W.D.N.Y. 2000); *Pension Benefit Guaranty Corp. v. LTV Steel Corp.*, 119 F.R.D. 339 (S.D.N.Y. 1988); *see also United States v. Akzo Coatings, Inc.*, 949 F.2d 1409, 1429 (6th Cir. 1991); *Water Supply & Storage Co. v. U.S. Dep't of Agriculture*, 2012 WL 6761907 (D. Colo. Nov. 15, 2012).  These exceptions apply to the APA and NEPA claims in this case.  Our amended complaint also asserts claims that are not raised under the APA and thus are not subject to its restraints on discovery.

        1.    **Flooding.**  This case is highly unusual if for no other reason than that a major post-determination event – *i.e.*, Hurricane Sandy – undermines the agencies' determinations.  Our amended complaint's tenth, eleventh and twelfth claims for relief demand that the Corps or DSNY (as the case may be) reevaluate the East 91st Street MTS in light of

KRAMER LEVIN NAFTALIS & FRANKEL LLP

The Honorable Paul A. Crotty
July 8, 2013
Page 2

Sandy and FEMA's post-determination flood maps.  The Corps' record of post-Sandy flood consideration consists of 16 pages (USACE Record 11418-29, 11433-36) comprised of a March 21, 2013 memorandum that concludes, based on the original application materials dating back to 2008, that there is no reason to reevaluate the § 404 permit, and a May 21, 2013 memorandum that supersedes the earlier one and expresses the same conclusion based on a March 21 letter of Deputy Mayor Holloway.  The City's post-Sandy conclusions, foretold in the Holloway letter, are officially set forth in its May 29 memorandum, with attachments.

   The post-determination FEMA maps show that the proposed MTS's pier level would be more than five feet <u>below</u> FEMA's new design flood elevation.  However, the City asserts that it cannot raise the MTS's pier level due to site and permitting constraints, and it refuses to consider abandonment of this proposed MTS.  Instead, the City has devised Band-Aid fixes limited to minor flood-resistant design changes and a vague 48-hour pre-event protocol for battening down and vacating the MTS.  But even these design changes admittedly leave the facility exposed to an unexplained "moderate" risk of flooding that could shut the facility down for weeks.  Plaintiffs therefore seek discovery concerning this subject, including (a) the scope and content of the City's post-Sandy review, (b) the meaning of the "moderate" risk of flooding to which the MTS would be exposed, (c) the feasibility of the 48-hour pre-event protocol that the City has sketched out, (d) the consideration (if any) given to abandonment of this MTS or raising the pier height, (e) communications within the City, and between the City and the Corps, about these matters, and (f) the degree of consideration actually given by the Corps to these issues.

   2. **Alternatives and equal protection.**  The City's stubborn insistence, despite the flooding risks, on building an MTS at this site, in the midst of a dense residential neighborhood, leads to the question of why the City is so wedded to this site.  Our complaint's sixth and seventh claims, asserted under the equal protection clauses of the federal and state constitutions, allege that the City is intentionally discriminating against plaintiffs by selecting this site even though the City's own regulations prohibit a privately-owned transfer station at the site, and the City would not build one in any other comparable residential location; this MTS is a wasteful sop to outer-borough constituencies.  Just two weeks ago, the U.S. Supreme Court wrote that equal protection "must at the very least mean that a bare … desire to harm a politically unpopular group cannot justify disparate treatment of that group," and that in determining whether governmental action "is motivated by an improper animus or purpose, discriminations of an unusual character especially require careful consideration."  *United States v. Windsor*, 2013 WL 3196928, *15 (U.S. June 26, 2013) (citations and quotation marks omitted).

   Plaintiffs' equal protection claims are not subject to the APA and the case law limiting discovery in APA cases.  Plaintiffs should be allowed to have discovery about the selection of this site and the City's subsequent insistence on adhering to it, including (a) how and why this site was selected at the same time that the City adopted regulations prohibiting transfer stations in proximity to parks and residences, (b) communications within City government about site selection, (c) communications between City officials and third parties, including advocates of so-called "environmental justice," about site selection, (d) evaluations and re-evaluations of

KRAMER LEVIN NAFTALIS & FRANKEL LLP

The Honorable Paul A. Crotty
July 8, 2013
Page 3

the relative economic and environmental costs and benefits of building this MTS in comparison with other alternatives, including continuation of a truck-based disposal system for Manhattan's residential waste, and (e) post-Sandy evaluation of this site.

       **3.**    **Completeness of the record.** The Corps' administrative record appears to us to be incomplete. Even in non-NEPA cases under the APA, courts allow discovery and/or supplementation where there is an incomplete record. Here, while the 11,469-page record spans four years, there are virtually no notes of meetings or telephone conversations with the City or other federal agencies, and very few internal memoranda. In addition, there are indications in the record that the Corps was interested in the operational impacts of the MTS (*e.g.*, questions about the number of trucks that would access the MTS and the MTS's effect on truck traffic [USACE Record 01012, 02265, 04333]), and the Corps' final Memorandum of Record supporting its issuance of permits selectively cites operational matters in those instances where its statements about those matters support issuance of the permits. However, the Corps' memorandum also asserts, in conclusory fashion, that the scope of the Corps' review under NEPA was limited to construction and in-water impacts, and the record contains no explanation of these inconsistencies in the Corps' position on the scope of its NEPA review. Our complaint's fifth claim asserts that the Corps' NEPA review was improperly constricted in its scope. Plaintiffs therefore seek discovery not only as to the completeness of the record, but also concerning the Corps' inquiries about operational impacts, any responses thereto, and how a determination ultimately was made to take the position that the scope of the Corps' NEPA review was limited.

       **4.**    **Asphalt Green.** Our complaint's eighth and ninth claims are asserted solely on behalf of Asphalt Green, Inc., a non-profit organization that operates a widely used recreational complex pursuant to a contract with the City on land owned by the Department of Parks and Recreation in immediate proximity to the proposed MTS site. The Asphalt Green campus is bifurcated by a ramp that provides the only vehicle access to the MTS site. The complaint asserts that the ramp cannot be demolished, and a new one cannot be built, without occupation by the City and its contractors of land immediately adjacent to the ramp, in violation of Asphalt Green's contract with the City. Although the City denies this assertion, plaintiffs should be allowed to obtain discovery from the City as to how it expects to be able to perform this work without violating Asphalt Green's contract rights or endangering the health and safety of the thousands of people (especially children) who use Asphalt Green.

       We look forward to the opportunity to discuss these matters with the Court at the July 10 conference, and to brief them further if the Court believes that it would be useful.

                        Respectfully submitted,

                        Jeffrey L. Braun

JLB: tim
cc: All Counsel