

MICHAEL A. CARDOZO
*Corporation Counsel*

THE CITY OF NEW YORK
# LAW DEPARTMENT
100 CHURCH STREET
NEW YORK, NY 10007

CARRIE NOTEBOOM
Phone: 212-356-2319
Fax: 212-356-1148
E-mail: cnoteboo@law.nyc.gov

October 7, 2013

**VIA ECF**
The Honorable Paul A. Crotty
U.S. District Court, Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312
CrottyNYSDChambers@nysd.uscourts.gov, Marlon_Ovalles@nysd.uscourts.gov

Re:  *Residents for Sane Trash Solutions v. U.S. Army Corps of Engineers*, 12-cv-8456 (PAC), and *Kellner v. U.S. Army Corps of Engineers*, 12-cv-8458 (PAC)

Dear Judge Crotty:

I write in response to Plaintiffs' letter dated October 7, 2013, which requests an emergency conference at which they would seek an order staying the City of New York from proceeding with certain construction activities for the East 91st Street Marine Transfer Station. Plaintiffs' request for a stay should be denied.

Plaintiffs point to issues related to the pier's location in the advisory 100-year flood plain as one of the bases of their request for a stay of construction. As the City will explain in detail in its motion for summary judgment, Plaintiffs' claim that the potential flooding risks associated with the facility require additional environmental review is without merit.[1] Both DSNY and the Corps considered potential environmental impacts related to flooding, both as

---

[1] Plaintiffs also point to the emergence of the MTS as an issue in the mayoral campaign as supposedly underscoring the meritoriousness of their claims, but this political argument has nothing to do with the legal merits of Plaintiffs' assertions, and should be disregarded by the Court. In addition, the current government shutdown is not an appropriate basis for a stay, as the parties always contemplated that briefing on the parties' summary judgment motions would not be completed until at least December. *See* So-Ordered Briefing Schedule dated July 15, 2013.

part of the original environmental review and following Hurricane Sandy and FEMA's issuance of revised flood maps. *See, e.g.*, Administrative Record at USACE 161-62 (July 2012 Environmental Assessment addressing flood hazard issues); USACE 11418-29 (June 2013 Memorandum addressing post-Sandy information); DSNY 2013 Technical Memorandum.[2] First, the facility was designed from the start to ensure that floodwaters would not encroach on solid waste being processed at the facility, in accordance with New York State solid waste management facility regulations, as the lowest level where loose waste will be present is the loading level, located approximately 16 feet above the 100-year flood plain shown on the 2007 FEMA flood insurance maps. DSNY 2013 Technical Memorandum at 2. Following Sandy, DSNY reviewed available information regarding the potential flood risks for the facility, including the revised FEMA maps, and adopted design modifications that will provide perimeter flood proofing measures to protect all critical equipment within the building, and additional dry flood proofing for rooms with critical equipment. *See* DSNY 2013 Technical Memorandum at 3-4. DSNY's Technical Memorandum also describes the operational measures it will employ to further secure the MTS in the event that storm surge or flooding is predicted. A description of these design and operational measures was provided to the Corps, which reviewed them and concluded that, should flooding occur, garbage will not be released into public waters and the neighboring community. USACE 11419-11420. This review satisfied both agencies' obligation to take a "hard look" at new information relevant to potential environmental impacts, and the Court must defer to the agencies' reasoned conclusions on these matters. *See Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 372-76 (1989); *Matter of Riverkeeper, Inc. v. Planning Bd. of Town of Southeast*, 9 NY3d 219, 231-232 (2007).

In addition, Plaintiffs' cannot establish the irreparable harm necessary to justify staying construction of the pier structure, which "is the single most important prerequisite for the issuance of a preliminary injunction." *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d. Cir. 1990) (internal quotations and citations omitted). Because the City has already studied the exact information they raise in their Amended Complaints, and included additional flood proofing measures in the facility's design, Plaintiffs' purported concerns have already been addressed. That they were addressed in supplemental memoranda issued by the relevant agencies, instead of through a formal Supplemental Environmental Impact Statement, is not irreparable harm that would justify halting construction on the MTS. *See State of New York v. Nuclear Regulatory Comm'n*, 550 F.2d 745, 753-54 (2d Cir. 1977).

