UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

NEW YORK STATE ASSEMBLY MEMBER MICAH Z.
KELLNER, et al.,

                                                Plaintiffs,

                    -against-

UNITED STATES ARMY CORPS OF ENGINEERS,
PAUL E. OWEN, Colonel, as Commander of the United
States Army Corps of Engineers, New York District, CITY
OF NEW YORK, NEW YORK CITY DEPARTMENT OF
SANITATION and NEW YORK CITY DEPARTMENT
OF DESIGN AND CONSTRUCTION

                                                Defendants.

------------------------------------------------------------------------ x

**CITY DEFENDANTS'
LOCAL CIVIL RULE 56.1
STATEMENT OF
UNDISPUTED FACTS IN
SUPPORT OF THEIR
MOTION FOR SUMMARY
JUDGEMENT**

12 CV 8458 (PAC)

RESIDENTS FOR SANE TRASH SOLUTIONS, INC., et
al.,

                                                Plaintiffs,

                    -against-

UNITED STATES ARMY CORPS OF ENGINEERS,
THE CITY OF NEW YORK DEPARTMENT OF
SANITATION, THE CITY OF NEW YORK
DEPARTMENT OF DESIGN AND CONSTRUCTION
AND THE CITY OF NEW YORK,

                                                Defendants.

------------------------------------------------------------------------ x

12 CV 8456 (PAC)

                   Pursuant to Rule 56.1(a) of the Local Civil Rules of this Court, Defendants the

City of New York, the New York City Department of Sanitation ("DSNY"), and the New York

City Department of Design and Construction ("DDC") (collectively, "the City"), submit the

following statement of material facts to which there is no genuine issue to be tried.  These facts

are drawn from the Certified Administrative Record served on all parties by Defendant United

States Army Corps of Engineers on or about June 11, 2013, the supplement to the Administrative

Record provided by the Corps on or about September 27, 2013, and additional publicly available

documents annexed to the Declaration of Carrie Noteboom dated October 23, 2013 ("Noteboom

Decl.").[1] The City submits that the following facts are undisputed:

**A.      The City's Solid Waste Management Plan**

1.    These lawsuits primarily concern a permit issued by the United States Army

Corps of Engineers for construction and dredging activities required to build a City-owned

marine waste transfer station ("MTS") at East 91st Street and the East River in Manhattan.  The

facility is an element of the City's comprehensive Solid Waste Management Plan ("SWMP"),

dated September 2006, a document required under State law which provides the framework for

managing the City's solid waste stream over a 20-year period.  *See* SWMP (on disk bates labeled

11470, relevant excerpts annexed as Exhibit 3 to Noteboom Decl.); N.Y. Envtl. Conserv. Law

§ 27-0107; 6 N.Y.C.R.R. Part 360-15.

2.    A total of approximately 50,000 tons of waste and recyclables are collected

each day within the City of New York.  Roughly 25 percent of that total, approximately 12,000

tons per day ("tpd"), is putrescible waste (*i.e.*, waste containing organic matter susceptible to

odor and decay) and recyclables generated by City residents and public institutions, and directly

managed by DSNY.  The waste not collected by DSNY is collected and managed by privately

owned waste management companies, and is referred to as commercial waste.  SWMP at ES-1.

3.    DSNY-managed waste was delivered to Fresh Kills landfill, the last in-City

disposal facility, prior to its closure in 2001.  Following Fresh Kills' closure, both residential and

---

[1]  For the Court's convenience, relevant excerpts of the administrative record documents
discussed herein are annexed to the Declaration of Carrie Noteboom, dated October 22, 2013.

commercial waste, including DSNY-collected materials, moved to a new, predominantly truck-based system that relied on a combination of local, private land-based transfer stations and disposal of waste in neighboring states. SWMP at ES-5. The City determined that this system, while meeting the immediate needs of both commercial and residential waste, streams, is unsustainable as a cornerstone of any long-term disposal plan. In addition, the City determined that the heavy reliance on trucking has impacts on the environment and on local communities along major truck routes, and the costs of this system were rising as nearby landfills fill up and the City is forced to rely on long-haul trucking to more distant landfills. SWMP at ES-1. The City developed the September 2006 SWMP to address these and other solid waste management issues. *See* SWMP at ES-1 to ES-2.

