UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------- x
RESIDENTS FOR SANE TRASH SOLUTIONS, INC., *et al.*,   :
                          Plaintiffs,   :
                            v.   :   12 Civ. 8456 (PAC)
UNITED STATES ARMY CORPS OF ENGINEERS, *et al.*,   :
                          Defendants.   :
------------------------------------------------------------------------- x
------------------------------------------------------------------------- x
NEW YORK STATE ASSEMBLY MEMBER MICAH Z. KELLNER, *et al.*,   :
                          Plaintiffs,   :
                            v.   :   12 Civ. 8458 (PAC)
UNITED STATES ARMY CORPS OF ENGINEERS, *et al.*,   :
                          Defendants.   :
------------------------------------------------------------------------- x

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

PREET BHARARA
United States Attorney for the
Southern District of New York
86 Chambers Street
New York, New York 10007
Tel.: (212) 637-2761
Fax: (212) 637-2786

CHRISTOPHER CONNOLLY
Assistant United States Attorney
     – Of Counsel –

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT ...................................................................................................................................3

        A.      The Court Should Disregard the *Kellner* Plaintiffs' Extra-Record Evidence ..........3

        B.      The Corps' Scope of Analysis Was Proper Under Both NEPA and the CWA ........4

        C.      The Corps Adequately Analyzed Alternatives Under Both NEPA and the
                CWA ...........................................................................................................................11

        D.      The Corps Adequately Considered Potential Effects on Waters of the United
                States ..........................................................................................................................15

        E.      The Corps Was Not Required to Supplement Environmental Analysis in Light
                of Hurricane Sandy ..................................................................................................16

CONCLUSION ..............................................................................................................................18

Defendants the United States Army Corps of Engineers and Colonel Paul E. Owen (together, the "Corps"), by their attorney, Preet Bharara, United States Attorney for the Southern District of New York, respectfully submit this memorandum of law in opposition to plaintiffs' motions for summary judgment.

## PRELIMINARY STATEMENT

These lawsuits concern the City of New York's (the "City's") plan to construct a marine transfer station over the East River at 91st Street (the "91st Street MTS") as part of its plan for managing the City's waste over the next two decades. Both the 91st Street MTS project and the broader Solid Waste Management Plan ("SWMP") of which it forms a part have been reviewed and approved by City and state authorities. They have also survived several challenges in New York state courts. Plaintiffs in the instant actions, some of whom were also parties to the unsuccessful New York state court actions, now seek to halt the 91st Street MTS by alleging that the Corps' issuance of a Permit to allow DSNY to conduct dredging, in- and over-water construction, and limited filling of navigable waters at the 91st Street site violated the Clean Water Act ("CWA") and the National Environmental Policy Act ("NEPA").[1]

---

[1] In its memorandum of law in support of its cross-motion for summary judgment filed on October 28, 2013 ("Corps' SJ Br.") (RSTS Dkt. # 62; Kellner Dkt. # 70), the Corps provided background on the City's SWMP and the 91st Street MTS project, the Corps' issuance of the Permit, and the prior unsuccessful challenges to the SWMP and 91st Street MTS. *See* Corps' SJ Br. at 6-10. It also summarized the relevant aspects of the CWA, NEPA, and associated statutes and regulations. *See id.* at 2-5. For the sake of brevity and clarity, the Corps does not restate that background information in the instant brief, but incorporates it by reference and employs the same abbreviations for defined terms as in its opening brief. Furthermore, as explained in its letter to the Court filed along with its cross-motion for summary judgment (RSTS Dkt. # 63, Kellner Dkt. # 71), because plaintiffs' claims against the Corps arise under the APA, the Court's review is based on the administrative record, and statements of undisputed material fact pursuant to Local Rule 56.1 are unnecessary. Accordingly, the Corps is not submitting a response to plaintiffs' Local Rule 56.1 statement, but is prepared to do so at the Court's direction. *See, e.g., Student X v. New York City Dep't of Educ.*, No. 07–CV–2316 (NGG)(RER), 2008 WL 4890440, at *11 (E.D.N.Y. Oct. 30, 2008) (declining to require counter-statement of undisputed material

