UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------- x

NEW YORK STATE ASSEMBLY MEMBER MICAH Z.
KELLNER, et al.,

                                    Plaintiffs,          12 CV 8458 (PAC)

              -against-

UNITED STATES ARMY CORPS OF ENGINEERS, et
al.,

                                    Defendants

---------------------------------------------------------------------- x

RESIDENTS FOR SANE TRASH SOLUTIONS, INC., et
al.,

                                    Plaintiffs,

              -against-
                                                         12 CV 8456 (PAC)
UNITED STATES ARMY CORPS OF ENGINEERS, et
al.,

                                    Defendants.


---------------------------------------------------------------------- x

### CITY DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS AND FOR SUMMARY JUDGMENT

                              JEFFREY D. FRIEDLANDER
                              ACTING CORPORATION COUNSEL
                              OF THE CITY OF NEW YORK
                              100 Church Street
                              New York, New York 10007

Of Counsel:
      Christopher G. King
      Katie Kendall
      Carrie Noteboom

# TABLE OF CONTENTS

ARGUMENT ..................................................................................................... 1

POINT I ............................................................................................................. 1

**THE CITY IS ENTITLED TO PARTIAL JUDGMENT
ON THE PLEADINGS DISMISSING PLAINTIFFS'
EQUAL PROTECTION CLAIMS** ................................................................. 1

    A.  Plaintiffs' Equal Protection Claims Are Time-
        Barred ...................................................................................... 1

    B.  Plaintiffs Have Not Alleged Cognizable Equal
        Protection Claims..................................................................... 5

POINT II ............................................................................................................ 8

**ASPHALT GREEN'S STATE LAW CLAIMS MUST
BE DISMISSED FOR LACK OF JURISDICTION,
AND ALSO FAIL AS A MATTER OF LAW** ................................................. 8

    A.  Asphalt Green's State Law Claims Do Not
        Share a Sufficiently Common Nucleus of
        Operative Facts With the Federal Claims............................. 8

    B.  Asphalt Green's Claims Should Be Dismissed
        as a Matter of Law ................................................................. 10

POINT III ......................................................................................................... 12

**BOTH DSNY AND THE CORPS APPROPRIATELY
CONSIDERED FLOODING IMPACTS** ....................................................... 12

    A.  The Minor Correction to the DSNY Technical
        Memorandum Does Not Alter its Analysis or
        Conclusions............................................................................ 12

    B.  Plaintiffs' Arguments Regarding the Purported
        Risk of Failure of DSNY's Selected
        Floodproofing Measures Mischaracterize the
        Record.................................................................................... 14

CONCLUSION................................................................................................. 15

City Defendants submit this Reply Memorandum of Law in further support of their motion for partial judgment on the pleadings and for summary judgment.[1]

## ARGUMENT

### POINT I

### THE CITY IS ENTITLED TO PARTIAL JUDGMENT ON THE PLEADINGS DISMISSING PLAINTIFFS' EQUAL PROTECTION CLAIMS

As set forth in their opposition to the City's Rule 12(c) motion, Plaintiffs argue that they are the only citizens in the City living in a densely populated residential neighborhood who are not afforded a 400-foot buffer zone from the City-owned MTSs being constructed pursuant to the SWMP.  *Kellner* Opp. Br., dated December 23, 2013, at 5-6 (*Kellner* Docket No. 82); *RSTS* Opp. Br., dated December 23, 2013, at 20-21 (*RSTS* Docket No. 68)  This focus on the 400-foot rule, promulgated in 2004, and the misguided attempt to contrast their circumstances with those of the entire citizenry of New York City demonstrate why Plaintiffs' claims are both time-barred and fail as a matter of law.

