UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
RESIDENTS FOR SANE TRASH SOLUTIONS, INC., :
CONGRESSWOMAN CAROLYN B. MALONEY, :
JED H. GARFIELD, ELLIOT MERBERG, LEANNE :
MOORE, PHILIP OPHER, LORRAINE JOHNSON, :
HAROLD S. POSTER, and SUSAN J. MILLER, :
                                                       :      12 Civ. 8456 (PAC)

              Plaintiffs, :
                              :
      -against- :
                              :
UNITED STATES ARMY CORPS OF ENGINEERS, :
THE NEW YORK CITY DEPARTMENT OF :
SANITATION, THE NEW YORK CITY :
DEPARTMENT OF DESIGN AND :
CONSTRUCTION, and THE CITY OF NEW YORK, :
                              :
              Defendants. :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL**
<u>**SUMMARY JUDGMENT**</u>

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ...............................................................................................1

ARGUMENT .....................................................................................................................................2

    I.    DEFENDANTS WERE REQUIRED TO PERFORM A SUPPLEMENTAL REVIEW OF FLOOD RISKS AT THE 91ST STREET MTS IN LIGHT OF SUPERSTORM SANDY AND REVISED FEMA FLOOD LEVELS ....................2

    II.    THE CORPS FAILED TO TAKE AN INDEPENDENT "HARD LOOK" AT ALTERNATIVES TO THE 91ST STREET MTS .......................................................4

    III.    THE SCOPE OF THE CORPS' ENVIRONMENTAL REVIEW WAS IMPROPER.........................................................................................................................7

CONCLUSION.................................................................................................................................10

# **TABLE OF AUTHORITIES**

**Page(s)**

**FEDERAL CASES**

*DOT v. Pub. Citizen*,
　541 U.S. 752 (2004) ......................................................................................................... 9

*Friends of the Earth v. Hintz*,
　800 F.2d 822 (9th Cir. 1986) ........................................................................................ 4, 5

*Mo. Coal. for Env't v. Corps of Eng'rs*,
　866 F.2d 1025 (8th Cir. 1989) .......................................................................................... 9

*Nat'l Audobon Soc'y v. Dep't of the Navy*,
　422 F.3d 174 (4th Cir. 2005) ............................................................................................ 3

*Natural Res. Def. Council, Inc. v. U.S. Army Corps of Eng'rs*,
　399 F. Supp. 2d 386 (S.D.N.Y. 2005) .............................................................................. 1

*Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*,
　556 F.3d 177 (4th Cir. 2009) .......................................................................................... 10

*Save the Bay, Inc. v. U.S. Corps of Eng'rs*,
　610 F.2d 322 (5th Cir. 1980) ............................................................................................ 9

*Sierra Club v. Marsh*,
　714 F. Supp. 539 (D. Me. 1989) ....................................................................................... 6

*Sierra Club v. U.S. Army Corps of Eng'rs*,
　450 F. Supp. 2d 503 (D.N.J. 2006) ............................................................................... 7, 9

*Stewart v. Potts*,
　996 F. Supp. 668 (S.D. Tex. 1998) ................................................................................... 8

*Wetlands Action Network v. U.S. Army Corps of Eng'rs*,
　222 F.3d 1105 (9th Cir. 2000) ...................................................................................... 8, 9

*White Tanks Concerned Citizens v. Strock*,
　563 F.3d 1033 (9th Cir. 2009) .......................................................................................... 9

**STATE CASES**

*Glen Head--Glenwood Landing Civic Council, Inc. v. Town of Oyster Bay*,
　453 N.Y.S.2d 732 (App. Div. 2d Dep't 1982) ................................................................... 3

*Matter of Coal. Against Lincoln West, Inc. v. Weinshall*,
　799 N.Y.S.2d 205 (App. Div. 1st Dep't 2005) .................................................................. 4

*Matter of Halperin v. City of New Rochelle*,
    809 N.Y.S.2d 98 (App. Div. 2d Dep't 2005) ................................................................. 4

*Matter of Molly, Inc. v. Cnty. of Onondaga*,
    770 N.Y.S.2d 542 (App. Div. 4th Dep't 2003) .............................................................. 4

**REGULATIONS**

40 C.F.R. § 1506.5 ................................................................................................................ 4

**PRELIMINARY STATEMENT**

Despite several rounds of briefing, Defendants have still failed to rebut the three principal reasons why the Corps should not have granted a permit to construct the massive 91st Street MTS trash facility in the middle of a densely-populated residential neighborhood:

