UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: July 10, 2014
```

-------------------------------------------------------------------------x

RESIDENTS FOR SANE TRASH SOLUTIONS, INC., *et al.*,   :

                            Plaintiffs,   :       12 Civ. 8456 (PAC)

        -against-   :

UNITED STATES ARMY CORPS OF ENGINEERS, *et al.*,   :

                            Defendants.   :

-------------------------------------------------------------------------x
-------------------------------------------------------------------------x

NEW YORK STATE ASSEMBLY MEMBER MICAH Z.
KELLNER, *et al.*,   :       12 Civ. 8458 (PAC)

                            Plaintiffs,   :

        -against-   :   **<u>OPINION & ORDER</u>**

UNITED STATES ARMY CORPS OF ENGINEERS, *et al.*,   :

                            Defendants.   :

-------------------------------------------------------------------------x

HONORABLE PAUL A. CROTTY, United States District Judge:

      Most New Yorkers are agnostic about where their garbage goes, or how it gets there, so long as it goes away.  But garbage disposal is both messy and expensive.  At present, New York City garbage must be collected, transported, consolidated, transshipped, and ultimately disposed of by means of landfill dumping, composting, energy conversion, or some other mechanism.

      For six decades beginning in the 1930s, there was a marine transfer station—a garbage-shipping plant used to dispose of the City's waste—at the intersection of 91st Street, the FDR Drive, and the East River.  During that timeframe, the surrounding neighborhood became more residential and affluent.  Asphalt Green was developed as a recreational facility.  The East River Esplanade, a pedestrian walkway between the FDR Drive and the East River, was created and

subsequently renamed the Bobby Wagner Walk.  And all during this six decade period of residential and neighborhood development, garbage trucks were driving to York Avenue and 91st Street, transiting over an escalated ramp, crossing the FDR Drive, and arriving at the marine transfer station where the garbage was dumped out of the truck into barges.

The 91st Street marine transfer station ceased operating in 1999.  But in 2004, the New York City Department of Sanitation ("DSNY")[1] revealed plans to build a massive, 70,000 square foot, 10-story tall, Marine Transfer Station ("MTS") at the 91st Street site.  The MTS will receive thousands of tons of the City's garbage per day for containerization and transportation via barge to remote locations.  The project requires multiple permits from New York State and New York City authorities, which are obtained only after numerous public hearings and exhaustive community and regulatory reviews.

Plaintiffs here, Residents for Sane Trash Solutions, Inc., *et al.*, 12 Civ. 8456 (hereinafter the "*Sane Trash* Plaintiffs") and Micah Z. Kellner, *et al.*, 12 Civ. 8458 (hereinafter the "*Kellner* Plaintiffs") (collectively, "Plaintiffs"), challenge the construction of the 91st Street MTS. Plaintiffs have previously initiated five New York state proceedings contesting all state and local actions related to the construction of the MTS, including the issuance of necessary permits and grants of certification.  All of their challenges, however, have been rejected.  In one final attempt to prevent the construction of the 91st Street MTS, Plaintiffs bring the present lawsuit, challenging a Clean Water Act ("CWA") § 404 permit to construct the MTS issued by the United States Army Corps of Engineers ("Corps").  The Corps' issuance of the permit was based on its review of an extensive administrative record.  Plaintiffs' action is therefore, in essence, an appeal of the Corps' decision to issue the permit.

---

[1] This is the first of many acronyms used in this opinion.  For ease of reference, a key of acronyms is attached to this opinion as Appendix A.

Plaintiffs claim that the Corps' issuance of the CWA § 404 permit was arbitrary, capricious, and unlawful, and that the Corps failed to take a "hard look" at the transfer station's consequences and alternatives, as required by the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321, *et seq*.  Specifically, Plaintiffs allege that the Corps:

(1) improperly limited the scope of its environmental review under NEPA (Sane Trash Am. Compl. ¶¶ 121-32, 157-60; Kellner Am. Compl. ¶¶ 104-21, 150-65);

(2) circumscribed its analysis of the public interest under the CWA (Sane Trash Am. Compl. ¶¶ 157-60; Kellner Am. Compl. ¶¶ 104-21);

(3) failed to adequately consider alternatives to the 91st Street MTS (Sane Trash Am. Compl. ¶¶ 133-37, 161-64; Kellner Am. Compl. ¶¶ 122-31);

(4) failed to consider potential degradation of waters stemming from construction of the 91st Street MTS (Sane Trash Am. Compl. ¶¶ 138-42, 165-72; Kellner Am. Compl. ¶¶ 132-40); and

(5) failed to provide a sufficient mitigation plan (Sane Trash Am. Compl. ¶¶ 138-42; Kellner Am. Compl. ¶¶ 141-49).

Additionally, Plaintiffs allege that the occurrence of Superstorm Sandy mandated that the Corps, the City of New York, and DSNY supplement their environmental analysis and reconsider the permit. (Sane Trash Am. Compl. ¶¶ 143-49; Kellner Am. Compl. ¶¶ 212-30.)

Plaintiffs also claim that the City and DSNY denied them equal protection of the law in violation of the Fourteenth Amendment and the New York State Constitution. (Kellner Am. Compl. ¶¶ 166-80, 181-183; Sane Trash Am. Compl. ¶¶ 173-78.)  The *Sane Trash* Plaintiffs also allege that the Corps was "complicit" in the City's violation of their constitutional right to equal protection.  (Sane Trash Am. Compl. ¶ 178.)  Finally, one of the *Kellner* Plaintiffs, Asphalt Green Inc., brings claims against the City for breach of contract, trespass, and private nuisance based on the City's intrusion on the Asphalt Green campus for the purpose of constructing the 91st Street MTS.  (Kellner Am. Compl. ¶¶ 184-201.)

As with Plaintiffs' prior state court challenges to the 91st Street MTS, their claims in this federal action lack merit.  Accordingly, the Court denies Plaintiffs' summary judgment motions, and grants Defendants' summary judgment and Rule 12(c) motions in their entirety.

## BACKGROUND[2]

### A.  The Parties

(1)     Residents for Sane Trash Solutions, Inc. ("Sane Trash") is a not-for-profit membership corporation whose purpose is to:

(a)  oppose construction and operation of the 91st Street MTS;

(b)  advocate for alternative solutions to disposing trash at the 91st Street MTS; and

(c)  protect the residential character of the adjoining Upper East Side neighborhood.

Sane Trash is joined as Plaintiff by an elected official, as well as neighborhood and community leaders.

(2)     Micah Z. Kellner is a New York State Assemblyman.  He is joined as Plaintiff by Gracie Point, Asphalt Green Inc., and another elected official, as well as community leaders. Gracie Point is an unincorporated association dedicated to preservation and betterment of the Gracie Point neighborhood.  Asphalt Green Inc. is a not-for-profit corporation which provides a community recreational facility.  It has a 20-year license on a City-owned 5-acre parcel of land bounded by 90th street to the south, 92nd Street to the north, York Avenue to the west, and FDR Drive to the east.  The Asphalt Green Inc. facility is bisected by a ramp which starts at 91st Street and York and rises as it crosses the FDR Drive to connect with the MTS.  The ramp divides the

---

[2] The facts in this section are not genuinely disputed by the parties unless otherwise noted.

4

outdoor play facility to the south from the indoor swimming pool and related facilities to the north.

(3)      The United States Army Corps of Engineers is a federal agency responsible for considering and issuing or denying CWA Section 404 permits.  33 U.S.C. § 1344.  Permits may be issued "after notice and opportunity for public hearing for the discharge of dredged or fill material into the navigable waters" of the United States.  33 U.S.C. § 1344(a).  The permit at issue was granted by the Corps' New York District Office.

(4)      The New York City Department of Sanitation and Department of Design and Construction are agencies of the City of New York.  DSNY applied for and received the Section 404 permit at issue here.  Since DSNY is the lead agency, it encompasses all City entities, unless otherwise indicated.

## B. New York City's Waste Management Methods

The City generates 50,000 tons of garbage every day.  Approximately 25% of this waste, or 12,000 tons, is generated by City residents and not-for-profit institutions.[3]  This waste is handled by DSNY, one of the world's largest departments of sanitation.  DSNY has nearly 10,000 workers and 5,700 vehicles, and a capital and expense budget of nearly $3 billion.

Over the past half century, the City has utilized many methods to collect, consolidate, transport, and dispose of its garbage.  These methods have included using the waste to add to the City's landmass (e.g., Governors Island; Battery Park City; and Willets Point, a former dumping ground for ash and waste which eventually became the grounds of the 1939 World's Fair).  Other common methods have included incineration and ocean dumping, but those methods are now banned for environmental reasons (among others).  No method of collection and disposal is without objection, and there are no popular methods of disposal.  Some attempts at disposal have

---

[3] Commercial carters attend to the balance of approximately 38,000 tons of waste.

been comical.  Who can forget the barge to nowhere: the Flying Dutchman of garbage disposal? [4]
The barge left New York and ended up in the Gulf of Mexico, where it was chased away by the
Mexican navy.  The barge was eventually returned to New York.

During the last two or three decades of the 20th century, the City's preferred method of
garbage disposal was using landfills.  But as landfills reached capacity, they were shut down,
until finally only one was left: the Fresh Kills Landfill in Staten Island, which was closed in
2001.  Until then, garbage trucks would collect residential garbage and transport it to DSNY's
eleven existing MTSs, which were scattered throughout the City's waterways.  One was located
on 91st Street, the site of the current dispute.  The garbage trucks would unload at the MTS, by
open dumping of the garbage into barges tied up at the transfer stations.  The barges would then
be towed to Staten Island where the garbage would be dumped into the Fresh Kills Landfill.