Next, Plaintiffs' lengthy delay in seeking a stay from this Court militates against granting them a stay at this stage. As is demonstrated by the correspondence annexed to Plaintiffs' letter to the Court, they have been aware that construction of the MTS has been proceeding for nearly a year, and yet failed to move for preliminary relief until the project was already significantly far along in construction. Plaintiffs, who are neighborhood residents, knew or should have known that work, including in-water work, was proceeding, and yet they waited

---

[2] A courtesy copy of this Technical Memorandum was provided to the Court on May 31, 2013. It is also available at http://www.nyc.gov/html/dsny/downloads/pdf/swmp/swmp/review_flood_e91_swbkmts.pdf.

to seek injunctive relief until nearly a full year after construction-related activity commenced. Moreover, the City has been forthcoming with information about the project's schedule when asked, and provided information on the construction's phasing plan to Mr. Braun on January 31, 2013, which indicated that completion of the foundations and pier platform were planned for Phase 1 of project, scheduled to be completed in March 2014. (*See* Exhibit 1 hereto.)

Finally, a stay at this stage of construction would result in significant prejudice to the City, both from monetary losses for each day construction is halted and from delays to the completion of this critical piece of municipal infrastructure, which has been years in the planning. *See Allens Creek / Corbetts Glen Preserv. Group, Inc. v. Caldera*, 88 F.Supp.2d 77, 84-85 (W.D.N.Y. 2000), *aff'd* 242 F.3d 364 (2001). To date, the City has expended over $7 million on construction of the MTS, and close to $2 million in design fees. In addition, we expect that an additional $10 million has already been incurred based on requisitions expected and received from the contractor, the design consultant, and the construction manager. Had the Plaintiffs sought to stay the project at an earlier date, the City could have chosen to spend this money elsewhere. Now that the contractor has mobilized its construction staff and equipment at the job site, the Department of Design and Construction, which is managing the project on behalf of DSNY, estimates that a stay would result in delay costs of approximately $500,000 per month through the end of Phase 1. Pursuant to Federal Rules, this Court may issue a preliminary injunction "only if the movant gives security in an amount that the Court considers proper to pay costs and damages sustained by any party found to be wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Where a party to be enjoined risks monetary loss the Court must require plaintiffs to post a bond. *Hoxwokth v. Blinder Robinson & Co.*, 903 F.2d. 186 (3rd Cir. 1990). Here, the City faces risk of high monetary losses for each day construction on the MTS is halted, and if the Court were to order a stay, it must be accompanied by an appropriate security.

If so directed by the Court, the City is prepared to file its papers in support of its motions for summary judgment and judgment on the pleadings on October 11, 2013 (the current due date for opening papers under the most recent briefing schedule, so-ordered on September 26, 2013). These papers explain in detail why the Plaintiffs' claim that additional environmental review is required to address the potential flooding impacts from the facility must be denied. While these papers will assist the Court in determining the likelihood of success on the merits of Plaintiffs' environmental review claims, the City respectfully requests the opportunity to supplement its papers with additional information regarding the issues of irreparable harm, costs of delay and prejudice to the City that would result from a stay, issues that are not addressed in the City's motion papers.