4. The City's September 2006 SWMP was authorized by the City Council on July 19, 2006, and approved by the New York State Department of Environmental Conservation ("DEC") in October 2006. *See* Exh. 1 (City Council Resolution) and Exh. 2 (DEC Approval Letter), annexed to the Noteboom Decl. The SWMP is designed to achieve dramatic reductions in the number of truck trips and vehicle miles and to address the traffic, air and noise issues that result from the current truck-based system. SWMP at ES-2. The SWMP achieves this aim for the DSNY-managed waste stream by relying on trains or barges, instead of transfer trailer trucks, to export waste under the City's Long-Term Export Program. *See* SWMP at ES-5 to ES-7 & Chap. 3. In addition, the SWMP uses commercial competition, long-term contracts and containerization technology to control costs, leverage private investment and ensure efficiency of the system as a whole. SWMP at ES-2. The SWMP also recognizes that—for both commercial waste and DSNY-managed waste—responsibility for the City's waste management system should be allocated equitably throughout the City, in each of the five boroughs. SWMP at ES-2.

-3-

To address the unfair burden being borne by certain communities, the SWMP furthers the principle of borough equity by making each borough responsible for export of its own DSNY-managed waste.  SWMP at ES-2 & 3-6.

5.   The SWMP includes a Long-Term Export Program for DSNY-managed waste.  *See* SWMP Chap. 3.   Under that program, the City is constructing four City-owned waterfront MTSs: the Hamilton Avenue and Southwest Brooklyn MTSs in Brooklyn, the North Shore MTS in Queens, and, in Manhattan, the East 91st Street MTS.  *See* SWMP at ES-6 to ES-7.  At the time the SWMP was prepared, all of these sites had existing MTSs which had ceased accepting waste when the City closed the Fresh Kills landfill.  The SWMP calls for these MTSs to be replaced with new facilities that will receive waste and transfer it into sealed, leak-proof shipping containers within a fully enclosed processing building.  SWMP at 3-11; Lead Agency Findings Statement for the New York City Comprehensive Solid Waste Management Plan, issued by DSNY in February 2006 ("Findings Statement") at 28 (relevant excerpts annexed to the Noteboom Decl. as Exh. 4).  The containerized waste will then be taken by barge by private waste management companies and transloaded onto ships or rail cars for transport to final disposal facilities.  FEIS at ES 5-6; SWMP at ES-6 & 3-3.  In addition to handling DSNY-managed waste, during the hours between 8:00 p.m. and 8:00 a.m. some capacity at each of the four City-owned Converted MTSs will be made available at a fee for commercial waste within the tonnage limits and other conditions set forth in the facilities' operating permits.  *See* FEIS at ES 15; SWMP at Section 4.3; *see also* DEC Permit, USACE 24-58.

**B.   The East 91st Street Marine Transfer Station**

6.   The East 91st Street MTS will replace an existing facility located on the Upper East Side of Manhattan along the East River waterfront, which was in operation from approximately 1940 to November 1999.  As part of the project, the existing building is being

demolished, and will be replaced with a newly constructed building.  The prior MTS sat on a DSNY-controlled parcel of land roughly three acres in size, bounded by the East River to the north and east, Carl Schurz Park to the south and the Bobby Wagner walk and FDR Drive to the west, which is zoned M1-4 (light industrial).   FEIS at 6-2 & 6-6.  The new facility will be constructed slightly north of the existing facility.  FEIS at 6-10.  The FDR Drive will separate the new MTS building from the rest of Manhattan. The MTS will be accessed by a reconstructed access ramp that begins at York Avenue and East 91st Street, and continues over the FDR Drive. Findings Statement at 21.

       7.   The new MTS includes several design features that are intended to minimize adverse impacts of the facility's operations on the surrounding community.  These include using a totally enclosed building for waste processing that includes state-of-the art dust suppression and odor control systems.  Findings Statement at 28, 51.   The facility's access ramp has been redesigned with features to eliminate on-street queuing (parking and idling) of collection trucks in the neighborhood, and will be engineered to occupy the same "footprint" as the existing ramp. FEIS at 6-10.  These design features were analyzed in a final environmental impact statement prepared at the direction of DSNY in 2005.  *See generally* FEIS (on disk bates labeled 11470).