Plaintiffs' arguments lack merit, and their motions for summary judgment should be denied. The Corps' involvement in the 91st Street MTS project extends only to its issuance of the Permit for limited purposes implicating the navigable waters of the United States, and it fulfilled its responsibilities consistent with the applicable statutes and regulations. First, plaintiffs' central argument—that the scope of the Corps' environmental review and public interest analysis was flawed because the Corps failed to account for the purported post-construction impacts of the 91st Street MTS's operation—is incorrect. The Corps correctly determined that the entire 91st Street MTS project is not a "federal action" for purposes of NEPA review and, accordingly, the scope of its public interest analysis complied with the CWA. Second, the Corps adequately considered both on- and off-site alternatives to the City's proposed 91st Street MTS and rejected those alternatives that were not practicable or that did not satisfy the City's overall project purpose. Third, in consultation with other federal agencies, the Corps assessed the potential effects of the permitted activity on the waters of the East River, and required a mitigation plan that addresses likely environmental consequences. Finally, the Corps took into account the potential for flooding at the 91st Street site, and properly determined that Hurricane Sandy required neither a supplementation of its EA nor a reconsideration of its decision to issue the Permit. In short, the extensive administrative record demonstrates that the Corps' decision to issue the Permit (which is entitled to deference) was not arbitrary, capricious, or an abuse of discretion. Plaintiffs are therefore not entitled to judgment as a matter of law.

---

facts in APA case because "the 56.1 Statement will not aid the court in its independent review of the [administrative] record").

**ARGUMENT**

A.     **The Court Should Disregard the *Kellner* Plaintiffs' Extra-Record Evidence**

As a threshold matter, the Court should disregard the extra-record evidence submitted by the *Kellner* plaintiffs. Kellner Dkt. ## 55-58. It is well established that in APA cases, judicial review is presumptively limited to the administrative record. *See* 5 U.S.C. § 706 (providing that APA review shall be based on a review of "the whole record or those parts of it cited by a party"); *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) (in an APA case, "[t]he focal point for judicial review of an administrative action should be the administrative record already in existence, not some new record made initially in the reviewing court" (quoting *Camp v. Pitts*, 411 U.S. 138 (1973))); *Dopico v. Goldschmidt*, 687 F.2d 644, 654 (2d Cir. 1982) (APA review must be based on the "facts . . . before the agency at the time it acted"). In light of this "record rule," courts generally should consider extra-record evidence only where there is "a strong showing of bad faith or improper behavior" on the part of the agency in assembling the record. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977); *see also Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14-15 (2d Cir. 1997); *Community for Creative Non-Violence v. Lujan*, 908 F.2d 992, 997-98 (D.C. Cir. 1990). Indeed, given the "presumption of administrative regularity" afforded to agency actions, a "court assumes the agency properly designated the Administrative Record absent clear evidence to the contrary." *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993).

Furthermore, although courts have recognized the need for occasional supplementation of the record in APA cases that implicate NEPA, such supplementation is "limited" and is appropriate "only when the administrative record is so inadequate as to prevent the reviewing

3

court from effectively determining whether the agency considered all environmental consequences of its proposed action." *Hoffman*, 132 F.3d at 15; *see also Preservation Coal. of Erie Cnty. v. Fed. Transit Admin.*, 129 F. Supp. 2d 538, 544 (W.D.N.Y. 2000) ("The record compiled by the agency will often be sufficient for the court to make this determination.").

Here, the *Kellner* plaintiffs do not even attempt to demonstrate that the administrative record is inadequate or that the Corps acted in bad faith in compiling the record that was submitted to the Court. Accordingly, the Court should not entertain the extra-record materials in considering plaintiffs' motions for summary judgment. *See, e.g., Pogliani v. U.S. Army Corps of Eng'rs*, No. 01-CV-0951 (NEM), 2007 WL 983549, at *9-*10 (N.D.N.Y. Mar. 28, 2007) (applying "record rule" and declining to consider extra-record evidence submitted by plaintiffs). Indeed, disregarding the extra-record evidence is particularly appropriate here, where the Court has already found that "factual review is generally limited to the administrative record that exists, and not to a new record to be made by the reviewing court" and denied plaintiffs' request to supplement the record through discovery. *See* RSTS Dkt. # 27; Kellner Dkt. # 32 (Order dated July 11, 2013).[2]