**A.    Plaintiffs' Equal Protection Claims Are Time-Barred**

      **1.    Plaintiffs' Claims Accrued, at the Latest, When the City Finalized Its Decision To Site the MTS at East 91st Street in 2006**

In their attempt to extend their claims well past the expiration of the statute of limitations and relitigate issues arising from City actions and decisions that occurred more than seven years ago, Plaintiffs contend that the statute of limitations did not begin to run until July

---

[1] This reply brief addresses Plaintiffs' equal protection claims, state common law claims, and claims related to the State Environmental Quality Review Act ("SEQRA"). For Plaintiffs' CWA and NEPA claims, the City respectfully refers the Court to its opening brief and its brief in opposition to Plaintiffs' Motions for Summary Judgment, as well as the Corps' briefs, which extensively discuss these issues.

20, 2012, when the Corps of Engineers its permit.  While the Corps permit is required for the construction of the MTS, this approval was not necessary to inform Plaintiffs that the City had selected the East 91st Street location for the MTS, the act that Plaintiffs allege violates their equal protection rights.  *See Kellner* A.C. ¶¶ 167-79; *Residents* A.C. ¶¶ 174-78.  Equal protection claims accrue the moment "the plaintiff knows or has reason to know of the injury which is the basis of his action."  *Pearl v. City of Long Beach*, 296 F.3d 76, 80 (2d Cir. 2002).

In this case, the act giving rise to Plaintiffs' claim was independent of the Corps permit proceeding, and occurred no later than 2006, the date the SWMP was approved.[2] Plaintiffs clearly knew or should have known about the siting decision by that date.  Where, as here, plaintiffs have "the necessary information as to the nature or duration" of the alleged injury to formulate an equal protection claim, the statute of limitations begins to run.  *Schulz v. Milne*, 1996 U.S. App. LEXIS 26266, *12 (9th Cir. 1996) (even though city planning staff "lacked the power to authorize the [plaintiffs] to go ahead with their building plans," the statute of limitations began to run at the time of the staff's determination because it was the staff's delay that plaintiffs cited as the basis of their equal protection claim); *see also Sampson v. Town of Salisbury*, 441 F.Supp.2d 271, 276. (D.Mass. 2006) (plaintiffs' equal protection claim began to accrue at the time of the original plan approval because it was the basis for the alleged differential treatment, not the later date when the building permit was granted).

---

[2] The discovery sought by the *Kellner* Plaintiffs underscores this point.  *See Kellner* Opp. Br. at 10 n.9.  The litany of purported factual issues they identify relate solely to City actions and decisions that occurred prior to 2006 and/or are completely unrelated to the Corps permit proceedings.  This request highlights the important policy reasons underlying statutes of limitations—to timely adjudicate matters to ensure that basic facts are not lost or obscured by the passage of time.  *See Toussie v. United States*, 397 U.S. 112 (U.S. 1970).

It simply does not make sense that an equal protection claim based exclusively on the City's 2006 siting decision would not accrue until the Corps issued its permit to proceed with construction in 2012.  *See Eagleston v. Guido*, 41 F.3d 865, 871 (2d Cir. 1994) (proper focus is on the allegedly discriminatory act, not the time the consequences of the act were felt by Plaintiffs); *see also* USACE 172-73 (the City "has the primary responsibility for zoning and land use issues associated with the proposed activities").  Because the Corps' jurisdiction does not extend to the City's siting decision, the Corps' action cannot be used as the date that Plaintiffs' claims accrue.

Moreover, one of the Plaintiffs clearly considered itself injured by the MTS project generally, and the purported "violation" of the 400-foot rule specifically, as far back as 2005, when the *ACORN* suit was filed.  *See ACORN* Petition (City Exh. 10) (listing *Kellner* Plaintiff Gracie Point Community Council as a petitioner).  Plaintiffs cannot reconcile their position in this litigation that they did not suffer a concrete injury with regard to equal protection until the Corps permit was issued with the position taken in *ACORN*, in which nearly identical arguments were made regarding the 400-ft rule.  There, petitioners unsuccessfully claimed that the East 91st Street MTS "will create the same damaging impacts in densely populated residential community of Gracie Point that DSNY has stated it is attempting to cure with the proposed new SWMP and its new [400-ft] siting regulations."  City Exh. 10 at ¶¶74-89. Plaintiffs should not be allowed to take a contrary position in this litigation to avoid application of the statute of limitations.