First, the Corps' permit was based on its conclusion that garbage would be "containerized" on the MTS's loading level "some 14 feet abo[ve] the pier level and thus out of reach of floodwaters." That conclusion was clearly erroneous based on the undisputed facts in the record. Thus, the Corps cannot have reasonably concluded that DSNY adequately considered flood risks and designed the MTS to minimize adverse impacts from flooding.[1]

Second, the Corps' permit was based on its wholesale adoption of the City's policy of "borough equity," and DSNY's analysis of alternatives to the 91st Street MTS, without the "hard look" required by the law. The undisputed facts in the record show that the Corps even directed DSNY to draft the Corps' "independent" analysis of alternatives. That was clearly error.

Third, the Corps resolutely refused to consider the environmental consequences of the 91st Street MTS beyond the construction of the project in the East River. That was erroneous as a matter of law. The Corps has control and responsibility over the operation of the 91st Street MTS because of the connection between the permitted activities (including construction of the facility itself) and the overall project.

In short, a "searching and careful inquiry" shows that the Corps did not take a "hard look" at the environmental consequences of the 91st Street MTS before issuing the Permit. *Natural Res. Def. Council, Inc. v. U.S. Army Corps of Eng'rs*, 399 F. Supp. 2d 386, 399

---

[1] The abbreviations in this memorandum are the same as those in the Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment ("RSTS Mem.," Dkt. No. 50). Citations to "Corps. Opp. Mem." and "City Opp. Mem." refer to the Corps' Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment (Dkt. No. 72) and the City Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment (Dkt. No. 69), respectively. Citations to "Corps Mem." and "City Mem." refer to the Memorandum in Support of the Corps' Motion for Summary Judgment (Dkt. No. 62) and the Memorandum in Support of the City Defendants' Motion for Summary Judgment (Dkt. No. 55), respectively.

(S.D.N.Y. 2005) (citations omitted).  Plaintiffs' motion for partial summary judgment should be granted.

## ARGUMENT

I.  **DEFENDANTS WERE REQUIRED TO PERFORM A SUPPLEMENTAL REVIEW OF FLOOD RISKS AT THE 91ST STREET MTS IN LIGHT OF SUPERSTORM SANDY AND REVISED FEMA FLOOD LEVELS**

The Corps defends its failure to perform a supplemental flood analysis based on information that is indisputably false.  It continues to argue that no supplemental review of the flood risks imposed by the 91st Street MTS was necessary because "even during Hurricane Sandy, the only part of the 91st Street MTS that would have experienced flooding was the lower level, which would contain only empty or sealed containers rather than loose garbage." (Corps Opp. Mem. at 17.)  In other words, the Corps argues that so long as the lowest level of the facility, or the "pier level," will not contain any loose garbage, it is of no moment that revised FEMA guidelines make clear that the flooding of that level of the facility is inevitable.  Yet, in a letter dated October 23, 2013, the City Defendants admitted that their prior representation was inaccurate:  there will indeed be unsealed containers and, as a result, loose garbage on the pier level.  (October 23, 2013 DSNY Ltr. at 1 (Dkt. No. 53).)  According to the Corps' own logic, a supplemental review of the environmental impact of the 91st Street MTS, in light of revised FEMA flood levels, is therefore required.

Remarkably, even after the City Defendants admitted that garbage at the 91st Street MTS would not be containerized on the "loading level," the Corps has submitted two memoranda of law repeating the false statement to this Court and claiming it as the basis for its decision not to perform a supplemental review.  (Corps Mem. at 24; Corps Opp. Mem. at 17.)  This is emblematic of the Corps' review of the flooding issue in general—instead of a careful investigation, the Corps has essentially disregarded the very real flooding dangers posed by the

2

new facility. Accordingly, as a matter of law, the Corps has not given flooding at the 91st Street MTS the "hard look" that the law requires. *See Nat'l Audobon Soc'y v. Dep't of the Navy*, 422 F.3d 174, 185 (4th Cir. 2005).