The Fresh Kills Landfill grew to the point where it was reputed to be the highest
elevation on the East Coast of the United States between Maine and Florida.  Staten Island
residents protested that they were being dumped upon—and they were literally correct.

When the Fresh Kills Landfill was closed, the City began to transship its garbage,
primarily by truck, to remote out-of-City landfills.  Use of trucks is expensive, and out-of-City
landfills and disposal sites have twin liabilities: they are expensive to use and, in any event, have
dwindling capacity.  Such dwindling capacity forces longer trips to more remote landfills,
resulting in greater truck transportation and expense.  Since more garbage is moving by truck
over longer distances, there is greater pollution.

### C.  The 2006 Solid Waste Management Plan

New York State Environmental Conservation Law Sections 27-0106 and 27-0107 require
that every 10 years the City prepare a 20-year plan, called a Solid Waste Management Plan

---

[4] *See* The Voyage of the Mobro 4000 (1987).

("SWMP"), to manage disposal of the City's municipal waste.  The City unveiled its SWMP for the next 20 years in October 2004.  The City submitted the plan to the New York State Department of Environmental Conservation ("State DEC") for its review and approval in 2006. The SWMP deals, *inter alia*, with the transition from using in-City landfills to trucking garbage to out-of-City landfills.

The SWMP integrated the systems for managing residential waste, residential recyclables, and commercial waste.  The recycling program dealt with the collection of paper, metal, glass, and plastic.  With regard to residential waste, the SWMP called for the elimination of the truck-based disposal system, and its replacement by containerizing waste and exporting it long distances by rail or barge.  The SWMP provides for commercial waste to be handled at private in-City transfer stations.

A key component of the SWMP is a detailed proposal to develop four preexisting marine transfer stations to handle the residential waste stream, including the 91st Street MTS.  The four new MTSs are improvements over the prior facilities.  The new MTS at 91st Street will be enclosed and under negative air pressure.  Its outside doors will open only to admit trucks, and no dumping will occur until the doors are closed.  The negative air pressure is designed to keep the garbage and odors inside the building.  The garbage is to be loaded into containers, and those containers are then closed and loaded onto barges for transport to remote disposal sites.  The SWMP was designed to reduce the number of truck trips.  Given the acrimonious history of landfills and transfer stations, the SWMP provides for borough equity, so that each borough bears its fair share of the garbage it generates.

**D.  State Proceedings Approving the Solid Waste Management Plan**

On April 1, 2005, following an extensive and intensive public review process (including 90 days for public comment and eight public hearings), DSNY issued a Final Environmental Impact Statement ("FEIS") for the SWMP.  The FEIS addressed public comments about the SWMP (most of which were negative), but found that any negative environmental impacts resulting from the new waste management method could be mitigated.  (Noteboom Decl. Ex. 5.) The FEIS was accompanied by the "Manhattan Transfer Station Siting Study Report." (Noteboom Decl. Ex. 7.)  This report discussed at great length the City's plan of developing a new marine transfer station at 91st street, the site of the old station.  That study examined four proposed alternative sites to 91st Street for the MTS—West 140th Street, West 30th Street, West 13th Street and Pier 42—but concluded that each site was either not technically feasible, or had other significant obstacles which would prevent its development.

Coincident with the review and approval process for the SWMP, the City submitted the selection of the 91st Street site to the City's Uniform Land Use Review Procedure ("ULURP").[5] ULURP requires public hearings and community review before any actions may be taken.[6]  The local planning board, Community Board 8, made many, if not all, of the same objections that are made in this federal action almost a decade later, and voted against the proposal, as did the Manhattan Borough President.  Thereafter, on April 13, 2005, the City Planning Commission ("CPC") voted to approve the proposal.  (Noteboom Decl. Ex. 6.)  At a City Council meeting in June 2005, the Council voted to disapprove CPC's decision.  On June 14, 2005, the Mayor

---

[5] Approval of the 91st Street MTS was an integral component of the SWMP so that all boroughs could bear their equitable share of waste transfer operations.
[6] ULURP requires Community review, Borough review, City Planning Commission review and action, as well as City Council review and action, before any plan subject to ULURP may be approved.

vetoed the City Council's action, which had the effect of restoring CPC's approval of the

ULURP.  The City Council did not override the Mayoral Plan.  (Noteboom Decl. Ex. 7.)

In February, 2006, DSNY, as lead agency, issued its Findings Statement on the SWMP.

(Noteboom Decl. Ex. 4.)  The Findings Statement was submitted pursuant to the State

Environmental Quality Review Act ("SEQRA") and the City Environmental Quality Review

("CEQR"): the process City agencies must undergo to determine the effects their approved

discretionary actions have upon the environment.  On July 19, 2006, the City Council enacted

local legislation granting "the authority for the submission of the proposed final comprehensive

solid waste management plan for the city of New York . . . to the New York state department of

environmental conservation."[7]  (Noteboom Decl. Ex. 1.)  On October 27, 2006, the State DEC

found the plan to be in compliance with NYS Environmental Conservation Law § 27-0107(1)

and, accordingly, approved the City's SWMP.  (Noteboom Decl. Ex. 2.)  The approval letter

stated:

> an Environmental Impact Statement was necessary for adoption of this
> plan and in April 2005, as lead agency, issued a Final Environmental
> Impact Statement and Findings Statement . . . . The City's SWMP sets
> an unprecedented vision for the future of the City's Solid Waste
> Management.   The plan reinforces the State's commitment to
> sustaining and managing our resources, environment, and economic
> competitiveness by placing emphasis on waste reduction and
> recycling, while providing an equitable waste management
> infrastructure where the needs of its residents, businesses and industry
> are met.

(*Id.*)

---

[7] The City Council's decision to approve the submission of the SWMP, as well as its decision not to override the
Mayor's veto of its ULURP decision, may be attributable, at least in part, to the goal of the SWMP, which calls for
each borough to handle its own garbage.

**E.  Legal Challenges to the Solid Waste Management Plan and 91st Street Marine Transfer Station**

Upon adoption, the SWMP and the 91st Street Marine Transfer Station were challenged in multiple legal proceedings.

**1.  *ACORN v. Bloomberg***

The first challenge to the SWMP and 91st Street MTS was a New York Civil Practice Laws and Rules Article 78 proceeding and plenary action alleging nuisance: *Ass'n for Cmty. Reform Now v. Bloomberg* (*ACORN*), 13 Misc. 3d 1209(A) (N.Y. Sup. Ct. 2006) [8], *aff'd*, 52 A.D.3d 426 (1st Dep't), *leave to appeal denied*, 11 N.Y.3d 707 (2008).  Plaintiff ACORN's legal challenge did not attack the overall SWMP, or its methods of implementation.  Rather, it challenged a single element: the new MTS at 91st Street.  The Article 78 proceeding alleged three causes of action:

> (1)    DSNY's selection of East 91st Street was arbitrary and capricious and an abuse of discretion, irreconcilably inconsistent with basic City policies.

> (2)    DSNY violated SEQRA and CEQR by conducting a materially defective environmental review.

> (3)    CPC violated SEQRA and CEQR and the Waterfront Revitalization Program when it approved site selection for each of the proposed MTSs based on the allegedly defective environmental review.

*ACORN*, 13 Misc. 3d 1209(A), at *4.

The nuisance action claimed that the 91st Street MTS constitutes both a private nuisance and a public nuisance.  *Id.*

Justice Stallman denied the Article 78 petition and granted the motion to dismiss the nuisance actions.  *Id.* at *19.  In a thoughtful and well-reasoned opinion, Justice Stallman

---

[8] For ease of reference, all pin cites to this case are to the pages found in the slip opinion at 2006 N.Y. slip op. 51750(U).

rejected the plaintiffs' arguments that selection of the site was arbitrary, capricious, and an abuse of discretion; he carefully reviewed the entire record and held that the selection of 91st Street was rational. *See id.* Among other things, the 91st Street site provided evidence of operational convenience; the site did not have to be rezoned; the City already owned the property so it would not have to be involved in a lengthy acquisition process; and finally, truck routes were already established. *Id.* at *5.

The court also found that DSNY conducted its environmental review in accordance with SEQRA and CEQR. *Id.* at *8-13. First, the court determined that DSNY procedures were lawful. *Id.* Then, having identified the relevant area of environmental concerns, the court determined that DSNY had taken a "hard look" at them and made a "reasoned elaboration" on its determination, as required by *Jackson v. N.Y. State Urban Dev. Corp.*, 67 N.Y.2d 400 (1986). *Id.* at *12. The court reasoned that satisfying SEQRA does not mandate that "every conceivable environmental impact" be included. *Id.* at *8. Instead, a rule of reason had to be applied. *Id.*

Finally, the court held that CPC did not violate SEQRA, CEQR, or the Waterfront Revitalization Program when it relied on existing environmental reviews. *Id.* at *14-16.

With regard to the private and public nuisance claims, the court found that such claims could not be permitted because doing so would be an implied challenge to DSNY determinations of the environmental impact. *Id.* at *16-19.