Respectfully yours,

*/s/ Carrie Noteboom*

Carrie Noteboom
Assistant Corporation Counsel

cc: All counsel (via ECF and email)

# EXHIBIT 1



MICHAEL A. CARDOZO
*Corporation Counsel*

THE CITY OF NEW YORK
**LAW DEPARTMENT**
100 CHURCH STREET
NEW YORK, NY 10007

Carrie Noteboom
phone: 212-788-0771
fax: 212-788-1619
email: cnoteboo@law.nyc.gov

January 31, 2013

By E-mail and Hand Delivery

Jeffrey L. Braun
Kramer Levin Naftalis & Frankel LLP
Counsel for Plaintiffs Micah Z. Kellner, et al.
1177 Avenue of the Americas
New York, NY 10036
jbraun@kramerlevin.com

Re:  Kellner v. U.S. Army Corps of Engineers, *et al.*, 12-cv-8458 (PAC)

Dear Jeff,

I am in receipt of your letters dated December 31, 2012, and January 23, 2013, which seek, on behalf of Asphalt Green, additional information about site protection and construction means and methods in relation to the construction of the East 91st Street marine transfer station ("MTS") at the access ramp and Asphalt Green's facilities.

As noted in my letter of December 20, 2012, the demolition and reconstruction of the ramp is expected to be part of Phase II of the project, which is scheduled to begin in approximately March 2014.  Since that letter was written, Skanska has confirmed that ramp reconstruction will be in Phase II.  Because Skanska is now focusing on the Phase I work, and has not developed detailed plans for Phase II, it is premature to provide the concrete details Asphalt Green seeks at this time.  We expect to be able to provide an update in approximately six months.  Enclosed please find a summary of the construction milestones and their currently expected durations.

However, we understand Asphalt Green's desire to be kept up to date on any elements of the project that may affect, or be perceived by members of the community as affecting, Asphalt

Green's operations. As I'm sure you are aware, the City went to great lengths to design the construction of the MTS facility to avoid utilizing the Asphalt Green campus and disrupting its operations during construction of both the MTS and the access ramp. The City's expected approach to the ramp work was set forth in materials submitted to the court in support of the City's motion for summary judgment in *New York State Assemblyman Adam Clayton Powell IV v. City of New York*, New York County Index No. 108220/2006, and is also reflected in the bid documents associated with the project. For your convenience, I enclose a copy of a draft report dated March 2007, entitled "East 91st Street MTS Ramp Demolition and Construction Sequencing," which was submitted in the *Powell* litigation. I can also provide a copy of the construction bid documents upon request. Please note, however, that these plans will be further developed and refined as Skanska prepares for Phase II of the project.

I hope this information is helpful in addressing Asphalt Green's concerns. Going forward, DDC can provide quarterly updates on the planned construction schedule to keep Asphalt Green apprised of the project's progress. In addition, please be aware that Skanska will require access to the Asphalt Green campus and the Parks Department property in the next four-to-six weeks to place monitoring equipment and establish baseline conditions prior to the start of substantive construction work. Such access will allow Skanska to place equipment to conduct condition monitoring to determine the existing structure and property conditions; vibration monitoring to establish the level of vibration during periods of demotion and construction operations using seismograph instrumentation; and positioning and crack monitoring to maintain and develop a baseline for initial crack widths. DDC also expects Skanska to take photographs of the interior and exterior of the pool building to assist in establishing baseline conditions.

Please do not hesitate to contact me with any additional questions.

                                                                                         Yours truly,

                                                                                         Carrie Noteboom

Encl.

Cc (w/o encl.):   Alessandro Olivieri, New York City Department of Parks and Recreation

# E91st Street Marine Transfer Station – Construction Milestones

**Milestone 1 – 455 CCD**



**Milestone 3 – 335 CCD**



**Milestone 2 – 395 CCD**



|  | Dur (ccd) | Year 1 | Year 2 | Year 3 | Year 4 |
|---|---|---|---|---|---|
| **Milestone 1:** Demolition of Existing MTS and completion of foundations and pier Platform | 455 | ▬▬▬ | | | |
| **Milestone 2:** Demolition of Bridge ramp and construction of new bridge ramp, enclosure of superstructure including walls, roof and walkways. | 395 | | ▬▬▬ | | |
| **Milestone 3:** Substantial completion of all contract work (Ready for DSNY Occupancy) | 335 | | | ▬▬▬ | |