       8.   DSNY served as lead agency for the environmental review of the SWMP, including the East 91st Street MTS, and related DEC permit applications under the State Environmental Quality Review Act ("SEQRA") and its City counterpart, the City Environmental Quality Review Procedure ("CEQR").  *See* Findings Statement at 1.   The decision to site the City-owned facility at East 91st Street was also reviewed and approved under the City's Uniform Land Use Review Procedures ("ULURP").   *See generally* City Planning Commission Resolution approving DSNY ULURP application, dated April 13, 2005, Exh. 6 to the Noteboom Decl.

("CPC Resolution").  The FEIS evaluated the potential for significant adverse environmental impacts of the SWMP, including site-specific analyses of the potential for significant adverse impacts associated with the East 91st Street MTS.  The environmental review also considered the site's suitability, alternatives, and mitigation measures to minimize the impacts of the project.  *See generally* FEIS Chap. 6.

9.  Following the completion of the FEIS, DSNY determined that the SWMP overall, and the East 91st Street Converted MTS in particular, would not have any unmitigable significant adverse environmental impacts.  *See* FEIS at ES-17 to ES-21; Findings Statement at 51-52.  Two separate lawsuits challenging the FEIS were dismissed by the New York courts.  *See Association for Community Reform Now (ACORN), et al. v. Bloomberg*, *et al.*, 824 N.Y.S.2d 752 (Sup. Ct. N.Y. 2006), *aff'd* 52 A.D.3d 426 (1st Dep't 2008), *lv. denied*, 11 N.Y.3d 707 (2008); *Powell v. City of New York*, 85 A.D.3d 429 (1st Dep't 2011), *lv. denied,* 17 N.Y.3d 715 (2011).  In *ACORN*, the Appellate Division found that the reactivated facility "would not cause any significant changes to the existing land uses or overall character of the neighborhood."  *ACORN*, 52 A.D.3d at 427.  *Kellner* Plaintiff Gracie Point Community Council was also a petitioner in the *ACORN* case.  *See* ACORN Petition (Exh. 10 to the Noteboom Decl.).

10. DSNY was required to obtain a permit under 6 NYCRR Part 360 from the New York State Department of Environmental Conservation ("DEC") in order to construct and operate the MTS.  DEC issued permits to operate and construct the East 91st Street Converted MTS in October 2009.  The DEC permit includes additional conditions on the MTS's construction and operation that are designed to be protective of the surrounding community.  *See* USACE 24-58 (DEC Permit).  DEC's decision to issue the permits was also upheld by the New York courts.  *See Gracie Point Community Council v. New York State Dep't of Envtl. Conserv.*,

92 A.D.3d 123 (3d Dep't 2011), *lv. denied*, 2012 NY Slip. Op. 77285 (2012).  In *Gracie Point Community Council*, the Appellate Division rejected a host of challenges to the permit raised by the petitioners based on DEC's permit issuance criteria, and agreed with the First Department's decision in *ACORN* that DSNY and DEC "rationally rejected [the] Harlem River Yard site in the Bronx based on the policy objective of avoiding the trucking of 'Manhattan waste' to a facility in another borough."  92 A.D.3d at 131 (quoting *ACORN*, 52 A.D.3d at 429).  *Kellner* Plaintiff Gracie Point Community Council was the lead petitioner in the state court *Gracie Point Community Council* case.

11. The DEC permits are annexed to the Army Corps permit, which requires, in addition to the conditions included in the Corps permit, that all work shall be performed in accordance with DEC's Clean Water Act Section 401 Water Quality Certificate Number 2-6204-00007/00014.  Permit NAN-2008-00927 dated July 20, 2012 (USACE 1 & USACE 24-58).

## C.    The Army Corps Permit Proceedings

12. In July 2008, DSNY applied for a Department of the Army permit for the East 91st Street MTS project to authorize in-water demolition, construction and dredging activities; the construction of a barge fendering system and a pile supported transformer building; and barge staging that will affect littoral (wetland) and non-littoral zones.  *See* USACE 4361-4403 (DSNY Permit Application); USACE 98.  ACOE held a public hearing on the permit application on September 18, 2008 and also accepted comments during a thirty-day comment period.  *See* USACE 109 & 235-38; USACE 11310-11329 (Public Hearing Notice); USACE 3475-4002 (Hearing Transcript).