**B.     The Corps' Scope of Analysis Was Proper Under Both NEPA and the CWA**

Central to plaintiffs' arguments is their contention that the Corps improperly limited the scope of both its NEPA review and its CWA public interest review by failing to consider the purported post-construction environmental impacts of the 91st Street MTS on surrounding neighborhoods. *See* RSTS Br. (Dkt. # 50) at 18-24 (discussing scope of NEPA analysis); Kellner Br. (Dkt. # 59) at 5-11 (NEPA), 15-16 (CWA). In advancing these arguments, plaintiffs ask the Court to conclude that by issuing the Permit, the Corps became responsible for all environmental

---

[2]     For the reasons set forth below, however, even if the Court were to consider the extra-record evidence, plaintiffs are still not entitled to judgment as a matter of law.

consequences of the 91st Street MTS, regardless of the connection between those consequences and the permitted activity. But that it not the law, and under both NEPA and the CWA, the Corps properly determined the scope of its review.

Pursuant to NEPA, federal actions "include actions approved by permit" such as the CWA permit challenged in this case. 40 C.F.R. § 1508.18(b)(4). Under the Corps' regulatory program, the specific activity requiring authorization by a Corps permit may, at times, be merely one component of a larger project that also involves non-jurisdictional activities. In these situations, the Corps' regulations instruct the Corps' District Engineer on the analysis required to determine whether there are portions of a broader project over which the District Engineer has sufficient "control and responsibility" to warrant federal review. 33 C.F.R. Part 325, App. B, § 7.b(1) ("In some situations, a permit applicant may propose to conduct a specific activity requiring a Department of the Army (DA) permit . . . which is merely one component of a larger project . . . ."). Here, the Corps properly limited its NEPA review of DSNY's permit application to the impacts of the specific activity for which the Permit was sought. *See* USACE 101, 103-09.

The Corps' regulations instruct the District Engineer on the factors to consider when determining whether "sufficient control and responsibility" exists to warrant federal review of the overall project. The Corps must consider whether the "Federal involvement is sufficient to turn an essentially private action into a federal action." *Id*. § 7.b(2). Typical factors to be considered in determining whether sufficient "control and responsibility" exists include:

> (i) Whether or not the regulated activity comprises "merely a link" in a corridor type project (*e.g.*, a transportation or utility transmission project).
> (ii) Whether there are aspects of the upland facility in the immediate vicinity of the regulated activity which affect the location and configuration of the regulated activity.
> (iii) The extent to which the entire project will be within Corps jurisdiction.
> (iv) The extent of cumulative Federal control and responsibility.

5

*Id.* The Corps' "control and responsibility" includes parts of the project beyond the limits of the specific activity authorized by the Corps only if "the cumulative Federal involvement of the Corps and other Federal agencies is sufficient to grant legal control over such additional portions of the project. These are cases where the environmental consequences of the additional portions of the projects are essentially products of Federal financing, assistance, direction, regulation, or approval." *Id.*

Courts have consistently interpreted these regulations as giving the Corps considerable discretion in the weighing of factors required to define the "federal action" subject to review. For example, in *Sierra Club v. United States Army Corps of Engineers*, 450 F. Supp. 2d 503 (D.N.J. 2006), *vacated as moot and remanded*, 277 Fed. Appx. 170 (3d Cir. 2008), the court considered a challenge to a Section 404 permit authorizing the fill of several acres of wetlands at a site planned for a mixed use development. The Sierra Club argued that the Corps violated NEPA by failing to consider the impacts "of the portions of the project located on that fill as well as the upland portions of the project." 450 F. Supp. 2d at 515. The court rejected the Sierra Club's interpretation of the Corps' NEPA responsibilities, upholding the Corps' decision to limit its review to the wetland impacts. *Id.* at 515-19. In so doing, the court explained that the plaintiffs' argument "ignores both the plainly discretionary nature of a determination of the scope of NEPA analysis under the Army Corps's regulations as well as the case specific, factor-based analysis that those regulations require." *Id.* at 518; *see also id.* at 517, n.14.

The *Sierra Club* court's analysis is consistent with other opinions upholding the Corps' decision to limit its review to impacts within its regulatory jurisdiction. *See Ohio Valley Envtl. Coal. ("OVEC") v. Aracoma Coal Co.,* 556 F.3d 177, 194-97 (4th Cir. 2009) (Section 404 permit central to success of project "does not itself give the Corps 'control and responsibility'")

6

(citation omitted); *Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105, 1115-18 (9th Cir. 2000).