Plaintiffs' equal protection claims accordingly accrued, at the latest, in 2006, and are now time-barred by the three year statute of limitations.[3]

### 2.     The Continuing Violation Doctrine Does Not Apply

Plaintiffs also attempt to resuscitate their time-barred equal protection claims by invoking the equitable "continuing violation" exception to the statute of limitations. *See Kellner* at 4; *RSTS* at 18-19.  This argument is without merit.   The continuing violation doctrine is "disfavored in this Circuit" and is "applied only upon a showing of compelling circumstances." *Remigio v. Kelly*, 2005 U.S. Dist. LEXIS 16789, *25-*26 (S.D.N.Y. 2005).    Invoking the continuing violation doctrine requires a plaintiff "to plead both an ongoing policy of deliberate indifference" and "some non-time-barred acts taken in furtherance of that policy."  *Harris v. City of N.Y.*, 186 F.3d 243, 250 (2d Cir. 1999).  Plaintiffs have done neither.

First, Plaintiffs have not alleged that the City has an ongoing policy of deliberate indifference with respect to the siting of City-owned MTSs, or any compelling circumstances that would justify the application of the continuing violation doctrine to their equal protection claims.  *See Corona Realty Holding, LLC v. Town of N. Hempstead*, 382 Fed. Appx. 70, 72 (2d Cir. 2010) ("discrete incidents of discrimination that are not part of a discriminatory policy or

---

[3] Plaintiffs' state equal protection claims are similarly barred by the statute of limitations.  *See, e.g., Stop-The-Barge v. Cahill*, 1 N.Y.3d 218, 224 (2003) (holding that the even though the City needed an air permit from DEC to begin construction, the statute of limitations began to run at the issuance of the City's environmental review determination, which had been final for 10 months before the permit was issued).  The cases cited by Plaintiffs do not dictate otherwise and their attempt to distinguish *Walton v. N.Y.S. Dep't of Corr. Servs.*, 8 N.Y.3d 186 (2007), misses the mark.  In *Walton*, the Court held the statute of limitations did not accrue until the phone call rate structure, the issue petitioners claimed violated their right to equal protection, was finalized by the Public Service Commission, the entity that regulates call rates. As explained *supra,* this is not the situation here.  It is immaterial whether the 4-month statute of limitations, CPLR 217, or the six-year statute of limitations, CPLR 213(1), applies to Plaintiffs' state equal protection claims. Plaintiffs' state equal protection claims are time-barred under either provision.

practice…cannot be continuing violations.") (citation omitted).   While the *RSTS* Plaintiffs do argue for the first time in their Opposition Brief that the SWMP is an ongoing discriminatory policy, their Amended Complaint contains no allegations that the SWMP or the borough equity policy violate their right to equal protection.  *Cf. RSTS* A.C. ¶¶ 33-36 (expressing general dislike for the SWMP's borough equity policy).  Plaintiffs' last-ditch attempt to keep their time-barred equal protection claims alive by bootstrapping arguments based on allegations not present in the pleadings should be rejected.

Second, Plaintiffs have not alleged any non-time-barred acts taken in furtherance of a discriminatory policy.  Allegations that the City continued with its plan to construct the MTS are not sufficient.   Indeed, contrary to Plaintiffs' contention, "[a] continuing violation is not stated if all that appears from the complaint is that the plaintiff continues to suffer from the ongoing effects of some past act of discrimination." *Goldman v. Sears, Roebuck & Co.*, 607 F.2d 1014, 1018 (1st Cir. 1979), *cert denied*, 445 U.S. 929 (1980).