Like the Corps, the City Defendants argue that they have conducted a "hard look" at the flood risks posed by the 91st Street MTS and determined that their initial review was not impacted at all by FEMA's release of flood guidelines that place the facility significantly below the level at which waters from the East River will rise during a severe storm, such as Superstorm Sandy. Specifically, the City Defendants point to their May 2013 Technical Memorandum as a "considered analysis [that] clearly satisf[ied] SEQRA's requirement to take a 'hard look' at new information."[2] (City Opp. Mem. at 10.) The administrative record reveals that the City Defendants' position is untenable, as there is indisputable evidence that "accurate and highly relevant" new information "at the heart of the environmental objections to the project" emerged *after* the initial environmental review; a supplemental review was therefore warranted. *Glen Head--Glenwood Landing Civic Council, Inc. v. Town of Oyster Bay*, 453 N.Y.S.2d 732, 739 (App. Div. 2d Dep't 1982). That scientific evidence continues to mount, despite the Defendants' studied disregard of the flooding risks.[3]

The administrative record reveals that the facility's design—and specifically "the pier level elevation"—was "defined" by the FEMA flood elevation levels in place at the time the Permit was issued and which are now obsolete. (USACE 161.) DSNY therefore only took into account flood risks to the extent that the pier level of the 91st Street MTS was to be built 6 inches *above* the level recommended by FEMA—but it will in fact be built 4 feet 8 inches *below* this

---

[2] As discussed further in Plaintiffs' Memorandum in Opposition to Defendants' Motions for Summary Judgment ("RSTS Opp. Mem.," Dkt. No. 68), these modifications would not change the structure itself (including its height), would not prevent the facility from flooding, do not account for vital outdoor equipment, and are supported only by vague statements regarding their efficacy. (RSTS Opp. Mem. at 7.)

[3] *See* Justin Gillis, *The Flood Next Time*, N.Y. TIMES, Jan. 13, 2014, at D1, *available at* http://www.nytimes.com/2014/01/14/science/earth/grappling-with-sea-level-rise-sooner-not-later.html.

level.  DSNY could not have possibly taken into account potential flood risks that exist now when these risks were not known at the time the 91st Street MTS was designed.  Rather, the design of the trash facility is unquestionably based on out-of-date assumptions.

Despite the clear evidence in the record that a supplemental review was required, the City Defendants point to New York State cases, wherein courts upheld an agency's decision to not supplement its initial environmental review after the occurrence of an intervening event, as support for their contention that they conducted the necessary "hard look."  (City Opp. Mem. at 10-11.)  In fact, these cases establish just the opposite.  In each of these cases, the agency's initial assessment was found to have sufficiently taken into account all potential environmental impacts.[4]  That is certainly not the case here, where the City's assumptions were irrefutably false, and the Corps does not appear to have ever reviewed DSNY's May 2013 Memorandum.  (Kellner 56.1 Stmt. ¶¶ 187, 229; City Defendants 56.1 Response ¶¶ 187, 229.)

## II.   THE CORPS FAILED TO TAKE AN INDEPENDENT "HARD LOOK" AT ALTERNATIVES TO THE 91ST STREET MTS

The Corps continues to argue that it properly considered alternatives to the East 91st Street location by adopting the City's analysis of alternatives, relying on the *Hintz* case.  (Corps Opp. Mem. at 13 (citing *Friends of the Earth v. Hintz*, 800 F.2d 822, 835-36 (9th Cir. 1986)).)  But in *Hintz,* the court emphasized that "the Corps . . . ha[s] an obligation to independently verify the information supplied to it."  *Hintz*, 800 F.2d at 835; *see also* 40 C.F.R. § 1506.5.  Thus, the court made specific findings that the Corps "evaluated [the applicant's] report,

---

[4] *See Matter of Coal. Against Lincoln West, Inc. v. Weinshall*, 799 N.Y.S.2d 205, 212 (App. Div. 1st Dep't 2005) (upholding Department of Transportation's decision not to undertake an SEIS where studies in the Technical Memorandum "did not identify any significant impacts not identified or considered in the original FEIS"); *Matter of Halperin v. City of New Rochelle*, 809 N.Y.S.2d 98, 109 (App. Div. 2d Dep't 2005) (upholding Zoning Board's decision not to prepare a supplemental review where "there were no environmentally significant modifications made after the Zoning Board issued the FEIS, *nor was there evidence of* changes to the proposal, *newly-discovered information*, or adverse impacts which were inadequately addressed in the FEIS that would warrant, let alone mandate, the preparation of a SEIS" (emphasis added)); *Matter of Molly, Inc. v. Cnty. of Onondaga*, 770 N.Y.S.2d 542, 544 (App. Div. 4th Dep't 2003) (upholding decision not to prepare an SEIS where consulting engineering firm concluded that environmental conditions relating to hotel development "have not become worse since 1989 [when the FEIS was issued] and may in fact have improved").