The Appellate Division unanimously affirmed the order. *See ACORN*, 52 A.D.3d at 426. The Appellate Division held that DSNY's decision to site the new marine transfer station at 91st Street on the site of the existing-but-inoperable transfer station was rational. *Id.* The proposed station would not have a significant or dramatic impact on the neighborhood because the transfer station is physically separate from the neighborhood. *Id.* at 427. Moreover, the neighborhood

had changed and had become more residential with greater recreational amenities while the existing transfer station was in operation.  *Id.*

As to the argument that DSNY had not followed the rules with respect to private transfer stations, the Appellate Division held that those rules were applicable only to private, commercial transfer stations, not to City-owned sites.  *Id.*  The Appellate Division agreed with the Supreme Court's determination that DSNY had taken a "hard look" at the relevant environmental concerns and made a "reasoned elaboration" of the basis for its determination.  *Id.* at 428.  Every conceivable alternative did not have to be evaluated, but rather, only reasonable alternatives.  *Id.* While the plaintiffs suggested that "Manhattan waste" be trucked to the Bronx for shipment out of the City, DSNY could rationally reject that suggestion since it was incompatible with the goal of equitable borough sharing of waste transfer.  *Id.* at 429.

### 2.  *Powell v. City of New York* (*Powell I*)

The *ACORN* action did not end the legal challenges.  Next, another elected public official and neighborhood leaders contended that the City failed to adequately analyze the construction impacts of the plan to convert and reactivate the 91st Street MTS.  *See Powell v. City of New York* (*Powell I*), 16 Misc. 3d 1113(A) (N.Y. Sup. Ct. 2007).[9]  The plaintiffs contended that the construction and operation of the 91st Street MTS would take over portions of park land for a non-park purpose.  If true, this would require state legislative approval.  In *Powell I*, Justice Stallman applied the standard articulated in *Jackson*, as he did in *ACORN*, assessing whether the agency: (a) followed lawful procedure; (b) identified the relevant areas of environmental concern; (c) took a "hard look" at them; and then (d) made a "reasoned elaboration" of the basis for its determination.  *Jackson*, 67 N.Y.2d at 417.  Justice Stallman explained: the judiciary does

---

[9] For ease of reference, all pin cites to this case are to the pages found in the slip opinion at 2007 N.Y. slip op. 51409(U).

not substitute its judgment for that of the agency; and the judiciary does not weigh the desirability of the proposed action, nor choose among the various alternative actions. *Powell I*, 16 Misc. 3d 1113(A), at *1.

The plaintiffs also claimed that DSNY should have described the means and methods of demolition and construction, as well as analyzed the construction impacts in detail. The Court noted that similar arguments were raised and rejected in the *ACORN* case. *Id.* at *2. Neither SEQRA nor CEQR, however, required what the plaintiffs sought, so their Article 78 petition was dismissed. *Id.* at *2, *4.

As to the claim that the demolition, construction and operation of the proposed 91st Street MTS and the access ramp would interfere with the Asphalt Green Campus and Bobby Wagner Walk, the court recognized that there was compelling evidence that neither Asphalt Green nor the Bobby Wagner Walk was parkland. *Id.* at *4. Justice Stallman did not rule on this issue. *Id.* Instead, he continued the matter. *Id.*

### 3. *Powell II: The Continuation of the Powell Lawsuit*

Upon continuation, the *Powell* plaintiffs argued that Asphalt Green and the Bobby Wagner Walk were parkland, and so were protected by the public trust doctrine. *Powell v. City of New York* (*Powell II*), 2009 WL 8435557, No. 108220/2006 slip op. at 1 (N.Y. Sup. Ct. Dec. 21, 2009). As such, the City was required to obtain approval by the State Legislature before commencing modification or reconstruction associated with the access ramp to the 91st Street MTS. *Id.* The plaintiffs did not challenge the SWMP, or the MTS, but rather, the modification and reconstruction of the ramp. Plaintiffs' legal strategy apparently was to stop the reconstruction of the ramp, so that there would be no access to the 91st Street MTS.

Justice Stallman noted that this was the third challenge, and the two prior challenges had been rejected.  As for the conversion of the 91st Street MTS, the Appellate Division had already ruled that the waterfront site offered operational convenience, was already appropriately zoned, and, since it was City-owned, would be more cost effective than purchasing or condemning another parcel of waterfront property.  *Id.*  The Appellate Division also opined that the MTS would not cause any significant or drastic changes to the existing land uses or overall character of the neighborhood.  *Id.*

Justice Stallman determined that neither Asphalt Green nor the Bobby Wagner Walk was parkland.  *Id.* at 5-6.  Neither had been mapped as parkland or expressly designated as a public park.  Asphalt Green's license agreement expressly stated that it is not parkland, and the Bobby Wagner Walk is a thoroughfare, not a park.  *Id.* at 5-6.  Even if it were parkland, the disruption due to the ramp modification and reconstruction was not substantial enough to invoke the public trust doctrine.  *Id.* at 6-7.  Accordingly, no state legislative approval was necessary prior to the commencement of demolition or construction of the access ramp.  On appeal, the Appellate Division affirmed.  *Powell II*, 85 A.D.3d 429 (1st Dep't), *leave to appeal denied*, 17 N.Y.3d 715 (2011).

### F.  Legal Challenges to the DEC Permits

Besides approving the SWMP, New York State required permits for the construction and operation of the 91st Street MTS.  On October 14, 2009, the State DEC issued the following permits:

> (1) a solid waste management facility permit;
>
> (2) a tidal wetlands permit; and
>
> (3) a use and protections of waters permit, with an associated water quality certificate.

14

The SWMP facility permit limits the amount of waste that can be processed at the site. Specifically, the permit provides for the construction and operation of the MTS and authorizes it to accept up to a maximum of 1860 tons of waste per day, except for an upset condition limit which raises the acceptable amount to 4290 tons per day, and an emergency condition limit which raises the amount to 5280 tons per day. (USACE[10] 100.)  The converted MTS containerizes waste for barge and rail export.  The facility is authorized to operate 24 hours a day, Monday through Saturday.  The construction conditions include specifications of how dredging must be conducted in order to minimize water quality impacts.  (USACE 24-58.)

DEC held a hearing and took testimony before issuing the requested permits and water quality certifications.  Gracie Point Community Council—one of the *Kellner* Plaintiffs in this action—challenged the DEC's actions in an Article 78 proceeding.  *Gracie Point Cmty. Council v. N.Y. State Dep't Envtl. Conservation*, 92 A.D.3d 123 (3d Dep't 2011), *leave to appeal denied*, 19 N.Y.2d 807 (2012).  On appeal from the New York Supreme Court (Albany County), the Third Department carefully reviewed the administrative record and concluded that all permits were properly issued.  *Id.*  The plaintiff argued that DSNY should be required to identify the ultimate disposal site and specify the route from the 91st Street MTS to the disposal site.  The DEC rejected the argument, but imposed a condition that within 90 days of commencement of operation, the route and destination must be provided.  *Id.* at 130.  Gracie Point Community also argued that the City failed to impose emission standards on commercial carters.  But it would be impossible to comply with such a condition because the Federal Clean Air Act preempts the City from acting in this area.  *See id.* at 130-31; 42 U.S.C. § 7543(a). There was a noise condition at

---

[10] "USACE" is the Bates label for the administrative record, which spans over 11,000 pages, starting at USACE 1 and ending at USACE 11471.

the site, but it was attributed to vehicular traffic on the FDR Drive, and nothing in the operation of the MTS would materially worsen the noise.

Finally, Gracie Point Community argued that the permit for tidal wetlands and use and protection of water should have been denied because the 91st Street facility is neither reasonable nor necessary. The premise for this argument was that Manhattan garbage could be trucked to the Bronx for disposal at the Harlem River Yard transfer facility, sparing the community the burden of the 91st Street MTS. That decision, however, would contradict the City's policy of "borough equity"—that each borough would handle its own garbage. *Id.* at 131. The argument about the Bronx option had already been made and rejected. *Id.* Accordingly, the DEC's issuance of the 91st Street permits was determined to be rational. *Id.*

The fifth[11] and final legal challenge in State Court arises out of DSNY's report to DEC on the construction project's progress. In February 2012, DSNY submitted a report on the delays it had encountered in commencing construction of the MTS from 2007 to 2012. The City styled its report as a "Modification," but the State DEC accepted it as a "compliance report" without requiring the City to submit a modification of the SWMP. The new schedule did not change any of the critical components (e.g., proposed locations or methods of handling waste).

The *Kellner* Plaintiffs in this action filed a state action: *Kellner v. City of New York*, No. 102950/2012, 2012 WL 5893909 (N.Y. Sup. Ct. Nov. 8, 2012). They claimed that there were a number of time-sensitive contingencies in the SWMP, all of which had been delayed. *Id.* at 3. They further contended that delays in other phases of the project would force the expansion of the 91st Street facility. *Id.* The anticipated usage at the 91st Street MTS would consequently

---

[11] The Corps counts the legal challenges differently (*see* Corps' Mot. for Summary Judgment Mem. 9) by counting *Powell I* and *Powell II* as one action, and citing an additional action for injunctive relief that was voluntarily withdrawn. *See Kellner v. City of New York*, No. 103098/2012 (N.Y. Sup. Ct. July 20, 2012) (seeking temporary restraining order to enjoin City from opening construction bids for the project).

have to be enlarged, and therefore environmental impacts previously analyzed were out of date.