13. DSNY also submitted a Mitigation Plan, dated May 31, 2011, describing the proposed impacts of the project on open waters and DSNY's proposed mitigation measures.

USACE 4658-4707.  Thereafter, ACOE issued a supplemental public notice on July 25, 2011, establishing another 30-day comment period for the Mitigation Plan.  *See* USACE 109.

14. During its review of the permit application, ACOE consulted with other agencies to get the input and concurrence regarding certain findings required before the permit could be issued.  This included review by the United States Environmental Protection Agency, which commented on the proposed mitigation plan (USACE 114-17); the National Oceanic and Atmospheric Administration's National Marine Fisheries Service (USACE 117 & 200-15); the United States Coast Guard (USACE 117-18); the United States Fish and Wildlife Service (USACE 118); and the New York State Historic Preservation Office (USACE 215).

15. ACOE issued the permit to DSNY on July 20, 2012.  *See* USACE 1-94.  In conjunction with the permit, ACOE prepared a Memorandum for Record ("MFR" or "Memorandum") constituting its Environmental Assessment, 404(b)(1) Guidelines Evaluation, Public Interest Review in accordance with 33 C.F.R. Part 320.4(a), and Statement of Findings. USACE 95-248.  (A copy of the entire MFR is submitted as City Exh. 15.)  Having reviewed the information provided by DSNY and interested parties during the permit proceeding, the Corps determined that the permit action would not significantly affect the quality of the human environment, and an Environmental Impact Statement was not required.  USACE 241-43.

**D.     The Army Corps' Permit Application Review and Determination**

16.  As set forth in its Memorandum, the Corps determined that the basic project purpose is to provide a marine terminal to load sealed containers of solid waste onto barges.  The Corps further determined that the overall project purpose is to reconstruct a Marine Transfer Station so as to reduce truck traffic and air pollution and allow for equitable distribution of waste transfer, by providing barge transportation of solid waste for residents of Manhattan, as stated in the City's SWMP dated September 2006.  USACE 99.

17. Applying the definition of water dependent activities found in 40 C.F.R. Part 230.10(a)(3), the Corps also determined that the project is water dependent, because it required direct access to a navigable waterway for barge transportation of solid waste in order to fulfill the basic project purposes.  USACE 99.

18. For purposes of its NEPA review, the Corps determined that its jurisdiction is limited to proposed work in or over the East River.  USACE 104.  As noted in the MFR, the basic test for determining the USACE scope of analysis under NEPA is not one of "independent utility," but rather whether the level of "federal control and responsibility" over the upland portions of a project is sufficient to "federalize" the entire project.  In this case, the Corps determined that there is insufficient federal control and responsibility over the upland portions of the Project or over the entire Project to expand the scope of review for a USACE permit decision beyond Corps jurisdictional activities in waters of the United States.  Thus, the Corps limited the scope of its review under NEPA to the replacement of the existing 91st Street MTS, associated dredging and mitigation activities.  USACE 105-106.  The Corps also noted that its own regulations establish that NEPA review will only cover "the specific activity requiring a DA permit and those portions of the entire project over which the district engineer has sufficient control and responsibility to warrant Federal review."  USACE at 106; 33 C.F.R. Part 325, App. B § 7.b.

**E.      Analysis of Alternatives**

19.  The MFR includes a review of alternative sites for the MTS project as well as on-site alternatives to the proposed design.  *See* USACE 120-32.  This review included consideration of off-site alternatives, which evaluated the siting criteria set forth in DSNY's "Commercial Waste Management Study: Volume V – Manhattan Transfer Station Siting Study Report," dated March 2004.  USACE 120.  This Study was included as part of Appendix I to

DSNY's FEIS.  *See* USACE 11420 (disk containing FEIS and its appendices); Exh. 7 to the Noteboom Decl.  Based on its review, the Corps determined that DSNY's siting criteria for the project were reasonable in light of the overall project purpose, and that the alternative Manhattan transfer station locations rejected by DSNY were not practicable alternatives.  USACE 121-23. For alternative locations outside of Manhattan that were raised during the comment period on the permit, the Corps determined that the overall purpose of the project takes into consideration the SWMP for the City of New York, including the SWMP's principle of borough equity to hold each borough responsible for the export of its own waste.  Therefore, transfer station locations outside of Manhattan were not considered feasible alternatives because they do not comply with the SWMP and the overall project purpose.  USACE 125.