The scope of the Corps' NEPA review with respect to the Permit at issue here was proper under any standard, let alone the applicable discretionary standard, and plaintiffs' arguments to the contrary lack merit. The law does not support Plaintiffs' simplistic "but for" formulation, *i.e.*, their assertion that the government must take ownership of a project if that project could not be built without the Corps' permit. *See* RSTS Br. at 22 ("[I]t is indisputable that the 91st Street MTS could not be built without the Permit."); Kellner Br. at 7 ("The § 404 permit is an essential prerequisite to the entire MTS, which cannot be built without it."). As explained above, the Corps' regulations specifically reject that approach in favor of a more nuanced, case-specific assessment of the nature of the federal relationship to the overall project. *See Save the Bay, Inc. v. U.S. Corps of Eng'rs*, 610 F.2d 322 (5th Cir. 1980) (permit for outfall pipe essential to operation of chemical plant, but NEPA did not require Corps to assess construction and operation of plant). In *Wetlands Action Network*, the Ninth Circuit explained:

> The linkage that the district court found between the permitted activity and the specific project planned is the type of 'interdependence' that is found in any situation where a developer seeks to fill a wetland as part of a large development project. If this type of connection alone were sufficient to require a finding that an entire project falls within the purview of the Corps' jurisdiction, the Corps would have jurisdiction over all such projects including those which the Corps' regulations cite as examples of situations in which the Corps would not have jurisdiction over the whole project.

222 F.3d at 1116-17. *See also OVEC*, 556 F.3d at 195 (fact that permit necessary for success of project does not federalize the overall project). Likewise, the Supreme Court has confirmed that NEPA requires a sophisticated analysis of the proximate cause of potential environmental impacts of a proposed action to determine whether the Corps must consider those impacts,

7

rejecting the simplistic "but for" causation inquiry that plaintiffs advance. *See DOT v. Pub. Citizen*, 541 U.S. 752, 767 (2004).

Plaintiffs also improperly rely on two Ninth Circuit decisions, *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113 (9th Cir. 2005), and *White Tanks Concerned Citizens, Inc. v. Strock*, 563 F.3d 1033 (9th Cir. 2009). *See* RSTS Br. at 21; Kellner Br. at 8. In these cases, the courts were not confronted with a separate regulatory scheme administered exclusively by a state charged with analyzing the very same impacts the plaintiffs were seeking to have the Corps analyze. *See, e.g., OVEC*, 556 F.3d at 194-95 ("The Corps' jurisdiction under CWA 404 is limited to the narrow issue of the filling of jurisdictional waters," and post-project operational impacts were regulated by the state); *see also Mo. Coal. for the Env't v. Corps of Eng'rs*, 866 F.2d 1025, 1033 (8th Cir. 1989) ("The activity permitted by the Corps is not the construction of an industrial park or a stadium; it is the filling of wetlands."), *abrogated on other grounds by Goos v. I.C.C.*, 911 F.2d 1283 (8th Cir. 1990); *NRDC v. U.S. Army Corps of Eng'rs*, No. 1:09 CV 588, 2010 WL 1416681, at *5 (N.D. Ohio Mar. 31, 2010) ("The effects of the facility's operations are clearly separate and distinguishable from the effects of filling the wetlands which were the subject of the permit request."). The *Save Our Sonoran* decision is also inapposite because it was an appeal of a preliminary injunction, and the court held only that the district court had not abused its discretion in finding a likelihood of success on the merits. 408 F.3d at 1125. The court took pains to note that its decision in that case was not inconsistent with *Wetlands Action Network*, discussed above. *Id.* at 1124-25. Likewise, in *White Tanks*, the Ninth Circuit again recognized the continued validity of its *Wetlands Action Network* decision. 563 F.3d at 1035-36, 1040.

This Court should instead follow the reasoning of the Fourth Circuit's ruling in *OVAC*. In that case, the court found that it was the State of West Virginia, "and not the Corps, that has

'control and responsibility' over all aspects of the valley fill projects beyond the filling of jurisdictional waters. Thus, under the plain language of the regulation, activity beyond the filling of jurisdictional waters is not within the Corps' 'control and responsibility' because upland environmental effects are 'not essentially a product of Corps action,' 33 C.F.R. pt. 325, App. B, § 7(b)(2) (2008)." 556 F.3d at 197. The same scenario is present here: the post-construction operations about which plaintiffs complain are regulated by the City and state.