**B.    Plaintiffs Have Not Alleged Cognizable Equal Protection Claims**

Plaintiffs allege that they are the only citizens in the five boroughs living in a residential neighborhood who are not afforded a protective 400-foot buffer zone from the City's MTSs.  *Kellner* Opp. Br. 5; *RSTS* Opp. Br. 20.  Somewhat confusingly, Plaintiffs argue that even though the DSNY Siting Rule does not preclude the City from locating the MTS within 400 feet of a residential district, nevertheless the City's failure to voluntarily observe a 400-foot buffer at the East 91st Street MTS violated their right to equal protection.  This is because, Plaintiffs contend, the City "will not and would not build [a transfer station] in any other similarly situated residential neighborhood." *Kellner* A.C. ¶ 168.   This argument is unavailing.  Because Plaintiffs do not allege that they were denied a right granted by a statute or official policy, they have not alleged an equal protection violation.  *See, e.g., O'Bradovich v. Village of Tuckahoe,* 325 F.

Supp. 2d 413, 431-32 (S.D.N.Y. 2004) ("Neither the Supreme Court nor the Second Circuit has held that the Equal Protection Clause applies when a plaintiff alleges unequal treatment that does not stem either from the existence of a discriminatory law or policy, or the discriminatory enforcement of an otherwise non-discriminatory law or policy").

To the extent Plaintiffs claim that the MTS violates equal protection because the City's Siting Rule establishes a policy that any transfer station, whether private or City-owned, new or existing, will be prohibited from being located within 400 feet of a residential district or park, they did not adequately plead such a theory, and in any event it is contradicted by the text of the 400-foot rule itself.  The rule restricts the siting of new solid waste transfer stations but grandfathers in those facilities with existing permits, and it also does not apply to DSNY facilities.  *See* 16 RCNY §§ 4-31 & 4-32(b); NYC Admin. Code § 130(b) (prohibiting "all persons and public agencies *other than the Department* [of Sanitation]" from operating solid waste transfer stations without a permit from DSNY) (emphasis added); *ACORN v. Bloomberg*, 2006 N.Y. Misc. LEXIS 2471 at *56-57 (Sup. Ct. N.Y. Cty 2006).  Thus, the very text of the rule contradicts Plaintiffs' contention that it represents a *per se* policy against locating any and all transfer stations within this limiting distance.

Plaintiffs also fail to establish sufficient factual allegations of disparate treatment.[4]  *See, e.g., Assoko v. City of N.Y.*, 539 F. Supp. 2d 728, 735 (S.D.N.Y. 2008) (holding that the individualized nature of the government's discriminatory conduct is a critical component to the "class of one" claim); *Collins v. Goshen,* 635 F.2d 954, 957 (2d Cir. 1980).  New York

---

[4] For the first time, in opposition to the City's motion, *RSTS* Plaintiffs assert that the City's decision to site the East 91st Street MTS was "motivated by ill will."  *RSTS* Opp. Br. at 24.  But this offensive suggestion was never specifically alleged in the Amended Complaint and is not supported by any facts.

City's citizens, land uses, and infrastructure differ from block to block and neighborhood to neighborhood.  Plaintiffs cannot reasonably claim that the circumstances of all citizens are so similar that they can serve as an appropriate comparator for equal protection analysis.  In Manhattan alone, there is a DSNY paper recycling MTS at West 59th Street, located in Hudson River Park, which is slated to be converted to a commercial waste MTS under the SWMP.  *See* City Exh. 3, Section 4.3.  Even if Plaintiffs could artificially limit the appropriate comparison to those citizens living near the SWMP's three remaining City-owned MTSs, these facilities are not isolated from nearby sensitive land uses in ways that are meaningfully different from the East 91st Street MTS.  Indeed, all of the MTSs are proximal to various sensitive receptors, including residential development, residential zoning districts, parks, and institutional uses such as a home for handicapped children and a school for special children.[5]  Thus, Plaintiffs' allegations that they alone are uniquely harmed by the East 91st Street MTS are belied by the very documents that underlie their pleadings.  *See Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004).