proffered questions, and only after requesting supplemental reports concurred . . . that no practicable alternatives existed." 800 F.2d at 835. The court further noted that although "[t]he Corps had to depend primarily on [the applicant] for . . . information, [it] exhaustively studied that information prior to making its decision, a decision which, we emphasize, is supported by the conclusions of the concerned resource agencies." *Id.*

Clearly, the court could not make those findings in this case, where there was no comparable evaluation of DSNY's conclusions. Although the Corps suggests that the record contains "extensive consideration of both on- and off-site alternatives" (Corps Opp. Mem. at 11), it points to no evidence that the Corps proffered questions about these alternatives, much less "exhaustively studied [the] information" provided by DSNY. *Hintz*, 800 F.2d at 835. To the contrary, the record indicates that the Corps may not have reviewed DSNY's work at all, but instead adopted DSNY's views whole cloth by directing a DSNY representative to draft the analysis of alternatives on the Corps' behalf. (*See* USACE 2267; RSTS Mem. at 13.) The Corps does not dispute this interpretation of the record. Rather, it merely points to the final Memorandum of Record, which recites the findings contained in DSNY's 2004 Manhattan Transfer Station Siting Report. (Corps Opp. Mem. at 11.) This is not evidence showing that the Corps performed its own independent review.

The Corps also claims that Plaintiffs' arguments "amount merely to a disagreement with the Corps' conclusions." (Corps Opp. Mem. at 13.) That is not correct. Plaintiffs have demonstrated that the Corps' "reasons" for eliminating environmentally preferable alternatives to the 91st Street MTS were: (a) inconsistent with the reasoning applied to DSNY's "preferred" option (as where the Corps rejected the West Side Rail Yard because it was "designated for residential and commercial development," while ignoring the residential and commercial

5

community around East 91st Street); (b) unrelated to the goals of the project (as where the Corps rejected sites at Pier 42 and West 140th Street for "space limitations," but failed to address whether a smaller facility that would serve DSNY's core goals could be built at these sites); and (c) unsupported by the facts (as where the Corps rejected alternative sites on Randalls and Wards Island because they are "located outside of Manhattan").[5]

The Corps' opposition does not—and cannot—address these issues, or otherwise support the Corps' conclusions that it was economically or technically infeasible to build an MTS that would serve DSNY's project goals at any of these alternate locations.[6] The Corps' opposition brief focuses primarily on Plaintiffs' argument that the Corps improperly adopted DSNY's borough equity policy. But the Corps does not refute that adopting this policy—along with the Corps' other unspoken criteria, such as the requirement that the facility be as large as that envisioned by DSNY—effectively (and improperly) left the Corps with no option but the 91st Street site, as DSNY itself recognized in its permit application. (USACE 4383 ("Alternative locations . . . present[] no viable options for the proposed action" because "[t]he lack of available, industrial-zoned waterfront space of sufficient size in the vicinity of the existing MTS . . . limited the possibility of alternate locations").)

Indeed, the Corps' treatment of Randalls and Wards Island is illustrative. The Corps argues that it declined to consider these alternative sites because the locations "can only be accessed by sending trucks through other boroughs." (Corps Mem. at 21.) But the Corps' brief quotes *DSNY's analysis* of sites on Randalls and Wards Islands, not its own. The Corps' own

---

[5] The Corps also argues that it adequately considered two "no action" alternatives. As discussed further in Plaintiffs' Memorandum in Opposition to Defendants' Motions for Summary Judgment, the Corps' consideration of these alternatives fell short of a "hard look" for similar reasons as explained above. (RFTS Opp. Mem. at 8-10.)
[6] *See Sierra Club v. Marsh*, 714 F. Supp. 539, 577 (D. Me.) ("Although MDOT amply demonstrates that it 'desires' a terminal facility capable of expansion to six berths, unless its preferences bear a rational relationship to the technical and economic integrity of the project they would not warrant the exclusion of some otherwise 'reasonable alternative' from analysis under NEPA. A project's principal goals must override the stated preferences of the applicant for purposes of NEPA's 'reasonable alternatives' analysis."), *amended*, 744 F. Supp. 352 (D. Me. 1989), *aff'd*, 976 F.2d 763 (1st Cir. 1992).

analysis indicated that it mistakenly believed that these sites were located outside of Manhattan. (USACE 4528.) In addition, neither the Corps nor DSNY studied whether allowing trucks to pass through other boroughs will contribute to borough "inequity." Given that a higher percentage of commercial waste collection truck miles are driven in Manhattan than in any other borough, this is not a foregone conclusion. (CWMS, Vol II, p. 8.)