*Id.*

The court rejected the petitioners' argument.  The State's receipt of the DSNY report was an appropriate exercise of State DEC's discretion.  *Id.* at 5.  It was sheer speculation to argue that the tonnage limits on the operation of the 91st Street MTS would have to be expanded.  *Id.* at 3. If that were to occur at some time in the future, further review would only be necessary at that time.  *Id.*  On appeal, the Appellate Division affirmed, 107 A.D.3d 529 (1st Dep't 2013), holding that:

> DSNY took the requisite "hard look" at the potential impacts of the delay in implementation and made a reasoned determination that an SEIS [Supplemental Environmental Impact Statement] was not required.  Petitioners' scenarios suggesting potential consequences of the delay are no more than speculation.

*Id.* at 529-30.

The state court action challenging the 91st Street MTS has spanned seven years, from the first challenge to the adoption of the SWMP in 2006, to 2013.  Each step in the various state and local regulatory processes and approvals has been challenged, but each has been sustained and approved.

The Court now turns to review the federal claims, where echoes of the same arguments and refrains that were already heard, considered, and disposed of will be considered again.

### G.  Basis for the Present Legal Challenge:  Issuance of the CWA Section 404 Permit

As with the prior legal challenges, the current challenge does not attack the overall SWMP, but rather only the 91st Street MTS.  On July 9, 2008, DSNY applied to the Corps for a CWA Section 404 permit to undertake certain activities in connection with the construction of the 91st Street MTS.  (USACE 4363-403.)  On July 20, 2012, after an extensive public comment and review process, the Corps issued the permit.  (USACE 1-94.)

Prior to issuing the permit, the Corps: (1) determined the scope of the proposed action; (2) provided public notice and held a hearing; (3) consulted with other federal agencies; (4) assessed a mitigation plan, for which there was additional notice and comment; and (5) conducted an extensive environmental review.

In setting the scope of its review of the construction of the 91st Street MTS, the Corps determined that most activities would be regulated by the Rivers and Harbors Act of 1899, 33 U.S.C. § 401 *et seq.*  Accordingly, the Corps limited the scope of its CWA Section 404 review to the filling of 175 in-water support piles with sand and concrete .  In other words, the Corps' review was limited to the U.S. waters where the construction would occur, not the upland areas with which Plaintiffs are concerned, and not the operation of the MTS.

The Corps published a public notice on August 15, 2008, and conducted a public hearing regarding the permit application on September 16, 2008.  (USACE 109.)  171 people attended the public hearing, and 88 of those people made public comments.  *Id.*

The Corps consulted with other federal agencies, including the Environmental Protection Agency ("EPA"), National Oceanic and Atmospheric Administration-National Marine Fisheries Service ("NOAA-NMFS"), U.S. Coast Guard, and United States Fish and Wildlife Service ("USFWS").  (USACE 114-120.)  The EPA and NOAA-NMFS requested a mitigation plan from DSNY, and in May 2011, DSNY submitted a plan proposing to mitigate the environmental effects of the 91st Street MTS by (1) uncovering additional waters in the South Bronx (by demolishing an obsolete MTS), and (2) removing surplus piers from the Bush terminal site in Brooklyn.  (USACE 59-94.)  The mitigation identified was at least as large as the additional river space covered by the expanded 91st Street MTS footprint.  The Corps provided notice of this mitigation plan, and received and considered hundreds of comments.  (USACE 109.)

On July 12, 2012, the NOAA-NMFS submitted recommendations and found the mitigation plan satisfactory.  (USACE 210-211.)  Five days later, on July 17, 2012, the Corps finalized a Memorandum for Record ("MFR"), which served as a combined Environmental Assessment pursuant to NEPA, and a Statement of Findings pursuant to the CWA.  (USACE 98-248.)  The MFR included extensive review and analysis of issues pertaining to the permit, such as scope, comments from federal agencies, analysis of the DSNY proposal, application of the CWA § 404(1)(a) guidelines, public interest review, analysis of potential degradation of U.S. waters, and analysis of the mitigation plan.  (*Id*.)

In the fall of 2012, Superstorm Sandy occurred.  The Corps received additional comments from Plaintiffs concerning potential flooding risks to the East 91st Street MTS, in light of Sandy and the February 22, 2013 issuance of new Advisory Base Flood Elevations ("ABFEs") by the Federal Emergency Management Agency ("FEMA"). (USACE 11437-44, 11452-69.) The FEMA-promulgated ABFEs describe the height to which flood waters could rise in the case of a 1-percent-annual-chance flood event (a "100-year flood event" or "base flood").  Plaintiffs demanded that the Corps reconsider its permit decision and conduct a supplemental environmental review under NEPA.  (USACE 11437-44.)

In response, the Corps issued two additional Memoranda for Record, one dated March 21, 2013 (USACE 11433-36), and a superseding memorandum, signed by Defendant Paul E. Owen on June 13, 2013 (USACE 11418-29).  The June 13, 2013 MFR considered the issues raised in Plaintiffs' comments.  (USACE 11418-29.)  The Corps found that its original MFR of July 17, 2012 sufficiently evaluated flood hazard issues, including hurricane storm surges, extreme storm events, and sea level rise.  (USACE 11422.)  Superstorm Sandy and the new ABFEs raised no concerns that changed its original determination that DSNY had appropriately

considered flood risk in the design of the facility.  The MTS's loading level, which receives uncontainerized waste, was well above the 2007 ABFE.

After Superstorm Sandy, FEMA revised its ABFE calculations and found the new ABFE to have increased by approximately 5 feet.  (*See* Folb Decl. Ex. 4 at 6.) While the pier level is now below the new ABFE, the loading level still remains well above the ABFE.  (*See* USACE 11419.)  The Corps considered this fact in its October 24, 2013 MFR and concluded that no change in its prior determination was warranted.  (USACE 11418-29.)  The Corps concluded that "since the pier level will not contain loose material, flooding of the pier level would have little or no impact on the surrounding neighborhood."  (USACE 11419.)  The Corps further concluded that additional design changes and operational practices that DSNY identified in May 2013 to secure the facility during flood events (USACE 11419-20) would ensure that garbage would not be released into public waters or the community, if flooding occurred. (USACE 11420.)

### H.  Procedural History of This Action

Kellner and Sane Trash filed Amended Complaints on March 5, 2013.  Both sought discovery in four areas: (1) flooding; (2) completeness of the record; (3) alternatives and equal protection; and (4) Asphalt Green's claims.  This Court denied their motions in an Order dated July 11, 2013.  (Sane Trash Dkt. 27; Kellner Dkt. 32.)  With respect to the CWA and NEPA claims, the Court determined that there was no reason to depart from the rule that review is generally limited to the administrative record.  As for flooding, the existing record was sufficient to determine whether the decision to issue the permit and not conduct supplemental review in light of Superstorm Sandy was arbitrary and capricious.  Plaintiffs did not show that the administrative record was incomplete, and the Corps certified that it was complete.  Finally, the claims regarding alternatives, equal protection, and Asphalt Green's claims were subject to the City's Rule 12(c) motion, and discovery was thus inappropriate.

Plaintiffs have twice sought temporary restraining orders and preliminary injunctions to halt various aspects of construction of the 91st Street MTS.  The Court denied these motions on October 10, 2013 (Sane Trash Dkt. 48; Kellner Dkt. 60) and February 26, 2014 (Kellner Dkt. 93).  In its February 26, 2014 Order, the Court held that Asphalt Green is a mere licensee, not a leaseholder, of the Asphalt Green Campus that the City owns; the access ramp is not subject to Asphalt Green's License Agreement with the City; and the City's modification and reconstruction of the ramp (which required removing certain trees belonging to the City) would not interfere with Asphalt Green's ability to perform services under the License Agreement.

The Court now turns to the parties' cross-motions for summary judgment on Plaintiffs' CWA and NEPA claims, and the claim that Superstorm Sandy required the Corps, the City, and DSNY to supplement their environmental analysis and reconsider the permit.

## DISCUSSION

### I. <u>Legal Standards</u>

#### A.  Summary Judgment

 "Summary judgment is appropriate when, construing the evidence in the light most favorable to the non-moving party, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011) (quoting Fed. R. Civ. P. 56(a)).  A fact is material only if it "might affect the outcome of the suit under the governing law," and a factual dispute is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where, as here, a party seeks judicial review of agency action, summary judgment is appropriate, since "whether an agency action is supported by the administrative record and

consistent with the APA standard of review" is decided "as a matter of law." *UPMC Mercy v. Sebelius,* 793 F. Supp. 2d 62, 67 (D.D.C. 2011) (internal quotation marks and citations omitted); *see also Noroozi v. Napolitano,* 905 F. Supp. 2d 535, 541 (S.D.N.Y. 2012); *Physicians Comm. for Responsible Med. v. Johnson,* 436 F.3d 326, 331 (2d Cir. 2006) (resolving conflict over agency action on cross-motions for summary judgment).