F.     **Degradation of Waters Analysis**

20. The MFR includes a review of the project's compliance with 40 C.F.R. § 230.10(a)-(d) (degradation of waters).  *See* USACE 132-38.  As part of that review, the Corps considered the potential short-term and long-term effects of the discharge of fill material on the physical, chemical and biological components of the aquatic environment.  USACE 132.  Based on its review, the Corps determined that the proposed discharge of dredged and fill material represents the least damaging practicable alternative.  The Corps also determined that the discharge does not violate applicable state water quality standards; jeopardize the existence of a federally listed threatened or endangered species or its habitat; or violate the requirements of any federally designated marine sanctuary.  Therefore, the Corps concluded the activity will not cause or contribute to significant degradation of waters of the U.S., including adverse effects on human health, life stages of organisms dependent on the aquatic ecosystem, ecosystem diversity, productivity and stability, or recreational, aesthetic and economic values.  The Corps also

determined that appropriate and practicable steps have been taken to minimize potential adverse impacts of the discharge on the aquatic ecosystem.  USACE 137.

**G.       Wetlands Mitigation Analysis**

21.  The MFR includes a review of the wetland mitigation proposed by DSNY as part of its permit application.  *See* USACE 218-35.  Based on this review, the Corps concluded that the proposed mitigation plan was adequate because it provides sufficient in-kind compensatory mitigation to offset the proposed impacts.  USACE 225.

**H.       Analysis of Potential Flooding Impacts During Permit Proceeding**

22. The MTS site is located in the East River, within a FEMA-designated flood plain.  The currently effective base flood elevations (BFEs) issued by the Federal Emergency Management Agency ("FEMA") were issued in 2007.  DSNY Memorandum, "Environmental Review of New Flood Risk Information and Related Proposed Design Changes to East 91st Street MTS and Southwest Brooklyn MTS," dated May 29, 2013, included as Exh. 14 to the Noteboom Decl. ("DSNY 2013 Technical Memorandum"), at 2.  The 2007 FEMA BFE applicable to the MTS project site is E + 11, which means that during a 100-year flood, the floodwater would be expected to rise 11 feet.  USACE 161.

23. As part of its public interest review, the Corps considered the potential flood hazards and flood plain values of the MTS facility.  *See* USACE 160-62.  Several commenters raised potential flooding risks in their comments during the Army Corps permit public notice period.  Generally, commenters were concerned that locating the facility in a Flood Zone A, which has the highest risk of flooding during a major storm event, would pose unacceptable risks to the neighborhood.  USACE 161.  Some commenters were also concerned that the facility would be located near the FDR Drive, which floods frequently, and that the project would be susceptible to sea level rise.  USACE 161.

24. DSNY provided information to the Army Corps during the permit proceeding to respond to the comments regarding potential flooding impacts. *See* USACE 2491-2573 (Response to Comments, December 2008); USACE 1424-1454 (Response to Comments, October 27, 2011). DSNY noted that the MTS had been designed to be six inches above the 100-year Base Flood Elevations found in the Flood Insurance Rate Maps (FIRMs) issued by the Federal Emergency Management Agency (FEMA). USACE 2564-2565; USACE 1444-45. This design was compliant with the provisions of the New York City Building Code and the New York State solid waste management facility regulations applicable to the MTS when it was designed and when it received permits for its construction and operation. *See* USACE 161; N.Y.C. Admin. Code § 27-317 ("New construction or substantial improvements of non-residential buildings within special flood hazard areas … shall have the lowest floor elevated to or above the base flood elevation; or, together with attendant utilities and sanitary facilities, shall be floodproofed up to the level of the base flood elevation … .");6 N.Y.C.R.R. § 360-1.7(a)(2)(ii); *see also* 2008 New York City Building Code, Sec. BC G501.1, Table 1-1 ("Classification of Structures for Flood-Resistant Design and Construction") & Table 2-1 ("Minimum Elevation of the Top of Lowest Floor Relative to Design Flood Elevation (DFE)-A-Zones") (designating the BFE as the minimum design elevation for category II structures, which include the MTS).