Plaintiffs' related claim that even if the Corps lacks sufficient control and responsibility over the 91st Street MTS, the MTS's operation is nonetheless an "indirect effect" of the Permit and thus must be considered for purposes of NEPA review, fails to much the same reasons. *See* RSTS Br. at 18-19; Kellner Br. at 9 n.3. Again, plaintiffs argue that the Corps' issuance of the Permit renders them liable for any environmental consequences of the MTS. *See* RSTS Br. at 19 (quoting *White Tanks* for the proposition that because the Permit allows the project to occur, the Permit is the cause of the MTS's environmental effects). But here, as with the "control and responsibility" analysis, the Supreme Court's proximate cause analysis in *Public Citizen* applies and plaintiffs' "but for" test is insufficient to render the Corps' scope of review arbitrary and capricious. *See City of Shoreacres v. Waterworth*, 420 F.3d 440, 452 (5th Cir. 2005).

Plaintiffs also cannot rely on one example of a situation in which the Corps' analysis might extend beyond the permitted activity—*i.e.*, where the Corps permit relates to the construction of a shipping terminal, 33 C.F.R. Part 325, Appx. B § 7(b)(3). *See* RSTS Br. at 20; Kellner Br. at 6-7. The type of project this example describes, which includes "dredging, wharves, bulkheads, berthing areas and disposal of dredged material in order to function," 33 C.F.R. Part 325, Appx. B § 7(b)(3), is not, as plaintiffs claim, "indistinguishable" from the 91st Street MTS, RSTS Br. at 20. In fact, it is far more expansive than the 91st Street project, and

9

does not envision the degree of oversight of operations provided here by non-federal regulators. Additionally, this example merely explains that "[p]ermits for such activities are *normally* considered sufficient federal control and responsibility to warrant extending the scope of analysis." *Id.* By its own language, the example does nothing to diminish the deference that the Corps' scope of analysis determination is afforded, particularly where, as here, the Corps' involvement relates solely to dredging, fill, and in- and over-water construction, and state and City regulatory agencies govern the facility's operations.

Lastly in terms of the Corps' NEPA review, plaintiffs contend that the Corps conceded a broader NEPA scope of analysis by allegedly considering benefits of the planned facility. RSTS Br. at 22-23; Kellner Br. at 9-11. However, Plaintiffs confuse consideration of potential environmental impacts of the "federal action" under NEPA, which in this case does not include the entire facility, with the Corps' separate regulations governing the public interest review required for all Department of the Army permits. While the public interest review generally follows the scope of the required NEPA analysis, in appropriate circumstances it may include some discussion of an overall project in order to make the required determination that the permit is not "contrary to the public interest." 33 C.F.R. § 320.4(a)(1).

In terms of the CWA public interest analysis, the *Kellner* plaintiffs' arguments fail for much the same reasons as plaintiffs' NEPA arguments.[3] They allege that the Corps should have evaluated post-construction impacts of the 91st Street MTS on traffic, noise and air quality, and on the Asphalt Green recreational complex, and further allege that the Corps failed to balance potential benefits and detriments of the project relating to construction and operational costs and

---

[3] The Permit authorized dredging and other in-water and over-water activities associated with the construction of the MTS facility on an expanded platform over the East River, but authorized that activity under Section 10 of the Rivers and Harbors Act of 1899, an authorization that plaintiffs do not challenge. Under the CWA, the Permit authorized only the filling of structure-support pilings. *See* USACE 101.

10

land use. Kellner Br. at 16. But these issues pertain to the 91st Street MTS's operation rather than its construction, and thus fall well beyond the scope of the Corps' jurisdiction. To require the Corps to consider such issues with respect to a project such as this one would be to require the Corps to assume authority over issues beyond its area of expertise and that properly fall within the purview of state and local authorities. *See* 33 C.F.R. § 320.4(j)(2) ("The primary responsibility for determining zoning and land use matters rests with state, local and tribal governments. The district engineer will normally accept decisions by such governments on those matters unless there are significant issues of overriding national importance."); *Mall Properties, Inc. v. Marsh*, 672 F. Supp. 561, 573 (D. Mass. 1987) ("a broad grant of authority to the Corps to decide general public policy issues would require an agency to seek to develop expertise 'not otherwise relevant to [its] congressionally assigned functions'" (quoting *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 776 (1983))).