Similarly, Plaintiffs' arguments that they are "the only citizens whose air, streets, parks, low-income housing, and recreational center will be fouled by the constant stench of noxious waste, by a constant stream of huge garbage trucks on their already congested streets twenty-four hours a day, and by the constant threat of flooding and other spread of contaminating garbage," demonstrate a breathtaking disregard for those fellow NYC citizens who also live in neighborhoods surrounding municipal and private industrial facilities, including the other three

---

[5] For instance, like the East 91st Street MTS—which sits on a pier on the east side of a major highway (the FDR)—the Southwest Brooklyn MTS is located on the south side of a major highway (Shore Parkway) across from residential buildings and institutional facilities on the north side. FEIS 5-4 to 5-5; *see also* FEIS Figures 4.2-1, 5.2-1 & 7.2-1; FEIS at 4-2 to 4-3 & 7-4 to 7-5 (identifying residential and other sensitive uses are located near all three other MTSs).

MTSs.  *RSTS* Opp. Br. at 21-22; *see also Kellner* Opp. Br. at 5-6.   This is readily apparent in Plaintiffs' nonsensical attempt to distinguish their own circumstances from those of the residents of Jamaica, where there are three existing private waste transfer station within 400-feet of a residential district.  Tellingly, Plaintiffs conveniently ignore that the 400-foot siting rule does not apply to the East 91st Street MTS when they argue that the residents in Jamaica are not an appropriate comparator because the 400-foot rule does not apply to private waste transfer stations with existing permits.

Accordingly, Plaintiffs' equal protection claims must be dismissed.

### POINT II

### ASPHALT GREEN'S STATE LAW CLAIMS MUST BE DISMISSED FOR LACK OF JURISDICTION, AND ALSO FAIL AS A MATTER OF LAW

The *Kellner* Plaintiffs' arguments in opposition to the City's motion for judgment on the pleadings regarding Asphalt Green's state law claims demonstrate why the Court must dismiss these claims for lack of subject matter jurisdiction.  Other than unsupported, conclusory statements that the City's arguments are "preposterous," Asphalt Green fails to satisfy the "common nucleus" test required to invoke this Court's jurisdiction over its state law claims.  In addition, their claims fail as a matter of law.

**A.    Asphalt Green's State Law Claims Do Not Share a Sufficiently Common Nucleus of Operative Facts With the Federal Claims**

Only state law claims "so closely related to the federal questions as to form part of the same case or controversy under Article III" may be considered under pendant jurisdiction. *Lyndonville Savings Bank & Trust Co. v. Lussier*, 211 F.3d 697, 704 (2d Cir. 2000).  "When the federal and state claims rest on 'essentially unrelated facts,' the standard for supplemental jurisdiction is not met, and the Court lacks jurisdiction over the state claim." *Meserole St.*

*Recycling, Inc. v. City of New York*, 2007 U.S. Dist. LEXIS 4580 (S.D.N.Y. 2007) (citing *Bu v. Benenson*, 181 F.Supp.2d 247, 251 (S.D.N.Y. 2001)).   A plaintiff asserting subject matter jurisdiction has the burden of proving its existence by a preponderance of the evidence. *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

Here, the *Kellner* Plaintiffs do not even bother to explain which facts underlying Asphalt Green's contract and trespass claims share a "common nucleus" with their federal causes of action.   *See Kellner* Br. at 11 (noting only that the "state law claims arise out of the City's plan to build the new MTS").   Nor could they.   None of the facts they point to in arguing these claims (*e.g.*, the terms of the License Agreement, the cost of its termination, and the nature of the access to the Asphalt Green campus that construction requires) is remotely at issue in the federal claims before the Court.   Simply because the state law claims may involve or touch on the same facility as the federal claims is insufficient.   *See Meserole St. Recycling*, 2007 U.S. Dist. LEXIS 4580 at *28-29 (dismissing for lack of jurisdiction a state law challenge to a permit denial, while refusing to dismiss Section 1983 claim challenging a warrantless search of the same facility, even though issues regarding the search could arguably have some bearing on the permit denial).