Moreover, while the Corps argues that it is permitted to take into account "location-specific overall project purpose definitions *where the specific site was essential to the project purpose*," it fails to identify any legitimate, independent purpose that would be thwarted if the MTS were not constructed in Manhattan. (Corps Opp. Mem. at 12 (emphasis added).) In S*ierra Club v. U.S. Army Corps of Engineers*, 450 F. Supp. 2d 503, 527 (D.N.J. 2006), to which the Corps cites, redevelopment of an arena site was the central purpose of a proposed project at that site. Because the goal of redevelopment could not be achieved at any other location, the court held that the Corps was not required to consider alternate off-site locations. Here, by contrast, nothing is gained from restricting the proposed facility to sites in Manhattan. There is no inequity in the current distribution of waste transfer for residents of Manhattan, so this cannot be a purpose served by building an MTS in Manhattan. (*See* RSTS Opp. Mem. at 15.) In fact, "borough equity," as applied to the 91st Street MTS, is not a purpose at all for the Corps' consideration, but rather a political agenda to impose an MTS trash facility on certain residents of Manhattan *regardless* of the environmental impacts.

## III.   THE SCOPE OF THE CORPS' ENVIRONMENTAL REVIEW WAS IMPROPER

In response to Plaintiffs' motion for summary judgment as to the limited scope of its environmental review, the Corps tries to muddy the waters by misrepresenting Plaintiffs' positions, the facts of this case, and the applicable law. At bottom, however, the Corps does not refute that the agency's jurisdiction encompasses the heart of the 91st Street MTS project (*i.e.*,

7

construction of the facility itself and the aspects of the facility that make it a *marine* terminal) and it does not explain how under such circumstances it can avoid reviewing the environmental impact of the facility's operations.

Plaintiffs have never argued, as the Corps claims, that the Corps must review all of the environmental consequences of the 91st Street MTS "regardless of the connection" between the environmental consequences of the 91st Street MTS's operation and the activity over which the Corps has jurisdiction. (Corps Opp. Mem. at 5.) Instead, Plaintiffs have argued that there is no rational basis for the Corps' refusal to review the full environmental impact of the facility in light of the clear connection between the jurisdictional activity (which includes construction of the facility) and the operation of the 91st Street MTS.[7] The Corps fails to explain how it "has no jurisdiction to consider the environmental impacts of the [91st Street MTS's operation], even though it has jurisdiction to consider the impacts of the wetlands which co-exist underneath" the facility. *Stewart v. Potts*, 996 F. Supp. 668, 682-83 (S.D. Tex. 1998). Similarly, the Corps argues for a "sophisticated analysis of the proximate cause of potential environmental impacts of a proposed action to determine whether the Corps must consider those impacts," but does not itself apply such an analysis to this case. (Corps Opp. Mem. at 7.)

The Corps' position—*i.e.*, that it is not required to review the environmental impact of the 91st Street MTS's operation because its jurisdiction is narrowly limited to the construction of the facility—is indefensible even under the case law it cites. For instance, the Corps quotes at length the Ninth Circuit's decision in *Wetlands Action Network v. United States Army Corps of Engineers*, 222 F.3d 1105, 1115-18 (9th Cir. 2000) ("*Wetlands*"), because in that case the court

---

[7] *See, e.g.*, RSTS Mem. at 21 ("not only are the regulated activities indispensable pieces of the overall project, they are its central features"); 22 (the activities over which the Corps has jurisdiction could not be any more central to the overall project—they include the actual construction of the facility"); *see also* RSTS Opp. Mem. at 17 (the Corps' argument that it does not have 'control and responsibility' over the operation of the 91st Street MTS when it has jurisdiction over the construction of the facility defies logic").

found that the "linkage" between the "permitted activity" and "the specific project planned" was "the type of 'interdependence' that is found in any situation where a developer seeks to fill a wetland as part of a large development project" and the Corps was therefore not required to review the environmental impact of the entire project. Tellingly, the Corps does not disclose the extent of the "linkage" between the permitted activity and the project in *Wetlands*, nor does it explain how the relationship between the activity over which it has jurisdiction here and the operation of the 91st Street MTS are analogous to the facts of the Ninth Circuit case. The reason for the Corps' omission is simple: the court's reasoning in *Wetlands* supports Plaintiffs' position.