### B.  The National Environmental Policy Act and the Clean Water Act

Under NEPA, agencies must take a "hard look" at the environmental consequences of their actions before proceeding.  *Coalition on W. Valley Nuclear Wastes v. Chu*, 592 F.3d 306, 310 (2d Cir. 2009).  The Corps and the Council on Environmental Quality ("CEQ") promulgate regulations providing guidance on NEPA's implementation.  *See* 33 C.F.R. pts. 230, 325, app. B (Corps regulations); 40 C.F.R. §§ 1500-08 (CEQ regulations); *see also Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 355-56 (1989) (stating that CEQ regulations are entitled to substantial deference).  The regulations require that agencies prepare an environmental assessment ("EA") of their proposed actions.  40 C.F.R. §§ 1501.4(b), 1508.9.  The EA must include "brief discussions of the need for the proposal, of alternatives as required by [42 U.S.C. § 4332(E)], [and] of the environmental impacts of the proposed action and alternatives."  40 C.F.R. § 1508.9(b).  A more comprehensive Environmental Impact Statement ("EIS") is necessary only if the agency determines that the action constitutes a "major Federal action[] significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  If "pursuant to the EA, an agency determines that an EIS is not required under applicable CEQ regulations, it must issue a 'finding of no significant impact' (FONSI), which briefly presents the reasons why the proposed agency action will not have a significant impact on the human environment."  *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 757-58 (2004) (citing 40 C.F.R. §§ 1501.4(e), 1508.13).

Section 404 of the CWA authorizes the Corps to issue CWA permits authorizing the discharge of dredged or fill material. 33 U.S.C. § 1344(a). Section 404 permits must satisfy the guidelines promulgated by the EPA and codified at 40 C.F.R. pt. 230. 33 U.S.C. § 1344(b)(1), (e)(1); 33 C.F.R. § 320.4(a)(1). Accordingly, a permit will not be issued if a proposed discharge will "cause or contribute to significant degradation of the waters of the United States." 40 C.F.R. § 230.10(c). No discharge is permissible "unless appropriate and practicable steps have been taken that will minimize potential impacts of the discharge on the aquatic ecosystem." 40 C.F.R. § 230.10(d). Mitigation measures may be conditions to the grant of a permit. 33 C.F.R. § 325.4(a)(3). Mitigation includes steps to avoid or minimize an impact of the discharge, or to "compensat[e] for the impact by replacing or providing substitute resources or environments." 40 C.F.R. § 1508.20(e). A permit will also not be issued if there is a "practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). To be "practicable" an alternative must be "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of the overall project purposes." 40 C.F.R. § 230.10(a)(2).

The Corps may properly issue a Section 404 permit only after a resource-intensive process that involves opportunity for public hearing, public interest review, and a formal determination. 33 C.F.R. pts. 323, 325. Public interest review balances the "benefits which reasonably may be expected to accrue from the proposal" against the proposal's "reasonably foreseeable detriments." 33 C.F.R. § 320.4(a)(1).

### C.  The Administrative Procedure Act

Challenges to agency action pursuant to the CWA and NEPA are properly analyzed under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882-83 (1990).  A court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ."  5 U.S.C. § 706(2)(A).  This standard of review is highly deferential and presumes the agency's action to be valid.  *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981).  In determining whether an agency's action is arbitrary or capricious, the Court's task is not to "engage in an independent evaluation of the cold record," *Guan v. Gonzales,* 432 F.3d 391, 394-95 (2d Cir. 2005), but rather for the Court to determine whether the agency has "considered the pertinent evidence, examined the relevant factors, and articulated a satisfactory explanation for its action."  *J. Andrew Lange, Inc. v. FAA,* 208 F.3d 389, 391 (2d Cir. 2000).  While this determination requires a "searching and careful" inquiry into the facts, "the ultimate standard of review is a narrow one.  The court is not empowered to substitute its judgment for that of the agency."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

Judicial review is generally limited to the administrative record that the agency relied upon.  *Id.* at 419-20.  The Court affirms its prior ruling of July 11, 2013 denying Plaintiffs' request to supplement the voluminous administrative record.  That record is more than sufficient for the Court to make its determination regarding Plaintiffs' claims.

## II.  Analysis

### A.  The Corps' Permit Issuance Did Not Violate Either NEPA or the CWA

#### i)   The Corps' Determination of the Scope of NEPA Review

The Corps did not abuse its discretion in determining the scope of its NEPA review. Under NEPA analysis, the Corps must define the federal action subject to review.  40 C.F.R. § 1508.18.  To do so, the Corps' District Engineer must address the impacts of the specific activity requiring a permit and portions of the broader project over which the Corps has sufficient control and responsibility.  33 C.F.R. pt. 325, app. B § 7(b)(1).  In this case, the Corps determined that the activity requiring the permit was limited to dredging and filling in a small area of U.S. waters, and the construction, but not the operation, of an enlarged MTS platform.  The Corps determined that it did not have sufficient control and responsibility over post-construction operations to warrant an expanded review beyond the specific activity requiring the permit. (USACE 101, 103-09.)  This does not mean, however, that the post-construction operations of the 91st Street MTS are beyond regulatory control.  To the contrary, these operations will be carefully monitored and controlled by the State DEC.  NEPA requires deference to state and local regulation.

Under NEPA, the Corps has discretion in weighing the factors required to define the "federal action" subject to review.  *NRDC v. U.S. Army Corps of Eng'rs*, 2010 WL 1416681, at *3 (N.D. Ohio Mar. 31, 2010).  Courts routinely defer to the Corps' determination that its NEPA analysis is limited to its jurisdictional waters.  *Ohio Valley Envtl. Coalition v. Aracoma Coal Co.* (*OVEC*), 556 F.3d 177, 194-95 (4th Cir. 2009) ("The Corps' jurisdiction under CWA § 404 is limited to the narrow issue of the filling of jurisdictional waters.")  Here, the Corps determined that anything other than construction in and over the water was beyond the scope of federal

25

action; the environmental consequences of the operation of the 91st Street MTS are the products of a City project implemented as part of its comprehensive SWMP, and subject to planning, permitting, and regulation by state and local authorities.  (USACE 105-08.)  "NEPA plainly is not intended to require duplication of work by state and federal agencies," *OVEC*, 556 F.3d at 196, and as such the Corps was not required to assess post-construction environmental impacts. This determination is rational and entitled to deference.

Plaintiffs contend that the Corps must undertake an extensive NEPA review because the operations of the plant could not take place without the issuance of the permit.  The Supreme Court rejected this "but for" test a decade ago.  *Public Citizen*, 541 U.S. at 767.[12] "If this type of connection alone were sufficient to require a finding that an entire project falls within the purview of the Corps' jurisdiction, the Corps would have jurisdiction over all such projects." *Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105, 1116-17 (9th Cir. 2000) (citing 33 C.F.R. pt. 325, app. B § 7(b)(3)).  The determination of scope instead requires a "case-specific, factor-based analysis." *Sierra Club v. U.S. Army Corps of Eng'rs*, 450 F. Supp. 2d 503, 518 (D.N.J. 2006).  Those factors support the Corps' determination.

Additionally, Plaintiffs allege the Corps improperly segmented its review and failed to account for the cumulative impacts of the project.  This argument is baseless.  Under the Corps' regulatory program, the specific activity requiring authorization by a Corps permit may, at times, be merely one component of a larger project that also involves non-jurisdictional activities.  The regulations instruct the District Engineer to consider certain factors when determining whether "sufficient control and responsibility" exists to warrant federal review of the overall project.  33

---

[12] In *Public Citizen*, the Supreme Court reasoned:  "[A] 'but for' causal relationship is insufficient to make an agency responsible for a particular effect under NEPA and the relevant regulations. . . . NEPA requires a reasonably close causal relationship between the environmental effect and the alleged cause." 541 U.S. at 767 (citations and internal quotation marks omitted).

C.F.R. pt. 325, app. B, § 7(b)(1). The Corps has "control and responsibility" beyond the limits of the specific activity authorized by the Corps only if "the cumulative Federal involvement of the Corps and other Federal agencies is sufficient to grant legal control over such additional portions of the project. These are cases where the environmental consequences of the additional portions of the projects are essentially products of Federal financing, assistance, direction, regulation, or approval." *Id.* § 7(b)(2)(A).

No such finding can be made here. The Corps reviewed all portions of the project over which it had authority, *see* 40 C.F.R. § 1508.25(c), which was limited to the construction-related impacts of dredging, fill, and in-and-over water construction. As to the post-construction operation of the 91st Street MTS, the Corps properly deferred to the environmental assessment of the New York State DEC, the relevant and well-regarded local authority with a long history of vigorous enforcement of its regulations. *See Hoosier Envtl. Council v. U.S. Army Corps of Engineers*, 722 F.3d 1053, 1059 (7th Cir. 2013).

Finally, Plaintiffs argue the Corps should have relied on an EIS, rather than an EA, before issuing the permit. An EIS is a detailed statement by the responsible official of the agency on

> (i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C). In contrast, an EA is a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS]." 40 C.F.R. § 1508.9(a). The decision of whether to issue an EIS or an EA is subject to the Corps' discretion. An EIS is only necessary if the agency determines that the action constitutes a "major

Federal action[] significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C).

Here, the Corps found that the proposed project was not such an action, and the Corps instead made a finding of no significant impact, pursuant to § 1501.4(e) and § 1508.13, based on an analysis of the project.  (USACE 241-243.)  The factors Plaintiffs believe require an EIS, such as residential density, the impact of increased truck traffic, and the City's siting regulations (Sane Trash Am. Compl. ¶ 122), are outside the scope of the Permit.