25. DSNY also explained that the Zone A designation for the site comes from the New York City Office of Emergency Management (OEM), which has published a map indicating New York City Hurricane Evacuation Zones. DSNY explained that this map is not intended to be used as a design guide in designing structures and facilities located within the designated zones. Rather, it is to be used as a tool for residents so that they can be prepared to

evacuate certain areas of the City when given sufficient warning of a significant storm event. USACE 2565; USACE 1444-45.

26. DSNY noted that OEM had provided it with information indicating that the loading level of the MTS is located 14 feet above the pier level, and would not be subject to flooding during a Category 4 storm. USACE 2565; USACE 1445. The facility's design has three levels: the top, or tipping level, where waste is deposited from collection trucks; the middle, or loading level, where waste is loaded into shipping containers; and the lowest, or pier level, where waste containers are sealed and placed onto barges for transport. *See generally* DSNY Army Corps Permit Application, dated July 8, 2008, at Section 2 (describing facility's design and operations), USACE 4366-68. The loading level is the only level where loose waste will be present in the facility, and it is located approximately 16 feet above the 100-year flood plain shown on the 2007 FEMA flood insurance maps. DSNY 2013 Technical Memorandum at 2.

27. DSNY also noted that upon notice of a significant storm event, it would cease accepting waste and would have sufficient warning to take the necessary precautions to have all waste containing containers and barges dispatched from the MTS. USACE 2565; USACE 1445.

28. Based on the information provided by DSNY and contained in the record, the Army Corps determined that the DSNY had appropriately considered flood risk in the facility design and coordinated with OEM concerning hurricane storm surge. The Army Corps further determined that the proposed MTS facility would not result in significant adverse impact to flood hazards in the area. The Army Corps expected that the replacement MTS platform will not be substantially impacted by foreseeable sea level rise over the life span of the structure. USACE 162.

I.     **Analysis of Potential Flooding Impacts Following Permit Issuance**

1.     **Army Corps**

29. Following issuance of the permit and MFR, the Corps received additional comments from counsel for Plaintiffs in both actions, which raised further concerns relating to potential flooding risks to the facility, in light of the site's experience during Super Storm Sandy and the issuance of new Advisory Base Flood Elevations ("ABFEs") by FEMA.  *See* USACE 11437-11444 & 11452-11469.   Plaintiffs also requested that the Corps reconsider its determination to issue a permit based on new information and conduct a supplemental environmental review under NEPA.  *See* USACE 11437-11444.

30. In response to these comments, the Corps issued two additional Memoranda for Record, one dated March 21, 2013 (USACE 11433-11436), and one signed by Defendant Paul E. Owen on June 13, 2013 (USACE 11418-11429) ("June 13 MFR"), which superseded the March 21, 2013 Memorandum.  USACE 11418.  As set forth June 13 MFR, the Corps considered the issues raised in these comments.  *See* USACE 11418 to 11429.  In particular, the Corps found it had already determined, during the decision making process on DSNY's original permit application, that DSNY had appropriately considered flood risk in the design of the facility, and that construction of the MTS would not result in significantly greater risks of flood hazards in the area.  The Corps also noted that it does not set standards for building designs, including those pertaining to flooding.  USACE 11419.  Reviewing the Advisory Base Flood Elevations ("ABFEs") released by FEMA on February 22, 2013, the Corps noted favorably that the loading level of the MTS, the only place where loose uncontainerized material will be present, will be located 11 feet above the 100-year flood level identified in the ABFEs.  USACE 11419.

31. Next, the Corps reviewed the additional design changes and operational practices identified by DSNY in May 2013 to further secure the facility during flood events. USACE 11419-11420.   The Corps further determined that these design modifications and operational procedures will ensure that, should flooding occur, garbage will not be released into public waters and the neighboring community.  USACE 11420.

32. Regarding Plaintiffs' request that the Corps reevaluate its permit decision and supplement its environmental assessment to take into account new information regarding Super Storm Sandy, the Corps found that the fact that an extreme storm event occurred after the permit was issued is not in itself significant new information warranting a permit modification, and that the July 17, 2012 MFR sufficiently evaluated flood hazard issues, including hurricane storm surges, extreme storm events, and sea level rise.  USACE 11422.

33. In sum, the Corps stated that it thoroughly evaluated the concerns expressed relative to the permit decision documents, and after this careful review, found no reason to modify, suspend or revoke the issued permit.  USACE 11423.