As with their challenge to the scope of the Corps' NEPA analysis, plaintiffs' public interest challenge is essentially a disagreement with the Corps' conclusions. The record is clear that the Corps undertook and extensive analysis of the public interest factors, *see* USACE 138-99, and that analysis is entitled to deference.

## C.     The Corps Adequately Analyzed Alternatives Under Both NEPA and the CWA

Plaintiffs' claim that the Corps failed to adequately consider alternatives to the 91st Street MTS, s*ee* RSTS Br. at 12-17; Kellner Br. at 11-15, is belied by the extensive consideration of both on- and off-site alternatives contained in the administrative record. *See* USACE 120-31. Under NEPA, the Corps must consider a reasonable range of alternatives to the proposed action. 42 U.S.C. § 4332(2)(C)(iii); 40 C.F.R. § 1508.9(b); 33 C.F.R. Part 325 Appx. B § 7(a). The CWA, for its part, obliges the Corps to consider alternatives that are "practicable," taking into

account "overall project purposes." 40 C.F.R. § 230.10(a)(2). The Corps' alternatives analysis meets both standards. By contrast, plaintiffs bear the burden of demonstrating that the scope or extent of the Corps' discussion of alternatives was unreasonable, *Sierra Club v. U.S. Army Corps of Eng'rs*, 935 F. Supp. 1556, 1574 (S.D. Ala. 1996), and here, they fail to meet that burden.

Plaintiffs' disagreement with the Corps' alternatives analysis stems from their disagreement with the City's purpose in undertaking the 91st Street MTS project. The Corps defined the project's purpose as "reconstruct[ing] a Marine Transfer Station so as to reduce truck traffic and air pollution and allow for equitable distribution of waste transfer, by providing barge transportation of solid waste for the residents of Manhattan." USACE 99. In light of this project purpose, plaintiffs' criticisms of the City's borough equity policy are unavailing. *See* RSTS Br. at 14-16; Kellner Br. at 14-15. Under both NEPA and the CWA, the Corps was obliged to take the project's purpose into account. *See City of Shoreacres*, 420 F.3d at 450-51 ("NEPA requires only that the Corps consider alternative relevant to the applicant's goals and the Corps is not to define what those goals should be."); *Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1169 (10th Cir. 2012) ("[t]o be practicable" under the CWA, "an alternative site would have to satisfy [the applicant's] site selection criteria"). This includes taking into account "location-specific overall project purpose definitions where the specific site was essential to the project purpose." *Sierra Club*, 450 F. Supp. 2d at 526. Accordingly, the Corps properly considered and rejected off-site locations that are not located in Manhattan, such as the Harlem Yards site in the Bronx, as well as locations such as Randall's Island and Ward's Island, which would be accessible only by directing truck traffic through other boroughs. USACE 125-26. Thus, even if, as plaintiffs claim, sites outside of Manhattan "make[] more sense from an environmental perspective," RSTS Br. at 15, and the "borough equity" policy is

"an entirely political consideration," Kellner Br. at 15, the Corps' deference to that policy was in keeping with its statutory obligations and did not render its alternatives analysis arbitrary and capricious.

Nor was it improper for the Corps to consider the City's analysis of alternatives. *See* RSTS Br. at 13-14; Kellner Br. at 11. Indeed, preventing the Corps from relying on alternatives analyses conducting by permit applicants "would place unreasonable and unsuitable responsibilities on the Corps . . . ." *Friends of the Earth v. Hintz*, 800 F.2d 822, 835-36 (9th Cir. 1986). And the Corps did, in fact, analyze a number of potential off-site alternatives in Manhattan, rejecting them because, for example, they did not provide sufficient space for the proposed MTS facility or were subject to City or state zoning laws that would preclude the MTS project from being sited there. *See* USACE 121-123. Plaintiffs' disagreements with the Corps' evaluation of these alternative locations are self-serving, *see* RSTS Br. at 16-17; Kellner Br. at 13-15, and amount merely to a disagreement with the Corps' conclusions. But "[u]nder the practicable alternatives test, the Corps is not required to conduct an independent feasibility evaluation of each alternative site merely because a party disagrees with its ultimate conclusion." *Town of Norfolk v. U.S. Army Corps of Eng'rs*, 968 F.2d 1438, 1448 (1st Cir. 1992).