There is a similar lack of a common factual nucleus between Asphalt Green's nuisance claim and the federal claims.   The nuisance claim is premised on damages that Asphalt Green alleges it will suffer as a result of the *construction* (not operation) of the MTS and access ramp, such as noise, odors, dust and vibrations.   *Kellner* A.C. ¶ 196.   By contrast, in their federal environmental claims, Plaintiffs complain that the Corps did not adequately consider purported environmental impacts from the facility's *operation*, as well as the alleged degradation of waters from in-water work that has nothing to do with the Asphalt Green facility.   *See Kellner* Opp. Br. at 18-21.   Thus, unlike in the cases cited by the *Kellner* Plaintiffs, the alleged facts underlying

the state law nuisance claim are sufficiently different from those underlying the federal claims so that no common nucleus is present.  *See Meserole St. Recycling*, 2007 U.S. Dist. LEXIS 4580.

Although the *Kellner* Plaintiffs cite a number of cases where courts have exercised supplemental jurisdiction over state law nuisance and contract claims, *see Kellner* Opp. Br. at 11-12, it is equally common for courts to find a lack of jurisdiction over such state claims even when federal environmental claims are plead, or to decline to exercise jurisdiction where the federal claims are disposed of early in the litigation.[6]  *See, e.g.*, *87th Street Owners Corp. v. Carnegie Hill-87th Street Corp.*, 251 F.Supp.2d 1215, 1222 (S.D.N.Y. 2002); *Brooklyn Bridge Park Coalition v. Port Auth. of New York & New Jersey*, 951 F.Supp. 383, 395 (E.D.N.Y. 1997); *Brooklyn Heights Ass'n, Inc. v. Nat'l Park Svc.*, 818 F.Supp.2d 564, 566 & 570-71 (E.D.N.Y. 2011).  Here, whether decided in Defendants' favor or the Plaintiffs', summary judgment will necessarily dispose of the NEPA and Clean Water Act claims, with no additional fact finding required.   At that point, considerations of judicial economy will further militate against exercising jurisdiction over Asphalt Green's state law claims.  *See* 28 U.S.C. § 1367(c)(3); *Valencia v. Lee*, 316 F.3d 299, 306 (2d Cir. 2003) (collecting cases).

**B.      Asphalt Green's Claims Should Be Dismissed as a Matter of Law**

Asphalt Green's arguments regarding its rights under the License Agreement are unavailing.  First, though the *Kellner* Plaintiffs erroneously characterize the parcels at issue as

---

[6] Indeed, several of the cases cited by the *Kellner* Plaintiffs involve situations where defendants sought to dismiss state claims during, or even after, trial.  *See, e.g.*, *Enercomp, Inc. v. McCorhill Publishing, Inc.*, 873 F.2d 536, 545-46 (2d Cir. 1989).  In other cases, there was no dispute—and no discussion—regarding the degree of relatedness of the state and federal claims.  *See, e.g.*, *Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 743 (11th Cir. 2006); *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1050 (2d Cir. 1985); *Orange Envtl., Inc. v. County of Orange*, 860 F.Supp. 1003, 1029 (S.D.N.Y. 1994).

"Asphalt Green's property" (*Kellner* Opp. Br. at 18), there is no dispute that the entire Asphalt Green campus, including the facilities located thereon, are owned by the City of New York. *See* License at 1 (reciting Asphalt Green as "City-owned" property); *Kellner* A.C. ¶ 185. Under the City Charter, the City cannot dispose of its real property, including by lease, without going through established Uniform Land Use Review Procedures ("ULURP"). N.Y.C. Charter § 197-c(a)(10). The Asphalt Green License Agreement did not go through ULURP, and hence cannot convey the type of property interest that would give rise to a common law claim of trespass. *See also* Rst.2d Torts, Chap. 7 Scope Note (noting that the Trespass chapters "deal with invasions of the interest in the *exclusive possession* and physical condition of land") (emphasis added); License Agreement ¶ 3 (expressly noting "that the City has title to the Property and that no land, building, space or equipment is leased to AG"). The Agreement gives Asphalt Green the right to "possess and solely to use" the Property, *not* the right to "solely possess" it. This careful drafting further refutes Asphalt Green's argument that the Agreement should be considered a lease.