In *Wetlands*, the area subject to the Corps' permit was 16 out of approximately 600 acres, and the federal and non-federal portions could proceed without each other. *Id.* at 1116; *see also White Tanks Concerned Citizens v. Strock,* 563 F.3d 1033, 1036 (9th Cir. 2009) ("We held [in *Wetlands*] that the Corps properly confined its environmental review to the wetlands and was not required to study the environmental effects on the upland area, *principally because the development of the upland area could proceed independent of the wetlands project*." (emphasis added)). That is undoubtedly not the case here. Indeed, none of the cases cited by the Corps in support of its assertion that the linkage between the permitted activity and the operation of the 91st Street MTS are too attenuated have facts analogous to this case—*i.e.*, where the Permit is for construction of the project itself and is central to the nature of the facility.[8]

The Corps' attempt to distinguish this case—by arguing that because the operation of the 91st Street MTS will be within the regulatory purview of the City and State, it does not need to

---

[8] *See, e.g.*, *DOT v. Pub. Citizen*, 541 U.S. 752, 767 (2004) (finding that the Federal Motor Carrier Safety Administration was not responsible for reviewing environmental effects which it had "no authority to prevent"); *Mo. Coal. for Env't v. Corps of Eng'rs*, 866 F.2d 1025, 103 (8th Cir. 1989) ("[t]he activity permitted by the Corps is not the construction" of the project); *Save the Bay, Inc. v. U.S. Corps of Eng'rs*, 610 F.2d 322 (5th Cir. 1980) (determining that the Corps need not review the environmental effect of a plant, the construction of which was not subject to a Corps permit); *Sierra Club*, 450 F. Supp. 2d at 511 ("[a] small wetland occupies approximately eight (8) acres of the Arena site").

9

review any environmental impacts stemming from the facility's operation—is unavailing. As discussed further in Plaintiffs' Memorandum in Opposition to Defendants' Motions for Summary Judgment, this cannot possibly be the law because, if it were, NEPA procedures would rarely ever apply; and, in fact, courts have frequently rejected similar arguments that NEPA can be curtailed in this way. (*See* RSTS Opp. Mem. at 14 & n.9 (gathering cases).) The Corps asks this Court to "follow the reasoning of the Fourth Circuit's ruling in" *Ohio Valley Environmental Coalition v. Aracoma Coal Co.*, 556 F.3d 177, 194-97 (4th Cir. 2009) ("*Ohio Valley*"). Yet, the Fourth Circuit's reasoning is wholly inapplicable here. The *Ohio Valley* court determined that the Corps did not have jurisdiction to review the environmental impact of certain coal mining operations because Congress had passed a law to give "exclusive jurisdiction" over the regulation of such activities to the State of West Virginia. *Id.* at 196. The Corps here has asserted no analogous legal regime. Moreover, the permit at issue in *Ohio Valley* regarded only a "small" component of a much larger operation—nothing like the sort foundational element of the 91st Street MTS that the Corps' jurisdiction covers here.[9] *Id.* at 195.

## CONCLUSION

For the reasons set forth above, Plaintiffs ask this Court to grant their motion for partial summary judgment, vacate the Permit, enjoin any further construction of the 91st Street MTS, and remand this matter for additional environmental analyses.

---

[9] The Corps' final argument, justifying its consideration of the supposed benefits of the facility while ignoring the adverse consequences of the 91st Street MTS, misses the mark. Whether the Corps' consideration was under NEPA or the CWA is of no matter—it undisputedly considered the benefits of the facility (as asserted by DSNY) and did not take into account corresponding negative impacts on the residents that will live near the 91st Street MTS. This was inappropriate and evidences the Corps' willingness to accept anything DSNY said without scrutiny and at the cost of neighborhoods that will be forced to suffer the negative impacts.

Dated: New York, NY
January 22, 2014

    /s/ CHARLES C. PLATT
CHARLES C. PLATT
JENNIFER RIMM
SCOTT S. BERNSTEIN
Wilmer Cutler Pickering
  Hale and Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: (212) 230-8800
Email: charles.platt@wilmerhale.com

ALBERT K. BUTZEL
Albert K. Butzel Law Offices
249 West 34th Street, Suite 400
New York, NY 10001
Tel: (212) 643-0375
Email: akbutzel@gmail.com

*Attorneys for Residents for Sane Trash Solutions, Inc., Congresswoman Carolyn B. Maloney, Jed H. Garfield, Elliot Merberg, Leanne Moore, Philip Opher, Lorraine Johnson, Harold S. Poster, and Susan J. Miller*

11