### ii)  The Corps' Public Interest Analysis

Plaintiffs allege that the scope of the Corps' review in its public interest analysis should have been broader; namely, the Corps should have considered the environmental impact of operations, including post-construction impacts on recreation, traffic safety, air pollution, and vermin infestations.  "The primary responsibility for determining zoning and land use matters rests with state, local and tribal governments.  The district engineer will normally accept decisions by such governments on those matters unless there are significant issues of overriding national importance."  33 C.F.R. § 320.4(j)(2).  Plaintiffs' concerns do not pertain to the Corps' permitting of a limited amount of dredging, fill, and temporary in-and-over-water work at the 91st Street site; rather, they are operational concerns outside the Corps' jurisdiction.  Plaintiffs point to no issues of overriding national importance requiring any independent analysis by the district engineer.  Plaintiffs' issues were subjected to extensive state and local review.  The DEC permit, and not the Corps permit, is the proximate cause of these environmental effects.  DEC's permit imposes numerous special permit conditions designed to address environmental concerns related to the operation of the MTS, including limitations on truck traffic in any given hour, and

reducing the noise, odor, and potential air pollutants from both truck traffic and operation of the facility.  (USACE 24-58; 6 NYCRR pt. 360.)

Additionally, the Corps' own public interest analysis was thorough.  Nearly half of the Corps' MFR analyzes the CWA's public interest factors.  (USACE 138-99.)  The Corps considered thousands of public comments.  (USACE 4985-10224.)  Plaintiffs cannot credibly claim the Corps did not consider issues such as the economic effects of the 91st St project (Kellner Am. Compl. ¶ 107), aesthetic issues resulting from the construction of a larger MTS (*id.* ¶ 108), environmental concerns pertaining to the East River and its marine habitat (*id.* ¶ 109-10) or flood hazards (*id.* ¶ 111).  The Corps addressed each of these issues in turn.[13]  (USACE 138-99.)

### iii) The Corps' Analysis of Alternatives

Plaintiffs allege that the Corps' analysis of alternatives to the 91st Street MTS was arbitrary and capricious.  In assessing alternatives to a proposed action, "NEPA requires only that the Corps consider alternatives relevant to the applicant's goals and the Corps is not to define what those goals should be." *City of Shoreacres v. Waterworth*, 420 F.3d 440, 450-51 (5th Cir. 2005).  "[C]ourts have upheld location-specific overall project purpose definitions where the specific site was essential to the project purpose." *Sierra Club*, 450 F. Supp. 2d at 526.  Here, as set forth in the 2006 SWMP, the project's overall purpose is "reconstruct[ing] a Marine Transfer Station so as to reduce truck traffic and air pollution and allow for equitable distribution of waste transfer, by providing barge transportation of solid waste for the residents of Manhattan . . . ."

---

[13] The Corps addressed the following issues: (1) conservation (USACE 138); (2) economics (*id.* 138-41); (3) aesthetics (*id.* 141-42); (4) general environmental concerns (*id.* 142-49); (5) wetlands (*id.* 149); (6) historic properties (*id.* 149-50); (7) fish and wildlife values (*id.* 151-62); (8) floodplain values (*id.* 162); (9) land use (*id.* 162-78); (10) navigation (*id.* 178-81); (11) shore erosion and accretion (*id.* 181); (12) recreation (*id.* 182-84); (13) water supply and conservation (*id.* 184); (14) water quality (*id.* 184-87); (15) safety (*id.* 188-92); (16) food and fiber production (*id.* 192-93); (17) mineral needs (*id.* 193); (18) considerations of property ownership (*id.* 193-94); and (19) needs and welfare of the people (*id.* 194-99).

(USACE 99.)  The Corps considered on-site alternatives to the MTS, off-site alternatives, and "no-action" alternatives, but rejected each alternative for valid reasons.

The Corps considered four on-site alternatives: (1) build an MTS on the existing platform; (2) build a new MTS on an upland site at East 91st Street owned by the City; (3) build a new MTS in a different way on the existing platform; and (4) adopt the City's proposal. (USACE 127-29.)   The Corps weighed the potential impacts on the waters of the U.S. as well as compatibility with the overall project purpose for each alternative, and rejected each in turn. (*Id.*)[14]  The Corps considered "no-action" alternatives, including truck-based export plans, but properly rejected them as incompatible with the City's goals (USACE 130).  *See City of Shoreacres*, 420 F.3d at 450-51.[15]  The Corps reviewed four off-site alternatives, [16] but rejected them either because they did not possess the requisite space for the MTS or were precluded by zoning laws.  (USACE 120-123.)  Finally, the Corps considered public comments suggesting that Manhattan garbage be handled in other boroughs, but rejected them due to the City's goal of borough equity. (USACE 124-27.)  In light of the City's stated goals and the evidence in the record, the Court finds that the Corps' decision to approve the siting of the MTS was informed and rational.

Plaintiffs make a host of arguments regarding supposedly better alternatives to the MTS that the Corps never considered.  Such arguments do not demonstrate that the Corps' decision was arbitrary and capricious.  The Corps was not required to assess every conceivable alternative

---

[14] For instance, the Corps concluded for the first alternative that the existing platform could not accommodate the improvements embodied in the larger and more technologically advanced MTS facility and therefore was not "practicable." (USACE 127.)

[15] Plaintiffs cite a May 22, 2012 report by the City's Independent Budget Office comparing the costs of the MTS and truck-based export to argue that trucking is more economically beneficial to the City than the MTS.  This truck-based alternative, however, is completely at odds with the City's goal of reducing truck traffic on a citywide basis.  As such, the Corps was not required to consider it.  Furthermore, the report addressed interim trucking to New Jersey, and thus did not fully account for the costs and benefits of the MTS as compared with long-term truck-based exports.

[16] These alternatives include West 140th Street, West 30th Street, West 13th Street, and Pier 42.

to the MTS; NEPA merely requires that the Corps consider a reasonable range of alternatives to the applicant's proposed action.  *See* 42 U.S.C. § 4332(2)(C)(iii).  The Corps did this.  In addition to the Corps' own independent analysis, the Corps considered the City's analysis of alternative locations it had considered (USACE 2265-69), which was upheld in the *ACORN* decision.  *ACORN*, 52 A.D.3d at 428.  The Corps has discretion to consider the City's analysis when conducting its own review.  *See Hoosier Envtl. Council*, 722 F.3d at 1062-63 ("[The Corps] should be able to rely on [the permittee's] analysis, if it is a responsible analysis, while conducting its own analysis of those factors that are within its competence . . . ."); *Friends of the Earth v. Hintz*, 800 F.2d 822, 835-36 (9th Cir. 1986) (preventing the Corps from relying on alternatives analyses conducted by permit applicants "would place unreasonable and unsuitable responsibilities" on the Corps).

The Court may not substitute its judgment for that of the Corps, even in light of reasonable alternatives to the action.  *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The Corps "considered the pertinent evidence, examined the relevant factors, and articulated a satisfactory explanation for its action," *J. Andrew Lange, Inc. v. FAA*, 208 F.3d 389, 391 (2d Cir. 2000), and the Court concludes that the Corps' decision was rational.

### iv) The Corps' Consideration of the Potential Effects of the MTS on U.S. Waters

Plaintiffs allege that the Corps failed to adequately assess the potential effects of the MTS on U.S. waters.  Plaintiffs argue that the Corps ignored the fact that dredging will permanently alter the topography of the river bottom, causing winter flounder, Atlantic sturgeon, and other fish not to return.  Contrary to Plaintiffs' allegation, however, the Corps did consider the principal effects of the project on the aquatic environment, namely: (1) increased shading on the

water resulting from expansion of the pier; and (2) changes to the topography of the site from dredging.  The Corps considered two essential fish habitat studies conducted by consultants on behalf of the City.  (USACE 4708-785, 4789-810.)  The Corps consulted the City and its agencies, as well as the EPA and NOAA-NMFS.[17]  (USACE 104-05, 114-15, 200-02.)  The Corps found, based on the NOAA-NMFS's analysis, that there would be no substantial adverse effect on fish habitats at the 91st Street site.[18]  (USACE 201-15.)  Specifically, the Corps found that the marine biological environment at the East 91st Street MTS was not unique, and did not support rare fish communities.  (USACE 155-56, 159-60, 201-215, 222-23; Dolinar Decl. ¶¶ 10-23.)  The Corps also found that, while winter flounder and other species may temporarily be affected by the proposed action, the impacts would be minimal, and fish would swim to the site upon completion of dredging and pile-driving activities.  (USACE 204.)  Finally, special conditions in the permit and the City's mitigation plan offset any negative potential effects on U.S. waters.

### v)  The Corps' Approval of the City's Mitigation Plan

Plaintiffs' allegation that the City failed to provide a sufficient mitigation plan also lacks merit.  The mitigation plan increases un-shaded waters at the site of the now abandoned South Bronx MTS and creates additional open waters at the Bush Terminal site.  (USACE 59-94.)

---

[17] The finfish are protected by numerous federal agencies, but none has opposed the construction of the MTS. In accordance with the Fish and Wildlife Coordination Act, the Corps was required to consult with the NOAA-NMFS and the U.S. Fish and Wildlife Service ("USFWS") prior to approving construction of the MTS. (USACE 104.) The Corps' Essential Fish Habitat consultations with the NOAA-NMFS-Habitat Conservation Division (HCD) resulted in a series of comments that DSNY addressed. (USACE 215.)  On July 12, 2012, the NOAA-NMFS-HCD adopted the Corps' conclusions that Essential Fish Habitats would not be degraded by the project. (USACE 223, 230.) The Corps also coordinated with NOAA-NMFS and USFWS regarding the impact of the project on endangered species, pursuant to the Endangered Species Act of 1973. (USACE 105.)  In an October 1, 2008 letter, the NOAA-NMFS stated that it concurred with the USACE conclusion that the MTS is not likely to adversely affect any federally-listed endangered and threatened species. (USACE 201.)  The USFWS did not raise any objections to that conclusion. (USACE 200.)