**2.     DSNY**

34. DSNY also considered potential flooding impacts following the issuance of the revised FEMA advisory maps, and in light of the City's experience during Super Storm Sandy, and prepared a memorandum containing its findings.  *See* DSNY Memorandum, "Environmental Review of New Flood Risk Information and Related Proposed Design Changes to East 91st Street MTS and Southwest Brooklyn MTS," dated May 29, 2013, included as Exh. 14 to the Noteboom Declaration ("DSNY 2013 Technical Memorandum").  That memorandum was prepared by DSNY in its capacity as Lead Agency under the State Environmental Quality Review Act ("SEQRA").  DSNY 2013 Technical Memorandum at 1.   The memorandum

considers proposed design modifications to both the East 91st Street MTS and the Southwest Brooklyn MTS to further address potential flood risks in the aftermath of the October 26, 2012 storm surge from Tropical Storm Sandy, which produced flooding in excess of the 100-year base flood elevation (BFE) applicable to the two facility sites from 2007.  It also considers associated emergency Department of Buildings regulations and a revised advisory Federal FEMA flood insurance map.  DSNY 2013 Technical Memorandum at 1.

35. The memorandum notes that DSNY previously considered the risk of flooding to the MTS facilities, as both facilities are within the 100-year flood plain.  The East 91st Street MTS site is in Zone A, the area that is not subject to additional wave action, based on the FEMA flood insurance maps issued in the last official update in 2007.  DSNY conducted a review of the East 91st Street MTS's consistency with the City's Waterfront Revitalization Plan in 2005 and found that the facility would be consistent with the City's goal of minimizing risks from flooding.  DSNY 2013 Technical Memorandum at 2.

36. In addition, the memorandum states that the design of the MTS facility is intended to ensure that floodwaters would not encroach on solid waste being processed at the facility, in accordance with New York State solid waste management facility regulations.  The facility is designed to have three levels: the tipping level, the loading level and the pier level. Trucks enter at the top, or tipping level, and tip their loads onto the loading level.  Waste then gets pushed through openings in the loading level floor into containers located below on the pier level. The pier level was designed to be one foot above the 2007 Base Flood Elevation.  The loading level, the only level on which there will be loose waste, would be located approximately 16 feet above the 100-year flood plain shown on the 2007 FEMA flood insurance maps, and also well above even the 500-year flood plain.  Only waste that has been placed in the containers and

sealed on the pier level would be removed from the facility.  Sealed containers would be temporarily staged outside on a pier deck that is part of the pier level.  This design ensures that loose solid waste would not be at risk of encountering flood waters.  DSNY 2013 Technical Memorandum at 2.

37. In addition, DSNY identified operational measures that would further minimize risk from flooding.  Waste collections would cease 48 hours prior to a predicted flooding event, allowing the facility to process waste and be empty 24 hours in advance of the flood.  All containers of waste would be secured elsewhere in the harbor until the flood danger had passed.  DSNY 2013 Technical Memorandum at 2.

38. As noted in the DSNY memorandum, following Tropical Storm Sandy, the City had its consultants prepare a study of the actual storm surge levels from Sandy with respect to all four of the City-owned MTS sites included in the SWMP.  *See* DSNY 2013 Technical Memorandum, Attachment 1, "Superstorm Sandy: Storm Tide Flood Damage and Recommendations – Preliminary Report," Jan. 2013.  For the East 91st Street MTS, this study concluded that the maximum storm tide level during Sandy would have been between approximately eight inches below and six inches above the pier level of the facility.  DSNY 2013 Technical Memorandum, Attachment 1 at Page 8 of 10.

39. The City also asked its consultants to provide recommendations as to design modifications and other measures that could further harden the East 91st Street MTS against disruptions from future coastal flooding.  *See* DSNY 2013 Technical Memorandum, Attachment 2, "Flood Protection Conceptual Design Report," May 2013.  The *Flood Protection Conceptual Design Report* took into consideration the Advisory Base Flood Elevation ("ABFE") maps issued by FEMA on February 25, 2013, as well as emergency Department of Buildings

regulations issued on January 31, 2013 that mandated design of new structures to maintain one foot of freeboard above the current (2007) Base Flood Elevation.  DSNY 2013 Technical Memorandum at 3; *see also* R.C.N.Y. Title 1, Subchap. G, § 3606-04 (DOB emergency rule adopting new freeboard requirements), *available at* http://www.nyc.gov/html/om/pdf/2013/emergency_rule.pdf.