Contrary to plaintiffs' claims, RSTS Br. at 17; Kellner Br. at 12, the Corps also adequately considered a number of on-site alternatives, including two "no action" alternatives. *See* USACE 127-30. It properly rejected various on-site alternatives either because they could not accommodate the type of MTS the City envisioned, or because they would cause additional adverse impacts. *See id.* at 127-29. It rejected both "no action" alternatives because neither one was compatible with the City's goal of "provid[ing] primarily barge transportation of solid waste for residents of Manhattan." USACE 130. Again, plaintiffs' complaints about the Corps'

13

rejection of these alternatives rest on their objection to the City's project purpose, not on the nature of the Corps' analysis.

The *Kellner* plaintiffs' arguments concerning the anticipated costs associated with the transport and disposal of waste from the 91st Street MTS, as well as potential traffic and air quality issues, *see* Kellner Br. at 13-14, are unavailing. As a threshold matter, these arguments rely on evidence that was not in the administrative record. Beyond that, however, they fail to demonstrate that any alternative consistent with the City's overall project purpose would be better suited than the 91st Street MTS project. In effect, the *Kellner* plaintiffs would have the Corps invalidate the City's SWMP rather than issue the Permit for activities over which the Corps has jurisdiction.

Lastly, the *Residents for Sane Trash Solutions* plaintiffs incorrectly raise the issue of the applicability of DSNY's siting rules with respect to commercial waste facilities. *See* RSTS Br. at 14-16. But "[t]he primary responsibility for determining zoning and land use matters rests with state, local and tribal governments," and the Corps will defer to those determinations absent "significant issues of overriding national importance." 33 C.F.R. § 320.4(j)(2). This argument therefore has no bearing on the Corps' analysis of alternatives to the 91st Street project and is, in effect, another attempt to circumvent the City's project purpose.

In sum, the Corps' alternatives analysis exhibits a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). As such, it satisfies the arbitrary and capricious standard, and plaintiffs are not entitled to judgment as a matter of law on this issue.

**D.      The Corps Adequately Considered Potential Effects on Waters of the United States**

The *Kellner* plaintiffs' claim that there was "no basis" for the Corps' determination that the permitted activity would not result in a significant degradation of the waters of the United States is incorrect. *See* Kellner Br. at 16-19. Under the 404(b)(1) Guidelines, the Corps may only issue a permit where doing so would not contribute to the significant degradation of the waters of the United States. 40 C.F.R. § 230.10(c). It may also mitigate degradation to waters by requiring the applicant to take "appropriate and practicable steps" to "minimize potential adverse impacts of the discharge on the aquatic ecosystem." 40 C.F.R. § 230.10(d).

Here, the Corps did just that. Relying on input not only from the City and its agencies, but also from the EPA and NOAA-NMFS, it considered the principal effects of the permitted activity on the aquatic environment: the increased amount of shading that would result from the expansion of the pier at the 91st Street site and changes to the topography of the site that would result from dredging. *See* USACE 114-15, 201-02. Its determination that there would be no significant degradation to the water of the United States was founded, in large part, upon its extensive consultation with NOAA-NMFS and its adoption of the conservation recommendations that NOAA-NMFS advanced. USACE 201-15. The *Kellner* plaintiffs, relying on extra-record evidence, argue that the Corps' assessment failed to fully account for the impact of dredging at the 91st Street site and the South Bronx and Bush Terminal mitigation sites on winter flounder. Kellner Br. at 16-19. But they concede that, based on its extensive review and consultation, the Corps concluded that fish species would return to the 91st Street site and mitigation sites following the completion of construction. *See* USACE 4559, 4606. At bottom, the *Kellner* plaintiffs merely disagree with the conclusions that the Corps reached by means of a review of potential adverse aquatic impacts that was more than adequate.