Similarly, the physical occupation of at 16-inch strip of land required for ramp construction, as established in *Powell*, does not constitute a trespass because Asphalt Green is not entitled sole possession of the property. *Powell* further establishes that this occupation will not interfere with Asphalt Green's operations, and therefore will not constitute a breach of the License Agreement. *See Powell v. City of New York*, 85 A.D.3d 429 (1st Dep't 2011).

Finally, contrary to Asphalt Green's claims, the City has properly invoked *res judicata* as an additional bar to their nuisance claim. The *ACORN* court specifically considered and rejected a claim that the MTS would create a public and private nuisance. The *Kellner* Plaintiffs' argument that Asphalt Green's interest are materially different from those of the *ACORN* petitioners, who were represented by the same counsel as Asphalt Green's counsel in

this proceeding,[7] and made similar claims regarding the facility's impacts, are unconvincing. *Cf. Wilder v. Thomas*, 854 F.2d 605, 620-21 (2d Cir. 1988); *ACORN*, 2006 N.Y. Misc. LEXIS 2471 at *56-57.

**POINT III**

**BOTH DSNY AND THE CORPS APPROPRIATELY
CONSIDERED FLOODING IMPACTS**

In an attempt to obscure the weaknesses in their flooding claims, Plaintiffs seize on the minor correction made to the DSNY Technical Memorandum in October, incorrectly contending that the City provided "misinformation" to the public and the Corps, and has now "admitted" that loose garbage will be present on the pier level.  But Plaintiffs' overheated rhetoric is no substitute for a valid argument.  A review of the record demonstrates that both DSNY and the Corps were well aware of the facility's design at all stages of the process, and that both agencies took an appropriate hard look at the post-Sandy information and potential flood impacts of the MTS.  *See generally* City Opening Br. at 26-32; City Opp. Br. at 8-16.

**A.      The Minor Correction to the DSNY Technical Memorandum Does Not Alter its Analysis or Conclusions**

In their opposition to the City's and the Corps' motions for summary judgment, Plaintiffs erroneously contend that the pier level of the MTS will contain loose garbage.  *See Kellner* Opp. Br. at 24; *RSTS* Opp. Br. at 6.  Plaintiffs' mistaken conclusion that there will be loose garbage is based on a minor correction to the DSNY Technical Memorandum that was provided by the City on October 23, 2013.  That correction clarified that waste would be processed on the loading level (the second level of the facility), and would be pushed through

---

[7] *Kellner* Plaintiffs erroneously state that the City claimed the *Powell* case was brought by the same attorneys as the instant action.  *Kellner* Opp. Br. at 17 n.11.  Rather, in the City's opening
Continued…

openings in the loading level floor into containers located on the pier level, where the containers are also sealed.  Brodsky Reply Decl. at ¶ 2; DSNY Technical Memorandum at 2.  The corrected document also reiterated that the loading level, where the processing of loose waste would occur, is located approximately 16 feet above the 100-year flood plain shown on the 2007 FEMA flood insurance maps.  DSNY Technical Memorandum at 2.

Plaintiffs are entirely incorrect when they claim that this change means that there will now be loose garbage on the pier level of the MTS.  *See Kellner* Opp. Br. at 24; *RSTS* Opp. Br. at 6.  Rather, as has been true of the facility's design from the beginning, it is still the case that the only level of the facility where loose waste will be present is the loading level, the middle tier of the facility's three-level design.  Brodsky Reply Decl. ¶ 3; SWMP at 3-9; FEIS at 2-7 to 2-8; DSNY Permit Application at Section 2.2 (USACE 4366-68).  As with all of the City-owned MTSs included in the SWMP, collection vehicles enter a tipping floor at the uppermost level and tip waste onto the second-level loading floor, 12 feet below.  On the loading floor, waste is sorted and pushed by front-end loaders through slots in the floor directly over intermodal containers, located on the first level of the processing building.  Equipment operating over the slots in the loading floor evens and tamps the waste in the containers, which are then lidded with leakproof gasketed covers and moved by trolley to the external pier level of the facility.  SWMP at 3-9.  This description of the facility's operations was included in DSNY's permit application submitted to the Army Corps.  *See* DSNY Permit Application at Section 2.2 (USACE 4366-68) (noting that "[o]n the loading floor, loaders would either: push the waste into loading slots located over open-top containers located on the indoor pier level, at an elevation 16