[18] For example, NOAA-NMFS noted that rare species such as the shortnose sturgeon (acipenser brevirostrum) and sea turtles are rarely found in the East River.  (USACE 200-201.)

Plaintiffs assert that this is not good enough because, contrary to 40 C.F.R. § 230.95(a), the plan does not contain performance standards, and does not provide for monitoring.  But open water habitat mitigation is different than wetland mitigation, and implementation of performance standards and typical monitoring is not appropriate for the open water mitigation proposed for the MTS.  (USACE 232-33.)  The performance standard is the removal of existing structures necessary for creation of the open waters, and the monitoring necessary is that which confirms open waters have been created.  General Condition 6 of the Permit and Special Conditions J through N of the Permit oblige the City to fully complete its mitigation activities, contemplate the Corps' inspections of the mitigation sites, and require the City to take corrective action if mitigation fails.  (USACE 1-6.)  In light of these measures, the Court finds the plan is adequate.

### B.  Analysis and Supplementation of the Record After Superstorm Sandy

Plaintiffs claim that Superstorm Sandy is a game-changer.  Plaintiffs argue that with the rise in the floodplain, platforms in the MTS where garbage is containerized are at risk of flooding.  Plaintiffs assert that the City was required to prepare a supplemental EIS pursuant to SEQRA to consider flooding at the MTS in light of Sandy and the FEMA advisory flood maps issued in February 2013.  (Sane Trash Am. Compl. ¶¶ 150-55; Kellner Am. Compl. ¶¶ 202-11.)  Under SEQRA, judicial review of actions is limited to "whether the agency identified the relevant areas of environmental concern, took a hard look at them, and made a reasoned elaboration of the basis for its determination."  *Riverkeeper, Inc. v. Planning Bd.*, 9 N.Y.3d 219, 231-32 (2007) (internal quotation marks omitted).  A lead agency's determination whether or not to prepare a Supplemental EIS is discretionary, and is "'limited to the specific significant adverse environmental impacts not addressed or inadequately addressed in the EIS that arise from: (a) changes proposed for the project; (b) newly discovered information; or (c) a change in

circumstances related to the project.'" *Riverkeeper*, 9 N.Y.2d at 231 (quoting 6 NYCRR §

617.9(a)(7)(i)).  When an agency has taken a "hard look," its decision regarding the need for a

Supplemental EIS is entitled to judicial deference.  *See Coalition Against Lincoln W., Inc. v.*

*Weinshall*, 21 A.D.3d 215, 222-23 (1st Dep't), *leave to appeal denied*, 5 N.Y.3d 715 (2005).

      Here, the DSNY took a hard look at potential environmental impacts related to flooding

as part of its original environmental review, including in its FEIS, before Sandy occurred (*see,*

*e.g.*, USACE 161-62) (Environmental Assessment addressing flood hazard issues); then, after

Sandy occurred and FEMA issued revised flood maps, DSNY took a hard look again and

decided its first look was sufficient (*see, e.g.,* USACE 11418-29 (June 2013 Memorandum for

Record); Noteboom Decl. Ex. 14.)).  The MTS pier level was designed to be six inches above the

100-year flood elevations, in compliance with NYC Building Code and state regulations

governing solid waste management facilities.  (USACE 1444-45, 2564-65.)  DSNY concluded

based on its review of information provided by the City's Office of Emergency Management

(OEM) that the loading level of the MTS where garbage is placed into containers and sealed is

14 feet above the pier level and would not be subject to flooding during a Category 4 storm.

(*Id*.)  In severe storms, the MTS would stop accepting waste and would take precautions to

dispatch all sealed waste containers.  (*Id.*)  Following issuance of the Corps' permit, DSNY

considered new information regarding flooding and prepared a memorandum that considered

potential flooding impacts following the issuance of the revised FEMA advisory maps after

Sandy.  (DSNY Memorandum, "Environmental Review of New Flood Risk Information and

Related Proposed Design Changes to East 91st Street MTS and Southwest Brooklyn MTS," dated

May 29, 2013, revised October 23, 2013, Noteboom Decl. Ex. 14 ("DSNY Technical

Memorandum").)  In the memorandum, DSNY considered the risk of flooding to ensure that

floodwater would not encroach on solid waste processed at the facility.  (DSNY Technical

Memorandum 2.)  It concluded that no additional environmental review was warranted.

Plaintiffs argue that DSNY's analysis of additional floodproofing was incomplete and

superficial: DSNY rejected raising the pier level and did not consider the risk flooding poses to

shutting down the operations of the MTS.  Contrary to Plaintiffs assertions, DSNY's

floodproofing measures provided an appropriate level of safety for the MTS.  The proposed MTS

was code-compliant at the time of permitting (DSNY Technical Memorandum 3), but even

though no further action was required, the City made a policy determination that additional flood

mitigation measures should be implemented, and adopted the measures its consultants proposed.

(*See* Brodsky Decl. ¶ 12.)  The floodproofing measures take into account the revised flood

elevations set forth in FEMA's advisory flood maps, and satisfy the new City building code

requirements, enacted following Sandy, for non-residential buildings located in flood zones.  *See*

N.Y.C. Admin. Code § 27-317 (allowing floors located below the base flood elevation to be

floodproofed).  As Plaintiffs are quick to point out, the DSNY report said the floodproofing

measures have a "moderate probability" of failure, but these measures have been combined with

critical room dry floodproofing to provide additional protection to the MTS. (DSNY Technical

Memorandum Attachment 2 at 10-12 (discussing how an additional measure of safety can be

achieved by combining perimeter floodproofing with flood protection of critical rooms—the

option selected by DSNY).)  This analysis was more than adequate to satisfy SEQRA's "hard

look" requirements.  *See Coalition Against Lincoln West*, 21 A.D.3d at 222-23 (where studies

contained information that updated the studies in the Final EIS, and "did not identify any

significant impacts not identified or considered in the original FEIS," the agency properly exercised its discretion in determining that Supplemental EIS was not warranted).[19]

In addition to the claims against the City and DSNY, Plaintiffs also argue that the Corps violated NEPA by not supplementing its environmental review in light of Sandy.  NEPA regulations require that agencies supplement their environmental review where "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii).  Such a decision is subject to a "rule of reason" and should be upheld unless it is arbitrary and capricious.  *Marsh v. Or. Nat'l Res. Council*, 490 U.S. 360, 372-76 (1989).

The Corps' decision not to supplement its environmental review was rational.  There is no dispute that the 91st Street MTS on the East River is within the flood plain.  Accordingly, well before Superstorm Sandy, DSNY provided its information about flooding risks and how the MTS was designed to minimize adverse flooding impacts to the Corps.  (USACE 162.)  After Sandy, the new advisory base flood elevations were provided, but they did not impact the adequacy of the Corps' initial considerations of flooding.  Notwithstanding Plaintiffs' assertions to the contrary, the Corps considered the issues DSNY raised regarding Sandy and flood risks in its memoranda, dated March 21, 2013 (USACE 11433-36) and June 2013 (USACE 11418-29). Upon review, the Corps: (i) concluded the initial MTS design plan addressed the potential for flooding; (ii) noted the City's post-Sandy modifications to the design of the facility in order to further reduce flood risks; and (iii) observed that even during Sandy, the only part of the 91st St

---

[19] It is worth noting that many of Plaintiffs' concerns about floodproofing were addressed during the design phase of the DSNY's modification.  DSNY approved the recommended measures in the conceptual design outlined in the Technical Memorandum, and the design consultants thereafter developed a detailed design of the floodproofing measures.  As just one example, during the final design phase of the floodproofing measures, computer modeling was utilized to develop the hydronomic forces acting on the facility in the event of a severe storm.  (Brodsky Decl. ¶ 21.)

MTS that may have experienced flooding was the lower level, which contained only sealed or empty containers.[20]  (USACE 11419-20.)  As previously referenced, the loading level of the MTS is still located 11 feet above FEMA's applicable revised 100-year flood elevations.

The Corps was also not required to supplement the record or reconsider the permit for any other reason, as this Court already held in its July 11, 2013 Order.

### C.  Claims Against the City and DSNY

Plaintiffs claim that the City and DSNY denied them equal protection of the law in violation of the Fourteenth Amendment and the New York State Constitution.  One of the *Kellner* Plaintiffs, Asphalt Green, also alleges claims against the City for breach of contract, trespass, and private nuisance based on the City's intrusion on the Asphalt Green campus to construct the MTS.  The City and DSNY move for judgment on the pleadings on these claims pursuant to Federal Rule of Civil Procedure 12(c).

A motion for judgment on the pleadings under 12(c) is governed by the same standard as a 12(b)(6) motion to dismiss.  *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994).  The reviewing court may dismiss a complaint if a plaintiff fails to "provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the

---

[20] Plaintiffs also contend the Corps should reevaluate flooding impacts because the City Defendants have allegedly admitted that the waste on the facility's "pier level," below the FEMA levels, will not all be in containers. (*See* Dkt. 54, Noteboom Ltr. Ex. A , Oct. 23, 2013 DSNY Ltr. at 2) (stating that waste gets pushed from the loading level "into an opening down and into containers located on the bottom, or pier level, where the containers are also sealed.")  A proper reading of the Technical Memorandum and the SWMP, however, indicate that loose garbage would only be sorted on the loading level, and garbage at the pier level will be containerized.  (DSNY Technical Memorandum at 2; SWMP at 3-9.)  Waste will be sorted and pushed by front-end loaders through slots in the loading level floor directly down into intermodal containers, located on the first level.  Equipment will even and tamp the waste in the containers, which will then be lidded with leakproof, gasketed covers and moved by trolley to the external pier level of the facility.  (SWMP at 3-9.)  The container opening is larger than the loading slot to ensure the garbage will not escape the container during the loading process.  (Brodsky Reply Decl. ¶ 5 & Exh. A.)

speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Plaintiffs must allege "'enough

facts to state a claim to relief that is plausible on its face.'"  *Starr v. Sony BMG Music Entm't*,

592 F.3d 314, 321 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009).  The reviewing court must accept all factual allegations in the complaint as true

and draw all reasonable inferences in favor of the nonmoving party.  *See Johnson v. Rowley*, 569

F.3d 40, 43 (2d Cir. 2009).  Allegations that are merely conclusory are "not entitled to be

assumed true."  *Iqbal*, 556 U.S. at 680.

On a Rule 12(c) motion, the court considers "the complaint, the answer, any written

documents attached to them, and any matter of which the court can take judicial notice for the

factual background of the case." *Roberts v. Babkiewicz*, 582 F.3d 418, 419 (2d Cir. 2009).  "A

complaint is [also] deemed to include any written instrument attached to it as an exhibit,

materials incorporated in it by reference, and documents that, although not incorporated by

reference, are 'integral' to the complaint."  *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004)

(citations omitted).

### 1.  Equal Protection

Plaintiffs base their equal protection claim on the grounds that, in making its siting

decision for the MTS in 2004, DSNY irrationally exempted itself from its 2004 private transfer

station siting regulations, which prohibit permitting new private waste transfer stations within

400 feet of a residence, school, or park.[21]  (Sane Trash Am. Compl. ¶¶ 174-76; Kellner Am.

---

[21] The parties dispute whether Plaintiffs' equal protection claims are time-barred.  The Court does not decide the
issue on these grounds, but notes that Plaintiffs knew about the allegedly discriminatory decision to site the MTS at

Compl. ¶ 167-79.)  The state court already rejected this argument.  *See ACORN*, 13 Misc. 3d

1209(A), at *16 (holding that DSNY's siting rules do not apply to City-owned transfer

stations).[22]  As the reviewing court held, the City's decision not to apply the 400-foot prohibition

to the 91st Street MTS was rational since the rule does not apply to DSNY facilities, or to

facilities that had a permit from DSNY prior to issuance of the regulations.  *Id*.[23]

  Furthermore, Plaintiffs bring their claim on the grounds that they are a "class of one," not

a protected class.  Even if it were clear that pleading a "class of one" using an entire

neighborhood as a comparator is permissible—and it is not clear, *see, e.g.*, *McGowan v.*

*Maryland*, 366 U.S. 420, 427 (1961) ("[T]he Equal Protection Clause relates to equality between

persons as such, rather than between areas . . . .")—Plaintiffs have failed to allege that there was

any neighborhood so similarly situated that the reason for the disparate treatment was intentional

and invidious discrimination.  The Equal Protection clause does not "mandate that every

individual be treated exactly alike"; instead, "governments may draw lines or make decisions

which treat individuals or entities differently."  *Presnick v. Berger*, 837 F. Supp. 475, 477 (D.

Conn. 1993).  There were good reasons for the selection of East 91st Street as the site of the

MTS, including the fact that the new MTS is being constructed on top of the old site*, see, e.g.,*

*Willets Point Indus. and Realty Ass'n v. City of New York*, 2009 WL 4282017, at *4 (E.D.N.Y.

Nov. 25, 2009) (finding that the previous site of a landfill in the neighborhood was a rational

basis for the City's action, defeating the equal protection claim), its operational convenience, the

---

East 91st Street by no later than the date of DEC's approval of the SWMP in 2006; Plaintiffs then waited six years to bring this action, which exceeds the applicable three-year statute of limitations. *See* New York Civil Practice Law and Rules § 214(2); *Fahs Const. Grp., Inc. v. Gray*, 725 F.3d 289, 292 (2d Cir. 2013).

[22] Other than a conclusory statement to the contrary, Plaintiffs do nothing to refute this fact in their papers.  Indeed, Plaintiffs admit that "[t]he courts concluded that the City's selection of the East 91st Street site had a rational basis because, as written, the 400-foot rule does not apply to DSNY, an MTS is an allowable use under zoning, the site is near truck routes, and the defunct MTS had been located there." (Pl. Opp. Br. 10.)

[23] The state court similarly rejected Plaintiffs' argument that the MTS was subject to the 400-foot rule because it will receive commercial waste.  *Kellner*, 2012 WL 5893909, at *3 (holding petitioners' concern was "founded not in realities, but in speculation.").

fact that it was already appropriately zoned, and its cost effectiveness, *see Powell II,* 2009 WL 8435557 at 1.  Consequently, Plaintiff's equal protection claims are dismissed.

The *Sane Trash* Plaintiffs allege that the Corps was "complicit" in the City's violations of equal protection under both the 14th Amendment and the New York State Constitution.  Since the Court finds that Plaintiffs fail to state a claim that the City violated equal protection in the siting of the 91st Street MTS, the claim of complicity also fails.

### 2.   Breach of Contract, Trespass, and Private Nuisance

Asphalt Green brings claims of breach of contract, trespass, and private nuisance against the City for alleged infringements on Asphalt Green's property caused by construction of the 91st Street MTS.[24]  The Court has already held that Asphalt Green did not have the requisite property interest to allege these claims.  The City owns the Asphalt Green Campus, and Asphalt Green is a licensee, not a leaseholder: the December 2011 Agreement is titled "License Agreement," has a "No Lease" section, and contains no provisions which would convey rights permitting the licensee to dictate conduct to, or restrict the rights of, the licensor.  *See Kellner v. U.S. Army Corps of Engineers*, 2014 WL 753927, at *1 (S.D.N.Y. Feb. 26, 2014).  The access ramp is not subject to the license agreement and so Asphalt Green has no rights with respect to its modification and reconstruction.  The City's use of the 16-inch strip of land on either side of the access ramp for fencing has already been sustained in *Powell II,* 85 A.D.3d at 431. (Noteboom Decl. Ex. 11.)  Construction of the MTS did not breach the license agreement, and the City as landowner did not commit a trespass on the Asphalt Green campus, which Asphalt Green does not own.

---

[24] The parties dispute whether the Court has supplemental jurisdiction over Plaintiffs' state law claims.  The Court finds that Plaintiffs' state law claims arise from a common nucleus of operative fact with the federal claims, and the exercise of supplemental jurisdiction is appropriate.  *See Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 335 (2d Cir. 2006).  It would be wasteful of judicial resources to dismiss these claims just so that they may be brought again in state court.

Prior litigation already dismissed Plaintiffs' private nuisance claim.  The *ACORN* court held that this claim, which raised the same issues and was brought by the same counsel as the current action, was an impermissible collateral attack on the City's SEQRA review of the impacts of the MTS; petitioners could not seek to circumvent the Court's limited review of the agency's SEQRA findings "under the guise of a common law nuisance action." *ACORN*, 13 Misc. 3d 1209(A), at *18.  In *Powell II*, the state supreme court also found that the MTS would not substantially interfere with the use and enjoyment of Asphalt Green during demolition of the old MTS and construction and operation of the new MTS.  85 A.D.3d at 431.  This mandates dismissal. *See Alpert's Newspaper Delivery, Inc. v. The N.Y. Times Co.*, 876 F.2d 266, 270-71 (2d Cir. 1989) (finding claims barred by collateral estoppel where two different groups of litigants had the same attorneys and raised identical allegations, and similar interests drove both suits); *see also Wilder v. Thomas*, 854 F.2d 605, 621 (2d. Cir. 1988) (barring under collateral estoppel Plaintiffs' attempt to litigate SEQRA claims already decided in state court and finding that "the issues raised in the two proceedings are such that they do not vary according to individual plaintiffs").  Furthermore, in deciding the *Kellner* Plaintiffs' motion for a preliminary injunction, this Court already found that the modification and reconstruction of the ramp to the MTS would not interfere with Asphalt Green's ability to perform services under the license agreement, or otherwise encroach on Asphalt Green's campus. (Dkt. 93.)  Hence, Asphalt Green's private nuisance claim is dismissed.

The Court has considered Plaintiffs' remaining arguments and finds that they, too, lack merit.

**CONCLUSION**

For the foregoing reasons, and upon careful review, the Court finds that the decision of the United States Army Corps of Engineers to issue a CWA Section 404 permit for the construction of the new East 91st Street marine transfer station was rational and well-supported by the voluminous administrative record.  The Corps considered the pertinent evidence, examined the relevant factors, and articulated a satisfactory explanation for its action.  The Court denies Plaintiffs' motions for summary judgment, and grants Defendants' motions for summary judgment in their entirety.  The Court also grants Defendants' Rule 12(c) motions for judgment on the pleadings.  Plaintiffs' claims are dismissed with prejudice.  The Clerk of Court is directed to enter judgment and close this case.

Dated: New York, New York                    SO ORDERED
      July 10, 2014

_____
PAUL A. CROTTY
United States District Judge