40. As noted in the memorandum, the *Flood Protection Conceptual Design Report* developed a Revised Design Flood Elevation (Revised DFE) based on FEMA's ABFEs, and recommended design modifications for the East 91st Street MTS to provide perimeter flood proofing measures and dry floodproofing for rooms with critical equipment.  DSNY intends to adopt these recommendations.   DSNY 2013 Technical Memorandum at 3.   Perimeter floodproofing involves flood protection devices including flood planks and flood shields at every opening that is beneath the revised DFE, as well as revised construction methods to ensure that wall material and construction joints are watertight.  Perimeter floodproofing would require little interior modifications and would be able to protect all critical equipment within the building when deployed properly.  DSNY 2013 Technical Memorandum at 3-4.  When implemented, these measures will comply with the New York City Department of Building regulations adopted after Hurricane Sandy.  *See* N.Y.C. Admin. Code § 27-317 (allowing floodproofing of the lowest floor up to the level of the applicable base flood elevation).

41. The memorandum also explains that additional floodproofing of rooms with equipment critical for life safety will be done to supplement the dry perimeter floodproofing first line of defense.  This will give an extra measure of confidence that such critical equipment will be adequately protected.  The five rooms at the pier level containing such equipment are the Fire Pump/Meter Room, HVAC Room, Electrical Room, Building-Wide Alarm System Room, and

Security Room.  Sliding watertight doors with pneumatic seals would be installed.  One door would have a manual flood shield installed when needed instead, due to space constraints. Additional protective measures were recommended for critical equipment such as emergency generators, the gantry crane, and marine equipment, and these will be implemented as well. DSNY 2013 Technical Memorandum at 4.

42. As part of the memorandum, DSNY considered the potential environmental impacts of the design modifications to enhance floodproofing of the East 91st Street MTS in the wake of Tropical Storm Sandy and related new information on flood risks.  DSNY concluded that all of the proposed changes are intended to further safeguard the facility, keep it operational, and thereby minimize the risk of disruption to the City's integrated waste management system and further prevent spillage of waste to the environment in the event of major coastal flooding. DSNY also concluded that the modifications would not increase the potential for the facility to cause significant traffic, noise, air quality, odor, or water quality impacts beyond what was previously studied in the FEIS, and that none of the modifications, individually or collectively, are reasonably foreseeable to result in a significant adverse impact to any other environmental review category, based on a review of the standards contained in the 2012 City Environmental Quality Review Technical Manual.   Therefore, DSNY concluded that preparation of a Supplemental Environmental Impact Statement is not warranted.   DSNY 2013 Technical Memorandum at 4.

43. After DSNY prepared its 2013 Technical Memorandum, FEMA released preliminary work maps for New York City that supersede the ABFEs released on February 25, 2013.   According to FEMA's website, the preliminary work maps are based on the same underlying data as the ABFE maps, but include the results of a more refined analysis of shoreline

conditions, including the effects of erosion and wave runup.  The maps are a "draft" product that FEMA is sharing in advance of the upcoming release of the preliminary Flood Insurance Rate Maps ("FIRMs"), which will show both coastal and riverine flood hazards.  Once released, the preliminary work maps replace the ABFE maps (where applicable) as the best available flood hazard data until the release of the preliminary FIRMs.  *See* FEMA Region II, "Understanding the Best Available Flood Hazard Data for Your Community," *at* http://www.region2coastal.com/understanding_the_data (last visited Sept. 19, 2013).  Neither the ABFEs or the preliminary work maps have been officially adopted by FEMA.

Dated:         New York, New York
               October 24, 2013

                                        MICHAEL A. CARDOZO
                                        Corporation Counsel of the
                                          City of New York
                                        Attorney for the City Respondents
                                        100 Church Street, Room 6-133
                                        New York, New York 10007
                                        (212) 356-2319

                                        By: */s/ Carrie Noteboom*_____
                                             Carrie Noteboom (CN7173)
                                             Assistant Corporation Counsel
                                             Environmental Law Division

*Of Counsel*
        Katie Kendall,
        Christopher King