The *Kellner* plaintiffs also miss the mark in arguing that the Mitigation Plan does not provide for performance standards and monitoring. Kellner Br. at 18-19. The Mitigation Plan more than compensates for the shading, dredging, and fill that will occur at the 91st Street site. *See* USACE 59-94. Moreover, General Condition 6 of the Permit and Special Conditions J through N of the Permit oblige the City to complete its mitigation activities, contemplate Corps inspections of the mitigation sites, and require the City to take corrective action in the event its mitigation activities fail to comply with the Mitigation Plan. *See* USACE 1-5. In other words, it is simply not true that "it will be impossible to know whether winter flounder and other affected species are returning to the Site and the mitigation sites once dredging and other construction work have been completed." Kellner Br. at 18-19. By its own terms, the Permit contemplates ongoing coordination between the Corps and the City to address potential issues concerning the degradation of waters.

### E.   The Corps Was Not Required to Supplement Environmental Analysis in Light of Hurricane Sandy

Plaintiffs' arguments that the Corps was required to supplement its environmental review under NEPA and to reevaluate its issuance of the Permit in light of Hurricane Sandy are without merit. Here, plaintiffs rely primarily on the statements of public officials, *see* RSTS Br. at 9-10, and extra-record evidence, *see* Kellner Br. at 22-23. But the Corps' decision that a supplemental EA was not necessary is entitled to deference.

The CEQ's NEPA regulations provide that agencies must supplement their environmental review where "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii); *see also* 33 C.F.R. § 230.13(b) (the Corps should supplement its environmental review "whenever required" by the CEQ regulations). An agency's decision whether to

supplement its environmental review is subject to a "rule of reason" and should be upheld unless it is arbitrary and capricious. *Marsh*, 490 U.S. at 372-76. Here, the administrative record is clear that the Corps considered flooding issues both before and after Hurricane Sandy, and that its decisions not to supplement its EA or reconsider the issuance of the Permit were reasonable.

In response to issues raised during the public comment period concerning flooding risks, *see* USACE 161-62, DSNY provided information to the Corps explaining that the pier level at the planned 91st Street MTS would be six inches above the 100-year Base Flood Elevation, in compliance with applicable state building codes and regulations for waste management facilities. *See id.*; USACE 2564-65. Moreover, DSNY explained that the MTS's loading level, where garbage is containerized, would be some 14 feet about the pier level and thus out of reach of floodwaters even during a Category 4 storm. USACE 162, 2565. Based on this information, the Corps reasonably concluded that DSNY had adequately considered flood risks and designed the MTS to minimize adverse impacts from flooding. USACE 162.

Neither Hurricane Sandy nor the FEMA's subsequent issuance of new ABFEs for the 91st Street site are "game-changer[s]," RSTS Br. at 9, in terms of the essential adequacy of the Corps' consideration of flooding issues. In an initial memorandum for record dated March 21, 2013, *see* USACE 11433-36, and later in a revised memorandum issued in June 2013, *see* USACE 11418-29, the Corps reviewed these issues, (i) concluding that the initial design plan for the MTS adequately addressed the potential for flooding, (ii) noting the City's post-Sandy modifications to the design of the facility in order to further reduce flood risks, and (iii) observing that, even during Hurricane Sandy, the only part of the 91st Street MTS that would have experienced flooding was the lower level, which would contain only empty or sealed containers rather than loose garbage. *See* USACE 11419-20.

Plaintiffs are thus incorrect when they claim that FEMA's ABFEs have rendered the Corps' prior consideration of flood risks obsolete. The Corps initial assessment of flood risks remains valid, and the Corps' subsequent revisiting of this issue following Hurricane Sandy only further underscores the minimal flooding risks at the 91st Street site. Accordingly, the Corps' decision to refrain from supplementing its EA or, even more broadly, reconsidering its entire issuance of the Permit, was reasonable and is entitled to deference.

## CONCLUSION

For the foregoing reasons, plaintiffs' motions for summary judgment should be denied.

Dated: New York, New York
December 23, 2013

> Respectfully submitted,
>
> PREET BHARARA
> United States Attorney for the
> Southern District of New York
> *Attorney for the Defendants the United States*
> *Army Corps of Engineers and Colonel*
> *Paul E. Owen*
>
> By:   /s/ Christopher Connolly
> CHRISTOPHER CONNOLLY
> Assistant United States Attorney
> 86 Chambers Street, 3rd Floor
> New York, New York 10007
> Tel.: (212) 637-2761
> Fax: (212) 637-2786
> E-mail: christopher.connolly@usdoj.gov