---

brief at 26, Asphalt Green "is represented by the same counsel as the *ACORN* petitioners."

feet below; or push the waste into storage piles").  Simply put, there has been no change in the information before the Corps or DSNY regarding the facility's design.

Similarly, that the containerization process occurs on the pier level (as was always presented in the project documents) does not mean that loose waste will be present on the pier level.  In fact, the only waste present on the pier level will be in containers, and the containers will be sealed and lidded within the enclosed processing building.  The intermodal containers are approximately 20 feet long, 12 feet high and 8 ½ feet wide.  SWMP at 3-9.  The slots in the loading level floor are 18 feet long by 7 feet wide.  Thus, the container opening is larger than the loading slot, which will ensure that garbage does not escape the container during the loading process.  Brodsky Reply Decl. ¶ 5 & Exh. A.

## B.    Plaintiffs' Arguments Regarding the Purported Risk of Failure of DSNY's Selected Floodproofing Measures Mischaracterize the Record

In opposition to the City's motion, Plaintiffs repeat their erroneous argument (also set forth in their summary judgment motions) that DSNY's post-Sandy design changes to the MTS have a "moderate probability of failure."  *RSTS* Opp. Br. at 7.  As explained in detail in the City's opposition to Plaintiffs' motions for summary judgment, this argument misleadingly focuses on a statement made regarding the perimeter floodproofing measures standing alone.  *See* 2013 DSNY Technical Memorandum Attachment 2 at 10 (discussing design option four, consisting of only perimeter floodproofing); City Opp. Br. at 11-12.  But this is not the selected floodproofing design.  Rather, these measures have been combined with critical room dry floodproofing to provide a second layer of protection for the MTS in the event of a future flood event.  *See* 2013 DSNY Technical Memorandum Attachment 2 at 12 (noting that an additional measure of safety can be achieved by combining perimeter floodproofing with flood protection of critical rooms, which is option selected by DSNY).

In sum, Plaintiffs cannot point to any significant new information or changed circumstances that would result in potential new significant impacts that were not already considered, and thus would trigger the need for an SEIS. *See Riverkeeper Inc. v. Planning Bd. of Town of Southeast*, 9 N.Y.3d 219, 233 (2007); *Kellner v. City of New York Dep't of Sanitation*, 2012 NY Slip Op 32771U, 2012 N.Y. Misc. LEXIS 5268 (Sup. Ct. N.Y. Cty. 2012), *aff'd* 107 A.D.3d 529 (1st Dep't 2013); 6 NYCRR § 617.9(a)(7)(i).

## <u>CONCLUSION</u>

For the foregoing reasons, the City respectfully requests that the Court grant the City's motion for partial judgment on the pleadings with respect to claims six through nine in the *Kellner* action and claims four and five in the *Residents* action; further grant the City's motion for summary judgment on claims one through five and ten through twelve in the *Kellner* action and claims one through three in the *Residents* action; and deny Plaintiffs' motions for summary judgment in their entirety, together with any other appropriate relief.

Dated:      New York, New York
              January 22, 2014

                        JEFFREY D. FRIEDLANDER
                        Acting Corporation Counsel of the
                         City of New York
                        Attorney for the City Defendant
                        100 Church Street
                        New York, New York 10007
                        (212) 356-2319

                  By:    ***/s/ Carrie Noteboom***
                        Carrie Noteboom (CN 7173)
                        Assistant Corporation Counsel
                        Environmental Law Division

*Of Counsel:* Katie Kendall, Christopher Gene King